## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

NATIONAL CREDIT UNION           )
ADMINISTRATION BOARD,           )
as Liquidating Agent of U.S. Central   )
Federal Credit Union, Western   )
Corporate Federal Credit Union and Southwest  )
Corporate Federal Credit Union,   )
                                )   Case No. 13-cv-2012 RDR/KGS
            Plaintiff,          )
                                )   **JURY TRIAL DEMANDED**
v.                              )
                                )
JPMORGAN CHASE BANK, N.A., as   )
Successor-in-Interest to Washington Mutual  )
Bank, WaMu Capital Corp., Long Beach   )
Securities Corp., and WaMu Asset Acceptance  )
Corp., WAMU CAPITAL CORP., LONG   )
BEACH SECURITIES CORP., and WAMU   )
ASSET  ACCEPTANCE CORP.         )
                                )
            Defendants.         )

## COMPLAINT

# Table of Contents

I.    NATURE OF THE ACTION ........................................................................1

      Table 1 ....................................................................................................3

      Table 2 ....................................................................................................6

II.   PARTIES AND RELEVANT NON-PARTIES ..........................................7

III.  JURISDICTION AND VENUE ..............................................................11

IV.   MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION............13

      Figure 1
      Illustration of the Securitization Process...........................................15

V.    RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT ....................16

      Table 3
      Credit Ratings System .........................................................................17

VI.   THE CREDIT UNIONS' PURCHASES ...................................................19

      Table 4
      Credit Ratings for the Credit Unions' RMBS Purchases...................19

VII.  THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING
      GUIDELINES STATED IN THE OFFERING DOCUMENTS .....................................24

      A.    The Surge in Mortgage Delinquency and Defaults Shortly After
            the Offerings and the High OTD Practices of the Originators Demonstrate
            Systematic Disregard of Underwriting Standards.................................25

      Table 5
      Delinquency and Default Rates for the Credit Unions' RMBS Purchases.......................26

      Table 6
      Originator "Originate-to-Distribute" Percentages .........................................33

      B.    The Surge in Actual Versus Expected Cumulative Gross Losses is
            Evidence of the Originators' Systematic Disregard of Underwriting Standards...33

      Figure 2
      Illustration of Expected Gross Losses v. Actual Gross Losses for
      the Credit Unions' RMBS Purchases................................................................36

ii

C.    The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines ..................................................51

D.    Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards .............................................52

    1.    The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse .........................................52

    2.    Alliance Bancorp Systematic Disregard of Underwriting Standards ........57

    3.    Argent Mortgage Company's Systematic Disregard of Underwriting Standards ..........................................................................58

    4.    Countrywide's Systematic Disregard of Underwriting Standards............65

    5.    First Magnus Financial Corporation's Systematic Disregard of Underwriting Standards ..........................................................................74

    6.    GMAC's Systematic Disregard of Underwriting Standards....................75

    7.    GreenPoint Mortgage Funding, Inc.'s Systematic Disregard of Underwriting Standards ..........................................................................79

    8.    IndyMac Bank, FSB's Systematic Disregard of Underwriting Standards..........................................................................85

    9.    MortgageIT's Systematic Disregard of Underwriting Standards .............90

    10.   People's Choice Home Loans' Systematic Disregard of Underwriting Standards ..........................................................................93

    11.   VirtualBank's Systematic Disregard of Underwriting Standards.............96

    12.   WaMu Bank's and Long Beach Mortgage's Systematic Disregard of Underwriting Standards..........................................................................98

VIII.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT...........................................................................................111

Table 7
*Originators Supplying Loans for Each RMBS at Issue* .................................................112

A.    Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood to Repay the Mortgage Loan .....................................................115

B.    Untrue Statements Concerning Reduced Documentation Programs ..................122

iii

C.    Untrue Statements Concerning Loan-to-Value Ratios .........................................124

D.    Untrue Statements Concerning Credit Enhancement ..........................................126

IX.    LIABILITY OF NON-PARTY WAMU BANK ................................................129

X.    LIABILITY OF JPM CHASE BANK ...............................................................132

XI.    THE CLAIMS ARE TIMELY.........................................................................136

Table 8
*Purchases Subject to Tolling Under American Pipe* .......................................139

XII.    CLAIMS FOR RELIEF ...................................................................................143

COUNT ONE
Section 11 of the Securities Act of 1933
(WaMu Mortgage Pass-Through Certificates, Series 2007-OA4,
WaMu Mortgage Pass-Through Certificates, Series 2007-OA5,
WaMu Mortgage Pass-Through Certificates, Series 2007-OA6,
WaMu Mortgage Pass-Through Certificates, Series 2006-AR17,
WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,
WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,
WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,
Washington Mutual Mortgage Pass-Through Certificates,
WMALT Series 2006-AR2, Washington Mutual Mortgage
Pass-Through Certificates, WMALT Series 2006-AR3,
Washington Mutual Mortgage Pass-Through Certificates,
WMALT Series 2006-AR4, Washington Mutual Mortgage
Pass-Through Certificates, WMALT Series 2006-AR5,
Washington Mutual Mortgage Pass-Through Certificates,
WMALT Series 2006-AR6, Washington Mutual Mortgage
Pass-Through Certificates, WMALT Series 2006-AR7,
Washington Mutual Mortgage Pass-Through Certificates,
WMALT Series 2006-AR9, Washington Mutual Mortgage
Pass-Through Certificates, WMALT Series 2007-OA1,
Washington Mutual Mortgage Pass-Through Certificates,
WMALT Series 2007-OA4, Washington Mutual Mortgage
Pass-Through Certificates, WMALT Series 2007-OA5,
Washington Mutual Mortgage Pass-Through Certificates,
WMALT SERIES 2007-OC2)...........................................................143

COUNT TWO
Section 11 of the Securities Act of 1933
(Luminent Mortgage Trust 2007-1)...................................................146

iv

COUNT THREE
Section 11 of the Securities Act of 1933
      (Luminent Mortgage Trust 2007-1) ....................................................................147

COUNT FOUR
Section 11 of the Securities Act of 1933
      (Long Beach Mortgage Loan Trust 2006-11,
      Long Beach Mortgage Loan Trust 2006-10
      Long Beach Mortgage Loan Trust 2006-9) ........................................................148

COUNT FIVE
Section 11 of the Securities Act of 1933
      (WaMu Asset-Backed Certificates, WaMu Series 2007-HE4,
      WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,
      WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,
      WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,
      Washington Mutual Asset-Backed Certificates, WMABS Series
      2006-HE5, Washington Mutual Mortgage Pass-Through Certificates,
      WMALT Series 2006-AR8) ..............................................................................150

COUNT SIX
Section 11 of the Securities Act of 1933
      (Washington Mutual Mortgage Pass-Through Certificates,
      WMALT Series 2007-OC2) ..............................................................................151

COUNT SEVEN
Section 12(a)(2) of the Securities Act of 1933
      (WaMu Mortgage Pass-Through Certificates, Series 2007-OA4,
      WaMu Mortgage Pass-Through Certificates, Series 2007-OA5,
      WaMu Mortgage Pass-Through Certificates, Series 2007-OA6,
      WaMu Mortgage Pass-Through Certificates, Series 2006-AR17,
      WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,
      WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,
      WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,
      Washington Mutual Mortgage Pass-Through Certificates,
      WMALT Series 2006-AR2, Washington Mutual Mortgage
      Pass-Through Certificates, WMALT Series 2006-AR3, Washington
      Mutual Mortgage Pass-Through Certificates, WMALT Series
      2006-AR4, Washington Mutual Mortgage Pass-Through
      Certificates, WMALT Series 2006-AR5, Washington Mutual
      Mortgage Pass-Through Certificates, WMALT Series 2006-AR6,
      Washington Mutual Mortgage Pass-Through Certificates,
      WMALT Series 2006-AR7, Washington Mutual Mortgage
      Pass-Through Certificates, WMALT Series 2006-AR9, Washington
      Mutual Mortgage Pass-Through Certificates, WMALT Series
      2007-OA1, Washington Mutual Mortgage Pass-Through
      Certificates, WMALT Series 2007-OA4, Washington Mutual
      Mortgage Pass-Through Certificates, WMALT Series 2007-OA5,
      Washington Mutual Mortgage Pass-Through Certificates,
      WMALT Series 2007-OC2) ............................................................................153

COUNT EIGHT
Section 12(a)(2) of the Securities Act of 1933
      (Long Beach Mortgage Loan Trust 2006-11,
      Long Beach Mortgage Loan Trust 2006-9,
      WaMu Asset-Backed Certificates, WaMu Series 2007-HE4,
      WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,
      WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,
      WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, ........................156

COUNT NINE
Section 12(a)(2) of the Securities Act of 1933
      (Washington Mutual Mortgage Pass-Through Certificates,
      WMALT Series 2007-OC2) ............................................................................158

COUNT TEN
Violation Of Section 15 Of The Securities Act Of 1933
Against JPM Chase Bank As Successor-in-Interest To "Control Person"
WaMu Bank ....................................................................................................................159

COUNT ELEVEN
Violation of the California Corporate Securities Law of 1968
Cal. Corp. Code §§ 25401 and 25501
(IndyMac INDX Mortgage Loan Trust 2006-AR12,
        Luminent Mortgage Trust 2007-1,
        WaMu Mortgage Pass-Through Certificates, Series 2006-AR17,
        WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,
        WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,
        WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,
        WaMu Mortgage Pass-Through Certificates, Series 2007-OA4,
        WaMu Mortgage Pass-Through Certificates, Series 2007-OA5,
        WaMu Mortgage Pass-Through Certificates, Series 2007-OA6,
        Washington Mutual Mortgage Pass-Through Certificates, WMALT
        Series 2006-AR2, Washington Mutual Mortgage Pass-Through
        Certificates, WMALT Series 2006-AR3, Washington Mutual Mortgage
        Pass-Through Certificates, WMALT Series 2006-AR4,
        Washington Mutual Mortgage Pass-Through Certificates,
        WMALT Series 2006-AR5, Washington Mutual Mortgage
        Pass-Through Certificates, WMALT Series 2006-AR6, Washington
        Mutual Mortgage Pass-Through Certificates, WMALT Series
        2006-AR7, Washington Mutual Mortgage Pass-Through
        Certificates, WMALT Series 2006-AR9, Washington Mutual
        Mortgage Pass-Through Certificates, WMALT Series 2007-OA1,
        Washington Mutual Mortgage Pass-Through Certificates, WMALT
        Series 2007-OA4, Washington Mutual Mortgage Pass-Through
        Certificates, WMALT Series 2007-OA5, Washington Mutual
        Mortgage Pass-Through Certificates, WMALT Series 2007-OC2) ...................161

COUNT TWELVE
Violation of the California Corporate Securities Law of 1968
Cal. Corp. Code § 25504
Against JPM Chase Bank as Successor-In-Interest to
"Control Person" WaMu Bank ......................................................................................164

COUNT THIRTEEN
Violation of the Kansas Blue Sky Law
Kan. Stat. Ann. § 17-12a509
     (Long Beach Mortgage Loan Trust 2006-11,
     Long Beach Mortgage Loan Trust 2006-9,
     WaMu Asset-Backed Certificates, WaMu Series 2007-HE4,
     WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,
     WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,
     WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,
     Washington Mutual Asset-Backed Certificates WMABS Series
     2006-HE5, Washington Mutual Mortgage Pass-Through
     Certificates, WMALT Series 2006-AR8) ............................................................ 165

COUNT FOURTEEN
Violation of the Kansas Blue Sky Law
Kan. Stat. Ann. § 17-12a509(g)(1)
Against JPM Chase Bank as Successor-in-Interest to
"Control Person" WaMu Bank ........................................................................ 166

COUNT FIFTEEN
Violation of the Texas Blue Sky Law
Tex. Rev. Civ. Stat. Ann. art. 581, § 33
     (WaMu Asset-Backed Certificates WaMu Series
     2007-HE2 Trust, WaMu Asset-Backed Certificates
     WaMu Series 2007-HE4 Trust, WaMu Asset-Backed
     Certificates WaMu Series 2007-HE3 Trust, Washington
     Mutual Mortgage Pass-Through Certificates, WMALT
     Series 2007-HY1, Washington Mutual Mortgage
     Pass-Through Certificates, WMALT Series 2007-OC2) ...................................... 167

COUNT SIXTEEN
Violation of the Texas Blue Sky Law
Tex. Rev. Civ. Stat. Ann. art. 581, § 33F
Against JPM Chase Bank as Successor-in-Interest to
"Control Person" WaMu Bank ........................................................................ 169

Plaintiff, National Credit Union Administration Board ("NCUA Board") brings this action in its capacity as Liquidating Agent of Western Corporate Federal Credit Union ("WesCorp"), U.S. Central Federal Credit Union ("U.S. Central") and Southwest Corporate Federal Credit Union ("Southwest") (collectively the "Credit Unions") against WaMu Capital Corp. ("WaMu Capital") as underwriter and/or seller, and against Long Beach Securities Corp. and WaMu Asset Acceptance Corp. (collectively, the "Issuer Defendants") as issuers, of certain residential mortgage-backed securities ("RMBS") purchased by the Credit Unions, and against JPMorgan Chase Bank, NA ("JPM Chase Bank"), as successor-in-interest to non-party Washington Mutual Bank ("WaMu Bank") as control person of WaMu Capital and the Issuer Defendants, and as successor-in-interest to WaMu Capital and the Issuer Defendants, and alleges as follows:

## I.      NATURE OF THE ACTION

1.      This action arises out of the sale of RMBS to the Credit Unions where WaMu Capital acted as underwriter and/or seller of the RMBS.

2.      All of the RMBS sold to the Credit Unions were rated as triple-A (the same rating as U.S. Treasury bonds) at the time of issuance.

3.      The Issuer Defendants issued and WaMu Capital underwrote and/or sold the RMBS pursuant to registration statements, prospectuses, and/or prospectus supplements (collectively, the "Offering Documents").  These Offering Documents contained  untrue statements of material fact or omitted to state material facts in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2), 77o ("Section 11," "Section 12(a)(2)" and "Section 15," respectively), Article 5 of the Kansas Uniform Securities Act, Kan. Stat. Ann. § 17-12a509 ("Kansas Blue Sky Law"),  the California

Corporate Securities Law of 1968, Cal. Corp. Code §§ 25000, 25501 and 25504 ("California Corporate Securities Law"), and the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art 581, § 33 ("Texas Blue Sky Law").

4.      The Offering Documents described, among other things, the mortgage underwriting standards of the originators (the "Originators") who made the mortgages that were pooled and served as the collateral for the RMBS purchased by the Credit Unions.

5.      The Offering Documents represented that the Originators adhered to the underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.

6.      In fact, the Originators had systematically abandoned the stated underwriting guidelines in the Offering Documents.  Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards in the Offering Documents, the RMBS were significantly riskier than represented in the Offering Documents.  Indeed, a material percentage of the borrowers whose mortgages comprised the RMBS were all but certain to become delinquent or default shortly after origination.  As a result, the RMBS were destined from inception to perform poorly.

7.      These untrue statements and omissions were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans collateralizing the RMBS.  Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

8.      The Credit Unions purchased the RMBS listed in Table 1 (*infra*) through initial offerings directly from WaMu Capital by means of prospectuses or oral communications.  Thus, WaMu Capital is liable for material untrue statements and omissions of fact under Section 11,

2

Section 12(a)(2), the Kansas Blue Sky Law, the California Corporate Securities Law, and the

Texas Blue Sky Law.

**Table 1**

| CUSIP[1] | ISSUING ENTITY | DEPOSITOR DEFENDANT | PURCHASER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 54251WAD4 | Long Beach Mortgage Loan Trust 2006-9 | Long Beach Securities Corp. | U.S. Central | 10/5/2006 | $60,000,000 |
| 54251WAE2 | Long Beach Mortgage Loan Trust 2006-9 | Long Beach Securities Corp. | U.S. Central | 10/5/2006 | $65,000,000 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | Long Beach Securities Corp. | U.S. Central | 12/8/2006 | $57,000,000 |
| 92926SAD8 | WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust | WaMu Asset Acceptance Corp. | Southwest | 4/4/2007 | $10,000,000 |
| 93364EAD6 | WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust | WaMu Asset Acceptance Corp. | Southwest | 4/26/2007 | $11,000,000 |
| 93363XAE3 | WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | WaMu Asset Acceptance Corp. | U.S. Central | 6/8/2007 | $12,000,000 |
| 93363XAD5 | WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | WaMu Asset Acceptance Corp. | U.S. Central | 6/8/2007 | $15,000,000 |
| 93363XAD5 | WaMu Asset-Backed Certificates WaMu Series 2007-HE4 Trust | WaMu Asset Acceptance Corp. | Southwest | 6/8/2007 | $14,000,000 |
| 92925DAF7 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | WaMu Asset Acceptance Corp. | WesCorp | 11/20/2006 | $150,000,000 |
| 92925DAF7 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | WaMu Asset Acceptance Corp. | WesCorp | 11/20/2006 | $10,172,000 |
| 933638AF5 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | WaMu Asset Acceptance Corp. | U.S. Central | 12/1/2006 | $25,000,000 |
| 933638AF5 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | WaMu Asset Acceptance Corp. | WesCorp | 12/20/2006 | $67,000,000 |
| 92926WAB3 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | WaMu Asset Acceptance Corp. | U.S. Central | 1/9/2007 | $25,000,000 |
| 92926WAC1 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | WaMu Asset Acceptance Corp. | U.S. Central | 1/9/2007 | $20,000,000 |

[1] "CUSIP" stands for "Committee on Uniform Securities Identification Procedures."  A CUSIP number is used to identify most securities, including certificates of RMBS.  *See* CUSIP Number, http://www.sec.gov/answers/cusip.htm.

| CUSIP[1] | ISSUING ENTITY | DEPOSITOR DEFENDANT | PURCHASER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 92926WAC1 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | WaMu Asset Acceptance Corp. | WesCorp | 1/24/2007 | $20,930,000 |
| 933635AA2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | WaMu Asset Acceptance Corp. | U.S. Central | 2/6/2007 | $112,000,000 |
| 933635AD6 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | WaMu Asset Acceptance Corp. | WesCorp | 2/21/2007 | $46,785,000 |
| 93364CAE8 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | WaMu Asset Acceptance Corp. | WesCorp | 4/25/2007 | $83,129,000 |
| 93364BAE0 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | WaMu Asset Acceptance Corp. | WesCorp | 5/23/2007 | $35,381,000 |
| 93364BAD2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | WaMu Asset Acceptance Corp. | WesCorp | 5/23/2007 | $64,691,000 |
| 92927BAD4 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | WaMu Asset Acceptance Corp. | WesCorp | 6/25/2007 | $42,434,000 |
| 92927BAE2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | WaMu Asset Acceptance Corp. | WesCorp | 6/25/2007 | $72,434,000 |
| 93934XAC7 | Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5 | WaMu Asset Acceptance Corp. | U.S. Central | 11/30/2006 | $26,079,000 |
| 93934FMQ2 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | WaMu Asset Acceptance Corp. | WesCorp | 3/27/2006 | $99,955,465 |
| 93934FQR6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | WaMu Asset Acceptance Corp. | WesCorp | 4/25/2006 | $88,000,000 |
| 939345AE4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | WaMu Asset Acceptance Corp. | WesCorp | 5/26/2006 | $99,225,000 |
| 939345AF1 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | WaMu Asset Acceptance Corp. | WesCorp | 5/26/2006 | $20,000,000 |
| 93935AAH5 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | WaMu Asset Acceptance Corp. | WesCorp | 6/27/2006 | $84,253,259 |
| 93935AAE2 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | WaMu Asset Acceptance Corp. | WesCorp | 6/27/2006 | $27,820,280 |

4

| CUSIP[1] | ISSUING ENTITY | DEPOSITOR DEFENDANT | PURCHASER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 93935FAE1 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | WaMu Asset Acceptance Corp. | WesCorp | 7/26/2006 | $78,116,319 |
| 93935DAC0 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | WaMu Asset Acceptance Corp. | WesCorp | 8/28/2006 | $83,715,188 |
| 939346AD4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | WaMu Asset Acceptance Corp. | WesCorp | 10/25/2006 | $53,163,000 |
| 93936AAB7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | WaMu Asset Acceptance Corp. | Southwest | 1/22/2007 | $15,000,000 |
| 93935NAC8 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | WaMu Asset Acceptance Corp. | WesCorp | 1/25/2007 | $34,000,000 |
| 93935NAD6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | WaMu Asset Acceptance Corp. | WesCorp | 1/25/2007 | $54,000,000 |
| 93936MAC9 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | WaMu Asset Acceptance Corp. | WesCorp | 5/24/2007 | $21,594,000 |
| 93936MAD7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | WaMu Asset Acceptance Corp. | WesCorp | 5/24/2007 | $22,000,000 |
| 93936RAD6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | WaMu Asset Acceptance Corp. | WesCorp | 6/27/2007 | $51,979,397 |
| 93936LAE7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | WaMu Asset Acceptance Corp. | WesCorp | 6/26/2007 | $31,442,000 |
| 93936LAB3 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | WaMu Asset Acceptance Corp. | Southwest | 6/19/2007 | $14,200,000 |

9.     The Credit Unions purchased each RMBS listed in Table 2 (*infra*) pursuant to and traceable to registration statements containing untrue statements of material fact or that omitted to state material facts required to be stated therein or necessary to make the statements therein

not misleading.  WaMu Capital was an underwriter for all but one of the securities listed in Table

2.  WaMu Capital also sold certain of the securities directly to the Credit Unions as indicated in

Table 2 (*infra*).  WaMu Capital is therefore liable under the Kansas Blue Sky Law and California

Corporate Securities Law for any untrue statements made in connection with the sale of those

certificates.

**Table 2**

| CUSIP | ISSUING ENTITY | SELLER | DEPOSITOR DEFENDANT | PURCHASER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|---|
| 45661VAC0 | IndyMac INDX Mortgage Loan Trust 2006-AR12 | WaMu Capital | - | WesCorp | 03/06/2007 | $37,225,871 |
| 54251YAD0 | Long Beach Mortgage Loan Trust 2006-10 | - | Long Beach Securities Corp. | U.S. Central | 11/2/2006 | $10,000,000 |
| 54251YAE8 | Long Beach Mortgage Loan Trust 2006-10 | - | Long Beach Securities Corp. | U.S. Central | 11/2/2006 | $20,000,000 |
| 55028CAA3 | Luminent Mortgage Trust 2007-1 | - | - | U.S. Central | 1/23/2007 | $50,000,000 |
| 55028CAA3 | Luminent Mortgage Trust 2007-1 | - | - | WesCorp | 1/23/2007 | $35,000,000 |
| 55028CAB1 | Luminent Mortgage Trust 2007-1 | - | - | WesCorp | 1/23/2007 | $20,400,000 |
| 55028CAE5 | Luminent Mortgage Trust 2007-1 | WaMu Capital | - | WesCorp | 3/1/2007 | $25,074,560 |
| 93935LAB4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | WaMu Capital | WaMu Asset Acceptance Corp. | U.S. Central | 3/23/2007 | $49,041,000 |
| 939346AD4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | WaMu Capital | WaMu Asset Acceptance Corp. | WesCorp | 5/8/2007 | $4,791,511 |

10.     The RMBS purchased by the Credit Unions suffered a significant drop in market

value.  The Credit Unions have sustained significant losses from those RMBS purchased despite

the NCUA Board's mitigation efforts.

## II.    PARTIES AND RELEVANT NON-PARTIES

11.    The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF").  The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation.  The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021 through assessments against all federally-insured credit unions in the country.  The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions.  The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF.  The NCUA is under the management of the NCUA Board. *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

12.    U.S. Central was a federally chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas.  As a corporate credit union, U.S. Central provided investment and financial services to other corporate credit unions.

13.    WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.  As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

14.     Southwest was a federally chartered corporate credit union with its offices and principal place of business in Plano, Texas.  As a corporate credit union, Southwest provided investment and financial services to other credit unions.

15.     The NCUA Board placed WesCorp and U.S. Central into conservatorship on March 20, 2009, pursuant to the FCU Act, 12 U.S.C. § 1751 *et seq.*  On September 24, 2010, the NCUA Board also placed Southwest into conservatorship.  On October 1, 2010, the NCUA Board placed WesCorp and U.S. Central into involuntary liquidation pursuant to 12 U.S.C. §§ 1766(a), 1787(a)(1)(A) and appointed itself Liquidating Agent.  On October 31, 2010, the NCUA Board placed Southwest into involuntary liquidation, appointing itself Liquidating Agent.

16.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of the Credit Unions and of any member, account holder, officer or director of the Credit Unions, with respect to the Credit Unions and their assets, including the right to bring the claims asserted by them in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees of the Credit Unions, and succeeds to all rights, titles, powers, and privileges of the Credit Unions, *see* 12 U.S.C.  § 1787(b)(2)(A).  The NCUA Board may also sue on the Credit Unions' behalf.  *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

17.     Before being placed into conservatorship and involuntary liquidation, the Credit Unions were three of the largest corporate credit unions in the United States.

18.     Any recoveries from this legal action will reduce the total losses resulting from the failure of the Credit Unions.  Losses from the Credit Unions' failures must be paid from the NCUSIF or the TCCUSF.  Expenditures from these funds must be repaid through assessments against all federally insured credit unions.  Because of the expenditures resulting from the Credit

Unions' failures, federally insured credit unions will experience larger assessments, thereby reducing federally insured credit unions' net worth.  Reductions in net worth can adversely affect the dividends that individual members of credit unions receive for the savings on deposit at their credit union.  Reductions in net worth can also make loans for home mortgages and automobile purchases more expensive and difficult to obtain.  Any recoveries from this action will help to reduce the amount of any future assessments on federally insured credit unions throughout the system, reducing the negative impact on federally insured credit unions' net worth.  Recoveries from this action will benefit credit unions and their individual members by increasing net worth, resulting in more efficient and lower-cost lending practices.

19.     Defendant WaMu Capital was a U.S. Securities and Exchange Commission ("SEC") registered broker-dealer and was an underwriter and/or seller of all the RMBS that are the subject of this Complaint and that are listed in Tables 1 and 2 (*supra*).  WaMu Capital is a Washington corporation with its principal place of business in Washington State.

20.     WaMu Asset Acceptance Corp. is the depositor and issuer of the WaMu Asset-Backed Certificates, WaMu Series 2007-HE4, WaMu Mortgage Pass-Through Certificates, Series 2006-AR17, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, WaMu Mortgage Pass-Through Certificates, Series 2007-OA4, WaMu Mortgage Pass-Through Certificates, Series 2007-OA5, WaMu Mortgage Pass-Through Certificates, Series 2007-OA6, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-

AR5, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2, and

Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5 offerings.  WaMu

Asset Acceptance Corp. is a Delaware corporation with its principal place of business in

Washington State.

21.    Long Beach Securities Corp. is the depositor and issuer of the Long Beach

Mortgage Loan Trust 2006-9, Long Beach Mortgage Loan Trust 2006-10, and Long Beach

Mortgage Loan Trust 2006-11 offerings.  Long Beach Securities Corp. is a Delaware corporation

with its principal place of business in California.

22.    At all relevant times, non-party WaMu Bank was a federal savings (or thrift)

association that provided financial services to consumer and commercial clients.  WaMu Bank

was the sponsor of nearly half (13/29) of the offerings at issue herein.  Its wholly-owned

subsidiary Washington Mutual Mortgage Securities Corp. ("WMMSC") was the sponsor of all

but two of the rest of the offerings.  At the time of the offerings, WaMu Capital and the Issuer

Defendants were wholly-owned subsidiaries of WaMu Bank.  WaMu Bank directly participated

in and exercised dominion and control over the business operations of Defendants WaMu Capital

and the Issuer Defendants.  *See infra* Section IX.  WaMu Bank is not a defendant in this action.

23.     Defendant JPM Chase Bank is a national banking association and is a wholly-owned bank subsidiary of non-party J.P. Morgan Chase & Co.  JPM Chase Bank's main office is located in Columbus, Ohio.  JPM Chase Bank is a commercial bank that is chartered, and its business is subject to examination and regulation by, the Office of the Comptroller of Currency ("OCC").  It is a member of the Federal Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation ("FDIC").

24.     On September 25, 2008, JPM Chase Bank entered into a Purchase and Assumption Agreement (the "PAA") with the FDIC, under which JPM Chase Bank agreed to assume substantially all of WaMu Bank's liabilities and purchase substantially all of WaMu Bank's assets, including its subsidiaries at the time of receivership, which included WaMu Capital and the Issuer Defendants.  By virtue of the PAA, JPM Chase Bank assumed WaMu Bank's control person liability for the securities law violations of WaMu Capital and the Issuer Defendants, and JPM Chase Bank assumed liability for the securities law violations of WaMu Capital and the Issuer Defendants.  The transaction also constituted a *de facto* merger of JPM Chase Bank and WaMu Bank, which is liable as control person for the securities law violations of WaMu Capital and the Issuer Defendants.  This action is thus brought against JPM Chase Bank as the successor-in-interest to WaMu Capital and the Issuer Defendants and as the successor-in-interest to WaMu Bank which was liable as a control person for the securities law violations of WaMu Capital and the Issuer Defendants.

## III.     JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to:  (a) 12 U.S.C. § 1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA Board] shall be a party shall be deemed to arise under the laws of the United States, and the

11

United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy"; and (b) 28 U.S.C. § 1345, which provides that "the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

26.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v(a).

27.     Many of the transactions at issue occurred in Lenexa, Kansas, the headquarters of U.S. Central.

28.     Some of the loans backing the RMBS at issue are secured by properties located in Kansas and WaMu Bank originated and/or serviced these loans.

29.     JP Morgan routinely provided investment banking services to U.S. Central in Kansas, including serving as the counterparty to over $7.3 billion of swaps from 2007 to 2010.

30.     JP Morgan Securities is a registered business and registered broker-dealer in Kansas.

31.     JP Morgan Retirement Plan Services is a registered business in Kansas and employs 800 people in an office in Overland Park, Kansas.

32.     This Court has personal jurisdiction over each Defendant because they offered/sold the RMBS at issue in this Complaint to U.S. Central in this District; prepared/disseminated the Offering Documents containing untrue statements or omissions of material fact as alleged herein to U.S. Central in this District; and/or are residents of/conduct business in this District.

## IV.  MORTGAGE ORIGINATION AND THE PROCESS OF SECURITIZATION

33.  RMBS are asset-backed securities.  A pool or pools of residential mortgages are the assets that back or collateralize the RMBS certificates purchased by investors.

34.  Because residential mortgages are the assets collateralizing RMBS, the origination of the mortgages commences the process that leads to the creation of RMBS. Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting.  The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.  The underwriting guidelines consist of a variety of metrics, including:  the borrower's debt, income, savings, credit history and credit score; whether the property will be owner-occupied; and the amount of the loan compared to the value of the property at issue (the "loan-to-value" or "LTV" ratio), among other things.  Underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

35.  Historically, originators made mortgage loans to borrowers and held the loans. Originators profited as they collected monthly principal and interest payments directly from the borrower.  Originators also retained the risk that the borrower would default on the loan.

36.  This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (collectively government sponsored enterprises or "GSEs") began purchasing "conforming" or "prime" loans—so-called because they conformed to guidelines set by the GSEs.  The GSEs either sponsored the RMBS issuance

13

(Ginnie Mae) or issued the RMBS themselves after purchasing the conforming loans (Fannie Mae and Freddie Mac). The GSEs securitized the mortgage loans by grouping mortgages into "loan pools," then repackaging the loan pools into RMBS where investors received the cash flow from the mortgage payments. The GSEs guarantee the monthly cash flow to investors on the agency RMBS.

37.     More recently, originators, usually working with investment banks, began securitizing "non-conforming loans"—loans originated (in theory) according to private guidelines adopted by the originators. Non-conforming loans are also known as "nonprime" or "private label" loans and include "Alt-A" and "subprime" loans. Despite the non-conforming nature of the underlying mortgages, the securitizers of such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

38.     On information and belief, all of the loans collateralizing the RMBS at issue in this Complaint are non-conforming mortgage loans.

39.     The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages, to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution as RMBS. This practice is known as "originate-to-distribute" ("OTD").

40.     Securitization begins with a "sponsor" who purchases loans in bulk from one or more originators. The sponsor transfers title of the loans to an entity called the "depositor."

41.     The depositor transfers the loans to a trust called the "issuing entity."

42.     The issuing entity issues "notes" or "certificates," representing an ownership interest in the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

43.     The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

44.     One or more "underwriters"—like WaMu Capital—then sell the notes or certificates to investors.

45.     A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors.

46.     Figure 1 (*infra*) depicts a typical securitization process.

**Figure 1**
***Illustration of the Securitization Process***

47.     Because securitization, as a practical matter, shifts the risk of default on the mortgage loans from the originator of the loan to the RMBS investor, the originator's adherence to mortgage underwriting guidelines as represented in the offering documents with respect to the underlying mortgage loans is critical to the investors' ability to evaluate the expected performance of the RMBS.

## V.     RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT

48.     RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of risk.  RMBS certificates denote the particular tranches of the security purchased by the investor.

49.     The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.  Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit ratings agencies that assigned credit ratings to the RMBS in this case.

50.     The credit rating agencies use letter-grade rating systems as shown in Table 3 (*infra*).

**Table 3**
*Credit Ratings System*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | **Prime (Maximum Safety)** | **INVESTMENT GRADE** |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | **High Grade, High Quality** | |
| A1<br>A2<br>A3 | A+<br>A<br>A- | **Upper Medium Grade** | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | **Medium Grade** | |
| Ba2<br>Ba3 | BB<br>BB- | **Non-Investment Grade, or Speculative** | **SPECULATIVE GRADE** |
| B1<br>B2<br>B3 | B+<br>B<br>B- | **Highly Speculative, or Substantial Risk** | |
| Caa2<br>Caa3 | CCC+ | **In Poor Standing** | |
| Ca | CCC<br>CCC- | **Extremely Speculative** | |
| C | - | **May be in Default** | |
| - | D | **Default** | |

51.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk." Moody's Investors Services, Inc., Moody's Rating Symbols & Definitions at 6 (August 2003), *available at* http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf. Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its financial commitment on the obligation is extremely strong." Standard & Poor's, Ratings Definitions, *available at* http://www.standardandpoors.com/ratings/articles/en/us/?assetID=1245303711350.

52.     In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies, because the primary market for RMBS is institutional investors, such as the Credit Unions, which were

generally limited to buying only securities with the highest credit ratings. *See*, *e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities rated below AA-); *but see*, *e.g.*, Alternatives to the Use of Credit Ratings, 77 Fed. Reg. 74,103 (Dec. 13, 2012) (to be codified at 12 C.F.R. pts. 703, 704, 709, and 742).

53.     While the pool of mortgages underlying the RMBS may not have been sufficient to warrant a triple-A credit rating, various forms of "credit enhancement" were used to obtain a triple-A rating on the higher tranches of RMBS.

54.     One form of credit enhancement is "structural subordination."  The tranches, and their risk characteristics relative to each other, are often analogized to a waterfall.  Investors in the higher or "senior" tranches are the first to be paid as income is generated when borrowers make their monthly payments.  After investors in the most senior tranche are paid, investors in the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

55.     In the event mortgages in the pool default, the resulting loss is absorbed by the subordinate tranches first.

56.     Accordingly, senior tranches are deemed less risky than subordinate tranches and therefore receive higher credit ratings.

57.     Another form of credit enhancement is overcollateralization.  Overcollateralization is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security.  The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

58.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."  "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.  Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.  Finally, some RMBS are "cross-collateralized," *i.e.*, when a tranche in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI.     THE CREDIT UNIONS' PURCHASES

59.     The Credit Unions purchased only the highest-rated tranches of RMBS.  All were rated triple-A at the time of issuance.  These securities have since been downgraded below investment grade just a few years after they were sold (*see infra* Table 4).

**Table 4**
***Credit Ratings for the Credit Unions' RMBS Purchases***

| CUSIP | ISSUING ENTITY | PURCHASER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|---|---|
| 45661VAC0 | IndyMac INDX Mortgage Loan Trust 2006-AR12 | WesCorp | AAA 8/1/2006 | Aaa 7/31/2006 | CCC 8/19/2009 | Ca 2/20/2009 | D 6/23/2010 | C 12/01/2010 |
| 54251WAD4 | Long Beach Mortgage Loan Trust 2006-9 | U.S. Central | AAA 10/18/2006 | Aaa 10/24/2006 | B 9/2/2008 | Ba2 4/7/2008 | CCC 8/4/2009 | Ca 3/20/2009 |
| 54251WAE2 | Long Beach Mortgage Loan Trust 2006-9 | U.S. Central | AAA 10/18/2006 | Aaa 10/24/2006 | BB 4/2/2008 | Ba2 4/7/2008 | CCC 8/4/2009 | Ca 3/20/2009 |
| 54251YAD0 | Long Beach Mortgage Loan Trust 2006-10 | U.S. Central | AAA 11/13/2006 | Aaa 11/14/2006 | B+ 9/2/2008 | Caa1 10/16/2008 | CCC 10/6/2009 | Ca 3/20/2009 |
| 54251YAE8 | Long Beach Mortgage Loan Trust 2006-10 | U.S. Central | AAA 11/13/2006 | Aaa 11/14/2006 | BB 3/27/2008 | Caa2 10/16/2008 | CCC 10/6/2009 | Ca 3/20/2009 |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | U.S. Central | AAA 12/22/2006 | Aaa 1/2/2007 | BB 3/31/2008 | Ba2 4/7/2008 | CCC 8/4/2009 | Ca 3/20/2009 |

| CUSIP | ISSUING ENTITY | PURCHASER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|---|---|
| 55028CAA3 | Luminent Mortgage Trust 2007-1 | U.S. Central | AAA 2/1/2007 | Aaa 2/9/2007 | CCC 7/24/2009 | Caa1 2/20/2009 | CCC 7/24/2009 | Caa3 12/14/2010 |
| 55028CAA3 | Luminent Mortgage Trust 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 2/9/2007 | CCC 7/24/2009 | Caa1 2/20/2009 | CCC 7/24/2009 | Caa3 12/14/2010 |
| 55028CAB1 | Luminent Mortgage Trust 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 2/9/2007 | CCC 7/24/2009 | Ca 2/20/2009 | D 3/22/2012 | C 12/14/2010 |
| 55028CAE5 | Luminent Mortgage Trust 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 2/9/2007 | B 10/27/2008 | Ca 2/20/2009 | D 6/23/2010 | C 12/14/2010 |
| 92926SAD8 | WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust | Southwest | AAA 4/24/2007 | Aaa 5/4/2007 | B 9/9/2008 | Caa1 10/16/2008 | CCC 5/4/2009 | Ca 3/20/2009 |
| 93364EAD6 | WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust | Southwest | AAA 5/14/2007 | Aaa 5/31/2007 | B- 9/30/2009 | Ca 3/20/2009 | CCC 9/23/2011 | Ca 3/20/2009 |
| 93363XAE3 | WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | U.S. Central | AAA 6/25/2007 | Aaa 6/13/2007 | BB 8/20/2008 | Ba3 10/16/2008 | CCC 9/30/2009 | Ca 3/20/2009 |
| 93363XAD5 | WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | U.S. Central | AAA 6/25/2007 | Aaa 6/13/2007 | CCC 9/30/2009 | Ba2 10/16/2008 | CCC 9/30/2009 | Ca 3/20/2009 |
| 93363XAD5 | WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | Southwest | AAA 6/25/2007 | Aaa 6/13/2007 | CCC 9/30/2009 | Ba2 10/16/2008 | CCC 9/30/2009 | Ca 3/20/2009 |
| 92925DAF7 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | WesCorp | AAA 11/21/2006 | Aaa 12/1/2006 | BB 10/20/2008 | Ca 2/23/2009 | D 7/26/2011 | C 12/3/2010 |
| 933638AF5 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | U.S. Central | AAA 12/28/2006 | Aaa 12/21/2006 | B 10/30/2008 | Ca 2/23/2009 | D 1/19/2011 | C 12/30/2010 |
| 933638AF5 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | WesCorp | AAA 12/28/2006 | Aaa 12/21/2006 | B 10/30/2008 | Ca 2/23/2009 | D 1/19/2011 | C 12/30/2010 |
| 92926WAB3 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | U.S. Central | AAA 2/2/2007 | Aaa 1/25/2007 | CCC 10/8/2009 | Ca 2/23/2009 | D 10/29/2012 | C 12/3/2010 |

20

| CUSIP | ISSUING ENTITY | PURCHASER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|---|---|
| 92926WAC1 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | U.S. Central | AAA 2/2/2007 | Aaa 1/25/2007 | BB 10/6/2008 | Ca 2/23/2009 | D 6/21/2011 | C 12/3/2010 |
| 92926WAC1 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | WesCorp | AAA 2/2/2007 | Aaa 1/25/2007 | BB 10/6/2008 | Ca 2/23/2009 | D 6/21/2011 | C 12/3/2010 |
| 933635AA2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | U.S. Central | AAA 3/2/2007 | Aaa 3/12/2007 | N/A | B3 2/23/2009 | CCC 2/16/2010 | Caa3 12/3/2010 |
| 933635AD6 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | WesCorp | AAA 3/2/2007 | Aaa 3/12/2007 | CCC 10/8/2009 | Ca 2/23/2009 | D 5/19/2011 | C 12/3/2010 |
| 93364CAE8 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | WesCorp | AAA 5/2/2007 | Aaa 5/10/2007 | BB 10/6/2008 | Ca 2/23/2009 | D 7/26/2011 | C 12/3/2010 |
| 93364BAE0 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | WesCorp | AAA 6/1/2007 | Aaa 6/1/2007 | BB 10/6/2008 | Ca 2/23/2009 | D 5/19/2011 | C 12/3/2010 |
| 93364BAD2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | WesCorp | AAA 6/1/2007 | Aaa 6/1/2007 | CCC 10/8/2009 | Ca 2/23/2009 | D 8/30/2012 | C 12/3/2010 |
| 92927BAD4 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | WesCorp | AAA 7/2/2007 | Aaa 7/5/2007 | CCC 7/24/2009 | Ca 2/23/2009 | D 9/25/2012 | C 12/3/2010 |
| 92927BAE2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | WesCorp | AAA 7/2/2007 | Aaa 7/5/2007 | B 10/9/2008 | Ca 2/23/2009 | D 7/26/2011 | C 12/3/2010 |
| 93934XAC7 | Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5 | U.S. Central | AAA 12/28/2006 | Aaa 1/4/2007 | CCC 8/4/2009 | Ba3 10/16/2008 | CCC 8/4/2009 | C 7/16/2010 |

| CUSIP | ISSUING ENTITY | PURCHASER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|---|---|
| 93934FMQ2 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | WesCorp | AAA 4/4/2006 | Aaa 3/28/2006 | B 3/18/2009 | B2 9/4/2008 | D 11/25/2009 | C 12/7/2010 |
| 93934FQR6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | WesCorp | AAA 4/27/2006 | Aaa 4/26/2006 | B 11/11/2008 | Ca 2/23/2009 | D 2/24/2010 | C 12/7/2010 |
| 939345AE4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | WesCorp | AAA 6/8/2006 | Aaa 5/26/2006 | B 10/9/2008 | B2 9/4/2008 | D 3/23/2010 | C 12/7/2010 |
| 939345AF1 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | WesCorp | AAA 6/8/2006 | Aaa 5/26/2006 | B 10/9/2008 | B2 9/4/2008 | D 3/23/2010 | C 12/7/2010 |
| 93935AAH5 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | WesCorp | AAA 7/6/2006 | Aaa 7/18/2006 | B 10/9/2008 | B2 9/4/2008 | D 2/16/2010 | C 12/7/2010 |
| 93935AAE2 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | WesCorp | AAA 7/6/2006 | Aaa 7/18/2006 | B 10/9/2008 | B2 9/4/2008 | D 4/19/2010 | C 12/7/2010 |
| 93935FAE1 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | WesCorp | AAA 8/3/2006 | Aaa 8/10/2006 | CCC 5/20/2009 | Ba2 9/4/2008 | D 4/19/2010 | C 12/7/2010 |
| 93935DAC0 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | WesCorp | AAA 9/1/2006 | Aaa 9/19/2006 | B 4/8/2009 | Ba2 9/4/2008 | D 6/23/2010 | C 12/7/2010 |

| CUSIP | ISSUING ENTITY | PURCHASER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|---|---|
| 93935LAB4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | U.S. Central | AAA 10/2/2006 | Aaa 10/9/2006 | B 4/8/2009 | Caa3 2/23/2009 | D 7/31/2012 | Ca 12/7/2010 |
| 939346AD4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | WesCorp | AAA 11/1/2006 | Aaa 11/2/2006 | B 10/30/2008 | B1 9/4/2008 | D 4/19/2010 | C 12/7/2010 |
| 93936AAB7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | Southwest | AAA 2/1/2007 | Aaa 1/30/2007 | BB 10/27/2008 | Caa2 2/11/2009 | D 4/19/2010 | Caa3 9/1/2010 |
| 93935NAC8 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | WesCorp | AAA 2/2/2007 | Aaa 2/5/2007 | BB 10/6/2008 | Ca 2/23/2009 | D 11/24/2010 | C 12/22/2010 |
| 93935NAD6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | WesCorp | AAA 2/2/2007 | Aaa 2/5/2007 | B 10/6/2008 | Ba1 9/4/2008 | D 5/25/2010 | C 12/22/2010 |
| 93936MAC9 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | WesCorp | AAA 6/1/2007 | Aaa 6/5/2007 | BB 10/6/2008 | Ca 2/23/2009 | D 6/21/2011 | C 12/22/2010 |
| 93936MAD7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | WesCorp | AAA 6/1/2007 | Aaa 6/5/2007 | B 10/6/2008 | Ba1 9/4/2008 | D 6/23/2010 | C 12/22/2010 |
| 93936RAD6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | WesCorp | AAA 7/2/2007 | Aaa 6/5/2007 | B- 4/27/2009 | Ba1 9/4/2008 | D 12/17/2010 | C 12/22/2010 |

| CUSIP | ISSUING ENTITY | PURCHASER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | First Downgrade Below Investment Grade S&P | First Downgrade Below Investment Grade MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|---|---|
| 93936LAE7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | WesCorp | AAA 7/5/2007 | Aaa 7/5/2007 | BB 7/15/2008 | Caa1*- 9/4/2008 | D 12/24/2009 | C 9/1/2010 |
| 93936LAB3 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | Southwest | AAA 7/5/2007 | Aaa 6/27/2007 | CC 6/10/2009 | Caa2 2/11/2009 | CC 6/10/2009 | Caa3 9/1/2010 |

60.     At the time of purchase, the Credit Unions were not aware of the untrue statements or omissions of material facts in the Offering Documents of the RMBS.  If the Credit Unions had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering Documents—the Credit Unions would not have purchased the certificates.

61.     The securities' substantial loss of market value has injured the Credit Unions and the NCUA Board.

## VII.   THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS

62.     The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages.  The loan underwriting guidelines ensure that the borrower has the means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of reasonably anticipated defaults on underlying mortgage loans.

63.     With respect to RMBS collateralized by loans written by originators who systematically disregarded their stated underwriting standards, the following pattern is present:

a.    a surge in borrower delinquencies and defaults on the mortgages in the pools (*see infra* Section VII.A and Table 5);

b.    actual gross losses to the underlying mortgage pools within the first twelve months  after the offerings exceeded expected gross losses (*see infra* Section VII.B and Figure 2);

c.    a high percentage of the underlying mortgage loans were originated for distribution, as explained below (*see infra* Table 6 and accompanying allegations); and

d.    downgrades of the RMBS by credit rating agencies from high, investment-grade ratings when purchased to much lower ratings, including numerous "junk" ratings (*see infra* Section VII.C and Table 4).

64.    These factors support a finding that the Originators failed to originate the mortgages in accordance with the underwriting standards stated in the Offering Documents.

65.    This conclusion is further corroborated by reports that the Originators who contributed mortgage loans to the RMBS at issue in this Complaint abandoned the underwriting standards described in the Offering Documents (*see infra* Section VII.D).

**A.    The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards**

66.    Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after payment is due.  Residential mortgages where no payment has been received for more than 90 days (or three payment cycles) are generally considered to be in default.

67. The surge of delinquencies and defaults following the offerings evidence the systematic flaws in the Originators' underwriting process (*see infra* Table 5).

68. The Offering Documents reported zero or near zero delinquencies and defaults at the time of the offerings (*see infra* Table 5).

69. The pools of mortgages collateralizing the RMBS experienced delinquency and default rates up to 9.49% within the first three months, up to 20.67% at six months, and up to 62.93% at one year (*see infra* Table 5).

70. As of November 2012, over half (42.73% on average) of the mortgage collateral across all of the RMBS that the Credit Unions purchased was in delinquency, bankruptcy, foreclosure, or was real estate owned ("REO"), which means that a bank or lending institution owns the property after a failed sale at a foreclosure auction (*see infra* Table 5).

71. Table 5 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates on the RMBS as to which claims are asserted in this Complaint. The data presented in the last five columns are from the trustee reports (dates and page references as indicated in the parentheticals). The shadowed rows reflect the group of mortgages in the pool underlying the specific tranches purchased by the Credit Unions; however, some trustee reports include only the aggregate data. For RMBS with multiple groups, aggregate information on all the groups is included because the tranches are cross-collateralized.

**Table 5**
***Delinquency and Default Rates for the Credit Unions' RMBS Purchases***

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 45661VAC0 | IndyMac INDX Mortgage Loan Trust 2006-AR12 (P.S. dated July 27, 2006) | Zero. (S-30) | 1.53% (Aug., p.10) | 2.43% (Oct., p.10) | 3.61% (Jan., p.10) | 6.8% (Jul., p.10) | 41.26% (Nov. 2012, p.10) |

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Long Beach Mortgage Loan Trust 2006-9 (Oct. 6, 2006): Aggregate | Zero (S-66) | 0.05% (Nov., p.11) | 3.90% (Jan., p.11) | 12.50% (Apr., p.11) | 30.17% (Oct., p.11) | 45.14% (Nov. 2012, p.12) |
| | Long Beach Mortgage Loan Trust 2006-9: Group 1 | Zero (S-66) | 0% (Nov., p.12) | 2.33% (Jan., p.12) | 7.69% (Apr., p.12) | 21.37% (Oct., p.12) | 46.34% (Nov. 2012, p.17) |
| 54251WAD4 54251WAE2 | Long Beach Mortgage Loan Trust 2006-9: Group 2 *Classes 2A3 and 2A4 in Group 2. (S-3) | Zero (S-66) | 0.08% (Nov. p.13) | 4.72% (Jan., p.13) | 15.01% (Apr., p.13) | 34.75% (Oct., p.13) | 44.32% (Nov. 2012, p.23) |
| | Long Beach Mortgage Loan Trust 2006-10 (P.S. dated Nov. 3, 2006): Aggregate | Zero (S-67) | 0.04% (Dec., p.11) | 3.57% (Feb., p.11) | 12.45% (May, p.11) | 30.17% (Nov., p.11) | 46.83% (Nov. 2012, p.12) |
| | Long Beach Mortgage Loan Trust 2006-10: Group 1 | Zero (S-67) | 0.08% (Dec., p.12) | 2.38% (Feb., p.12) | 7.08% (May, p.12) | 21.38% (Nov., p.12) | 42.87% (Nov. 2012, p.17) |
| 54251YAD0 54251YAE8 | Long Beach Mortgage Loan Trust 2006-10: Group 2 *Classes 2-A3 and 2-A4 in Group 2. (S-2) | Zero (S-67) | 0.02% (Dec., p.13) | 4.23% (Feb., p.13) | 15.42% (May, p.13) | 35.05% (Nov., p.13) | 50.25% (Nov. 2012, p.23) |
| | Long Beach Mortgage Loan Trust 2006-11 (P.S. dated Dec. 11, 2006): Aggregate | Zero(S-67) | 0% (Jan., p.12) | 3.38% (Mar., p.12) | 12.43% (Jun., p. 12) | 29.89% (Dec., p. 12) | 42.16% (Nov. 2012, p.13) |
| | Long Beach Mortgage Loan Trust 2006-11: Group 1 | Zero(S-67) | 0% (Jan., p.12) | 1.80% (Mar., p. 12) | 7.65% (Jun., p. 13) | 21.53% (Dec., p. 13) | 43.4% (Nov. 2012, p.18) |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11: Group 2 *Class 2A4 in Group 2. (S-3) | Zero(S-67) | 0% (Jan., p.12) | 4.17% (Mar., p. 12) | 14.81% (Jun., p.14) | 34.09% (Dec., p.14) | 41.3% (Nov. 2012, p.24) |
| | Luminent Mortgage Trust 2007-1 (P.S. dated Jan. 24, 2007): Aggregate * Class 1-A1, 1-A2 and II-A3 | Zero. (S-24) | 1.24% (Feb., p.11) | 2.56% (Apr., p.11) | 4.82% (July, p.11) | 11.32% (Jan., p.11) | 35.58% (Nov.2012, p.11) |
| 55028CAA3 55028CAB1 | Luminent Mortgage Trust 2007-1: Group 1 *Classes 1-A1 and I-A2 in Group 1. (S-58) | Zero. (S-24) | 1.14% (Feb., p.13) | 2.54% (Apr., p.13) | 4.32% (July, p.13) | 9.95% (Jan., p.13) | 30.11% (Nov. 2012, p.12) |
| 55028CAE5 | Luminent Mortgage Trust 2007-1: Group 2 *Classes 2-A3 in Group 2. (S-59) | Zero. (S-24) | 1.40% (Feb., p.13) | 2.59% (Apr., p.13) | 5.55% (July, p.13) | 13.40% (Jan., p.13) | 45.14% (Nov. 2012, p.12) |
| | WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust (P.S. dated Apr. 5, 2007): Aggregate | Zero. (56) | .24% (May, p.12) | 6.52% (July, p.12) | 16.74% (Oct., p.12) | 32.66% (Apr., p.12) | 46.92% (Nov. 2012, p.12) |
| | WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust: Group 1 | Zero. (56) | .1% (May, p.10) | 3.26% (July, p.10) | 10.44% (Oct., p.10) | 24.39% (Apr., p.10) | 47.1% (Nov. 2012, p.10) |
| 92926SAD8 | WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust: Group 2 *Class 2-A2 in Group 2. (60) | Zero. (56) | ..32% (May, p.11) | 8.54% (July, p.11) | 20.67% (Oct., p.11) | 37.78% (Apr., p.11) | 46.76% (Nov. 2012, p.11) |
| | WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust (P.S. dated May 8, 2007): Aggregate | Zero. ("Representations and Warranties Regarding the Mortgage Loans" section) | .14% (June, p.12) | 3.43% (Aug., p.12) | 14.31% (Nov., p.12) | 29.41% (May, p.12) | 42.32% (Nov. 2012, p.12) |

27

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
|  | WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust: Group 1 | Zero. ("Representations and Warranties Regarding the Mortgage Loans" section) | .1% (June, p.10) | 2.45% (Aug., p.10) | 11.21% (Nov., p.10) | 23.34% (May, p.10) | 43.03% (Nov. 2012, p.10) |
| 93364EAD6 | WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust: Group 2 *Class 2-A3 in Group 2. ("Designations" section) | Zero. ("Representations and Warranties Regarding the Mortgage Loans" section) | .17% (June, p.11) | 4.14% (Aug., p.11) | 16.56% (Nov., p.11) | 33.82% (May, p.11) | 41.7% (Nov. 2012, p.11) |
|  | WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 (P.S. dated Jun. 11, 2007): Aggregate | Zero. (S-56) | 0% (Jul., p.12) | 4.54% (Sep., p.12) | 15.16% (Dec., p.12) | 31.59% (Jun., p.12) | 47.04% (Nov. 2012 p.12) |
|  | WaMu Asset-Backed Certificates, WaMu Series 2007-HE4: Group 1 | Zero. (S-56) | 0% (Jul., p.10) | 2.26% (Sep., p.10) | 12.04% (Dec., p.10) | 26.93% (Jun., p.10) | 45.13% (Nov. 2012 p.10) |
| 93363XAD5 93363XAE3 | WaMu Asset-Backed Certificates, WaMu Series 2007-HE4: Group 2 *Classes 2-A3 and 2-A4 in Group 2. (S-3) | Zero. (S-56) | 0% (Jul., p.11) | 6.55% (Sep., p.11) | 17.93% (Dec., p.11) | 35.69% (Jun., p.11) | 49.24% (Nov. 2012 p.11) |
| 92925DAF7 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 (P.S. dated Nov. 17, 2006): Aggregate *Class CA-1C in Groups 1 and 2. (S-7-8) | Zero. (S-58) | 1.25% (Dec., ps.33-34) | 1.83% (Feb., ps.35-36) | 1.71% (May, ps.35-36) | 3.87% (Nov., ps.30-31) | 34.05% (Nov. 2012, p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2006-AR17: Group 1 | Zero. (S-58) | 1.21% (Dec., ps.33-34) | 2.09% (Feb., ps.35-36) | 1.96% (May, ps.35-36) | 3.98% (Nov., ps.30-31) | 33.55% (Nov. 2012, p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2006-AR17: Group 2 | Zero. (S-58) | 1.47% (Dec., ps.33-34) | .37% (Feb., ps.35-36) | .37% (May, ps.35-36) | 3.28% (Nov., ps.30-31) | 36.85% (Nov. 2012, p.11) |
| 933638AF5 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 (P.S. dated Dec. 19, 2006): Aggregate *Class CA-1C in Groups 1 and 2. (S-8) | Zero. (S-62) | 1.1% (Jan., ps.33-34) | 1.56% (Mar., ps.35-36) | 1.56% (Jun., ps.35-36) | 5.04% (Dec., ps.31-32) | 32.01% (Nov. 2012, p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19: Group 1 | Zero. (S-62) | .91% (Jan., ps.33-34) | 1.78% (Mar., ps.35-36) | 2.11% (Jun., ps.35-36) | 5.78% (Dec., ps.31-32) | 32.84% (Nov. 2012, p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19: Group 2 | Zero. (S-62) | 1.6% (Jan., ps.33-34) | .94% (Mar., ps.35-36) | .05% (Jun., ps.35-36) | 2.95% (Dec., ps.31-32) | 29.67% (Nov. 2012, p.11) |
| 92926WAB3 92926WAC1 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1(P.S. dated Jan. 23, 2007) | Zero. (S-52) | 1.24% (Feb., ps.30-31) | 1.98% (Apr., ps.30-31) | 3.06% (July, ps.30-31) | 5.86% (Jan., ps.27-28) | 35.64% (Nov. 2012, p.11) |
| 933635AD6 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 (P.S. dated Feb. 20, 2007): Aggregate *Class CA-1C in Groups 1 and 2. (S-8) | Zero. (S-60) | 1.44% (Mar., 36-37) | 2.25% (May, ps.38-39) | 2.77% (Aug., ps.36-37) | 7.53% (Feb., ps.34-35) | 70.13% (Nov. 2012, p.12) |

28

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 933635AA2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA2: Group 1A *Class 1A in Group 1. (S-16) | Zero. (S-60) | 0% (Mar., 36-37) | 0% (May, ps.38-39) | 10.33% (Aug., ps.36-37) | 14.86% (Feb., ps.34-35) | 36.55% (Nov. 2012, p.12) |
| 933635AA2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA2: Group 1B *Class 1A in Group 1. (S-16) | Zero. (S-60) | 1.01% (Mar., 36-37) | 2.1% (May, ps.38-39) | 2.63% (Aug., ps.36-37) | 7.04% (Feb., ps.34-35) | 35.76% (Nov. 2012, p.12) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2007-OA2: Group 2 | Zero. (S-60) | 4.46% (Mar., 36-37) | 3.78% (May, ps.38-39) | 3.05% (Aug., ps.36-37) | 10.07% (Feb., ps.34-35) | 36.63% (Nov. 2012, p.12) |
| 93364CAE8 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 (P.S. dated Apr. 24, 2007): Aggregate *Class CA-1C in Groups 1 and 2. (S-8) | Zero (S-56) | 0.16% (May, p.36) | 2.82% (Jul., p.36) | 4.97% (Oct., p.36) | 11.22% (Apr., p.33) | 39.64% (Nov. 2012 p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2007-OA4: Group 1 | Zero (S-56) | 0.18% (May, p.32) | 2.82% (Jul., p.32) | 5.16% (Oct., ps.33-34) | 11.53% (Apr., p.33) | 39.49% (Nov. 2012, p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2007-OA4: Group 2 | Zero (S-56) | 0.03% (May, p.32) | 2.81% (Jul., p.32) | 3.58% (Oct., ps.33-34) | 9.13% (Apr., p.30-31) | 40.68% (Nov. 2012, p.11) |
| 93364BAD2 93364BAE0 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 (P.S. dated May 22, 2007): Aggregate * Classes CA-1B and CA-1C in Groups 1 and 2. (S-8) | Zero (S-58) | 0.44% (Jun., p.30) | 3.10% (Aug., p.30) | 5.12% (Nov., p.31) | 14.65% (May, p.32) | 43.96% (Nov. 2012, p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5: Group 1 | Zero (S-58) | 0.38% (Jun., p.30) | 3.39% (Aug., p.30) | 5.86% (Nov., p.31) | 15.52% (May, p.32) | 43.55% (Nov. 2012, p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5: Group 2 | Zero (S-58) | 0.76% (Jun., p.30) | 1.39% (Aug., p.30) | 0.80% (Nov., p.31) | 9.64% (May, p.32) | 50.23% (Nov. 2012, p.11) |
| 92927BAE2 92927BAD4 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 (P.S. dated Jun. 27, 2007): Aggregate * Classes CA-1B and CA-1C in Groups 1 and 2. (S-8) | Zero (S-58) | 0.33% (Jul., p.30) | 3.58% (Sep., p.30) | 5.84% (Dec., p.30) | 16.29% (Jun., p.32) | 48.79% (Nov. 2012, p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6: Group 1 | Zero (S-58) | 0.35% (Jul., p.30) | 3.82% (Sep., p.30) | 6.26% (Dec., p.30) | 17.63% (Jun., p.32) | 49.24% (Nov. 2012, p.11) |
|  | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6: Group 2 | Zero (S-58) | 0.21% (Jul., p.30) | 2.39% (Sep., p.30) | 3.72% (Dec., p.30) | 9.42% (Jun., p.32) | 46.49% (Nov. 2012, p.11) |
|  | Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5 (P.S. dated Dec. 1, 2006): Aggregate | Zero (S-68) | 0.96% (Dec., p.19) | 4.88% (Feb., p.19) | 10.03% (May, p.20) | 52.20% (Nov., p.20) | 47.1% (Nov. 2012, p.9) |
|  | Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5: Group 1 | Zero (S-68) | 0.67% (Dec., p.19) | 2.82%% (Feb., p.21) | 5.99% (May, p.21) | 44.12% (Nov., p.21) | 45.72% (Nov. 2012, p.9) |

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 93934XAC7 | Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5: Group 2 *Class 2-A2 in Group 2. (S-8) | Zero (S-68) | 1.31% (Dec., p.19) | 7.52% (Feb., p.20) | 15.34% (May, p.20) | 62.93% (Nov., p.22) | 49.5% (Nov. 2012, p.9) |
| 93934FMQ2 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 (P.S. dated Mar. 24, 2006) | Zero. (S-50) | .35% (Apr., p.23) | 2.7% (Jun., p.23) | 2.42% (Sep., p.23) | 6.87% (Mar., p.23) | 31.37% (Nov. 2012, p.9) |
| 93934FQR6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 (P.S. dated Apr. 24, 2006) | Zero. (S-56) | .04% (May, p.25) | 3.68% (July, p.25) | 3.48% (Oct., p.25) | 6.6% (Apr., p.25) | 41.08% (Nov. 2012, p.9) |
| 939345AE4 939345AF1 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 (P.S. dated May 25, 2006): Aggregate | Zero. (S-75) | Trustee Reports unavailable prior to 02/25/2009 | | | | 50.21% (Nov. 2012, p.15) |
| 93935AAH5 93935AAE2 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 (P.S. dated Jun. 26, 2006): Aggregate | Zero (S-73) | Trustee Reports unavailable prior to 02/25/2009 | | | | 44.94% (Nov. 2012, p.14) |
| 93935FAE1 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 (P.S. dated Jul. 25, 2006): Aggregate * Class CA-1C in Groups 1 and 2. (S-8) | Zero (S-57) | 3.12% (Aug., p.34) | 7.56% (Oct., p.35) | 4.72% (Jan., p.35) | 10.06% (Jul., p.34) | 43.41% (Nov. 2012, p.11) |
| | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6: Group 1 | Zero (S-57) | 4.15% (Aug., p.34) | 5.44% (Oct., p.35) | 4.04% (Jan., p.35) | 11.24% (Jul., p.34) | 48.53% (Nov. 2012, p.11) |
| | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6: Group 2 | Zero (S-57) | 2.66% (Aug., p.34) | 8.30% (Oct., p.35) | 4.92% (Jan., p.35) | 9.74% (Jul., p.34) | 42.02% (Nov. 2012, p.11) |
| 93935DAC0 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 (P.S. dated Aug. 25, 2006): Aggregate    * Class A1C | Zero (S-61) | Trustee Reports unavailable prior to 02/25/2009 | | | | 50.97% (Nov. 2012, p.13) |
| 93935LAB4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 (P.S. dated Sep. 26, 2006): Aggregate * Class 2A in Groups 1 and 2. (S-7) | Zero (S-88) | Trustee Reports unavailable prior to 02/25/2009 | | | | 48.72% (Nov., 2012 p.17) |
| 939346AD4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 (P.S. dated Oct. 24, 2006): Aggregate * Class CA-1C in Groups 1 and 2. (S-8) | Zero. (S-60) | Trustee Reports unavailable prior to 02/25/2009 | | | | 51.96% (Nov., 2012, p.14) |
| 93936AAB7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 (P.S. date Jan. 26, 2007) | Zero. (S-47) | 3.21% (Feb., p.21) | 4.58% (Spr., p.21) | 7.77% (July, p.21) | 14.68% (Jan., p.18) | 24.45% (Nov., 2012 p.9) |

| CUSIP | ISSUING ENTITY | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 93935NAC8 93935NAD6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1: Aggregate **Classes CA-1B and CA-1C in Groups 1 and 2. (S-8)** | Zero. (S-71) | Trustee Reports unavailable prior to 02/25/2009 | | | | 51.61% (Nov. 2012, p.14) |
| 93936MAC9 93936MAD7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 (P.S. dated May 23, 2007): Aggregate | Zero (S-60) | Trustee Reports unavailable prior to 02/25/2009 | | | | 39.29% (Nov. 2012, Pg. 9) |
| 93936RAD6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 (P.S. dated Jun. 25, 2007): Aggregate | Zero (S-58) | 4.96% (Jul., p.22) | 5.30% (Sep., p.22) | 8.56% (Dec., p.20) | 19.51% (Jun., p.20) | 45.98% (Nov., 2012 p.9) |
| 93936LAE7 93936LAB3 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 (P.S. dated Jun. 25, 2007): Aggregate | Zero (S-47) | 7.86% (Jul., p.21) | 9.49% (Sep., p.18) | 17.04% (Dec., p.18) | 29.52% (Jun., p.18) | 34.15% (Nov., 2012 p.9) |

72.     This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by the Credit Unions, was later discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

73.     The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default."  Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process, resulting from systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

74.     In January 2011, the Financial Stability Oversight Council ("FSOC"), chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy.  *See* Fin. Stability Oversight Council, Macroeconomic Effects of Risk Retention Requirements (2011) ("FSOC Risk Retention Report").  The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent better

lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have

on the economy."  *Id*. at 2.

75.     The FSOC Risk Retention Report observed that the securitization process often

incentivizes poor underwriting by shifting the risk of default from the originators to the

investors, while obscuring critical information concerning the actual nature of the risk.  The

FSOC Risk Retention Report stated:

> The securitization process involves multiple parties with varying incentives and
> information, thereby breaking down the traditional direct relationship between
> borrower and lender.  The party setting underwriting standards and making
> lending decisions (the originator) and the party making structuring decisions (the
> securitizer) are often exposed to minimal or no credit risk.  By contrast, the party
> that is most exposed to credit risk (the investor) often has less influence over
> underwriting standards and may have less information about the borrower.  As a
> result, originators and securitizers that do not retain risk can, at least in the short
> run, maximize their own returns by lowering loan underwriting standards in ways
> that investors may have difficulty detecting.  The originate-to-distribute model, as
> it was conducted, exacerbated this weakness by compensating originators and
> securitizers based on volume, rather than on quality.

*Id*. at 3.

76.     Indeed, originators that wrote a high percentage of their loans for distribution

were more likely to disregard underwriting standards, resulting in poorly performing mortgages,

in contrast to originators that originated and then held most of their loans.

77.     High OTD originators profited from mortgage origination fees without bearing

the risks of borrower default or insufficient collateral in the event of default.  Divorced from

these risks, high OTD originators were incentivized to push loan quantity over quality.

78.     Table 6 (*infra*) shows the percentage of loans originated for distribution relative to

all the loans made by the Originators for the years 2005, 2006 and 2007, for those Originators in

this Complaint with high OTD percentages.  The data was obtained from the Home Mortgage

Disclosure Act database.

**Table 6**
*Originator "Originate-to-Distribute" Percentages*

| Originator | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |
| First Horizon Home Loans | 99 | 98.3 | |
| First Magnus Financial Corp | 100 | 100 | |
| GMAC Mortgage Corp. | 89.4 | 85.1 | 91.8 |
| GreenPoint Mortgage Funding, Inc. | 89 | 87 | 95.6 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| Long Beach Mortgage Co. | | 80.23 | |
| Metrocities Mortgage | 99.96 | 100 | 100 |
| MortgageIT, Inc. | 55.5 | 98.8 | 100 |
| People's Choice Home Loan, Inc. | 83.4 | 87.8 | |
| Plaza Home Mortgage, Inc. | 96.7 | 84.1 | 92.5 |
| Secured Bankers Mortgage | 99.7 | 100 | 100 |
| SunTrust Mortgage, Inc. | 62.6 | 71.1 | 74.4 |

**B.     The Surge in Actual Versus Expected Cumulative Gross Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

79.     The actual gross losses to the mortgage pools underlying the RMBS the Credit Unions purchased have exceeded expected gross losses so quickly and by so wide a margin (*see infra* Figure 2) that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents.

80.      Every month, the RMBS trustee reports the number and outstanding balance of all loans in the mortgage pools that have defaulted.  The running total of this cumulative default balance is referred to as the "gross loss."

81.     When defaulted loans are foreclosed upon, the proceeds from the foreclosures are distributed to the investors and any shortfall on the defaulted loan balances is realized as a loss.

The running total of this cumulative realized loss (defaulted loan balance minus recovery in foreclosure) is referred to as the "net loss."

82.     "Actual loss" is the economic loss the mortgage pool experiences in fact.  So "actual gross loss" is the actual cumulative sum of the balance of the loans in default for a particular security.  Likewise, "actual net loss" is the actual cumulative realized loss on defaulted loans after foreclosure.

83.     At the time a security is rated, the rating agency calculates an amount of "expected loss" using a model based on historical performance of similar securities.  So "expected gross loss" is the expected cumulative sum of the balance of the loans in default for a particular security.  Likewise, "expected net loss" is the expected cumulative realized loss on defaulted loans after foreclosure.  The amount of expected net loss drives the credit ratings assigned to the various tranches of RMBS.

84.     Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected net loss (in equation form:  $CE/ENL = RF$).  Thus, the rating factor expresses how many times the expected net loss is covered by credit enhancement.  A triple-A rated security would have a rating factor of "5," so would require credit enhancement of five times the amount of the expected net loss.  A "double-A rating" would have a rating factor of "4," and thus would require credit enhancement equaling four times the expected net loss.  A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times expected net loss.  A "Baa" rating would require credit enhancement of  2—1.5 times expected net loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected net loss.

85.     Accordingly, by working backwards from this equation, one can infer expected net loss in an already-issued offering.  For example, assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million.  This means the non-senior tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior tranches in this hypothetical offering serves as the credit enhancement for the senior tranche.  Therefore, on our hypothetical $100 million offering, the expected net loss would be $5 million, which is the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5.  The following equation illustrates: $25,000,000/5 = $5,000,000.

86.     Expected gross loss can be then mathematically derived by applying an "expected recovery rate" to the expected net loss ($EGL = ENL/(1 – ERR)$).

87.     A comparison of actual gross losses to expected gross losses for a particular security can be made graphically by plotting the actual versus expected loss data on a line graph.  Figure 2 (*infra*) is a series of such line graphs.  Figure 2 illustrates the actual gross loss (again, actual defaults) the pools backing the RMBS purchased by the Credit Unions experienced in the first twelve months after issuance compared to the expected gross loss (again, expected defaults) for those pools during the same time period.

88.      The actual gross loss data in Figure 2 (*infra*) was obtained from ABSNET, a resource for asset-backed securities related data.  The expected gross losses were calculated by "grossing up" the rating-implied expected net losses using an expected recovery rate of 85%.

89.     As the graphs show, the actual gross losses (the solid lines) far exceeded the expected gross losses (the dotted lines) for the period analyzed.  That means that the actual

balance of defaulted loans in the first twelve months following issuance far exceeded the

expected balance of defaulted loans based on historical performance.

**Figure 2**
*Illustration of Expected Gross Losses v. Actual Gross Losses for
the Credit Unions' RMBS Purchases*

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 1 | $ - | $ 651,973 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 2 | $ - | $ 712,117 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 3 | $ - | $ 777,684 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 4 | $ 396,345 | $ 849,137 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 5 | $ 397,512 | $ 926,977 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 6 | $ 743,760 | $ 1,011,741 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 7 | $ 746,578 | $ 1,104,003 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 8 | $ 749,390 | $ 1,204,378 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 9 | $ 1,705,812 | $ 1,313,525 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 10 | $ 2,195,201 | $ 1,432,143 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 11 | $ 3,035,276 | $ 1,560,973 |
| IndyMac INDX Mortgage Loan Trust 2006-AR12 | 38456 | 12 | $ 5,705,655 | $ 1,700,803 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 1 | $ - | $ 6,559,201 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 2 | $ 509,317 | $ 7,164,288 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 3 | $ - | $ 7,823,925 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 4 | $ 544,249 | $ 8,542,786 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 5 | $ 2,392,515 | $ 9,325,900 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 6 | $ 26,040,970 | $ 10,178,664 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 7 | $ 30,473,162 | $ 11,106,869 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 8 | $ 81,251,092 | $ 12,116,705 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 9 | $ 101,257,725 | $ 13,214,782 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 10 | $ 119,993,620 | $ 14,408,137 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 11 | $ 149,372,173 | $ 15,704,242 |
| Long Beach Mortgage Loan Trust 2006-9 | 39281 | 12 | $ 176,661,494 | $ 17,111,006 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 1 | $ 271,526 | $ 4,501,935 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 2 | $ 271,387 | $ 4,917,239 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 3 | $ - | $ 5,369,983 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 4 | $ 1,269,964 | $ 5,863,377 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 5 | $ 3,204,501 | $ 6,400,870 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 6 | $ 15,115,141 | $ 6,986,168 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 7 | $ 32,266,339 | $ 7,623,245 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 8 | $ 46,606,341 | $ 8,316,351 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 9 | $ 62,839,633 | $ 9,070,020 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 10 | $ 89,410,230 | $ 9,889,085 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 11 | $ 105,816,830 | $ 10,778,671 |
| Long Beach Mortgage Loan Trust 2006-10 | 39282 | 12 | $ 120,703,298 | $ 11,744,210 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 1 | $ - | $ 6,553,966 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 2 | $ - | $ 7,158,570 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 3 | $ 890,051 | $ 7,817,680 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 4 | $ 8,357,534 | $ 8,535,968 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 5 | $ 12,840,288 | $ 9,318,456 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 6 | $ 32,937,163 | $ 10,170,540 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 7 | $ 47,453,779 | $ 11,098,004 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 8 | $ 77,814,855 | $ 12,107,034 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 9 | $ 111,775,253 | $ 13,204,235 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 10 | $ 146,284,958 | $ 14,396,637 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 11 | $ 170,179,730 | $ 15,691,707 |
| Long Beach Mortgage Loan Trust 2006-11 | 39653 | 12 | $ 184,780,135 | $ 17,097,348 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 1 | $ - | $ 837,607 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 2 | $ - | $ 914,876 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 3 | $ - | $ 999,112 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 4 | $ 1,982,522 | $ 1,090,910 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 5 | $ 3,098,851 | $ 1,190,091 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 6 | $ 7,535,538 | $ 1,299,811 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 7 | $ 8,877,706 | $ 1,418,342 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 8 | $ 7,269,659 | $ 1,547,298 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 9 | $ 7,809,257 | $ 1,687,522 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 10 | $ 6,135,975 | $ 1,839,912 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 11 | $ 11,639,877 | $ 2,005,424 |
| Luminent Mortgage Loan Trust 2007-1 | 40299 | 12 | $ 13,374,400 | $ 2,185,068 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 1 | $ - | $ 1,213,245 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 2 | $ - | $ 1,325,167 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 3 | $ 644,707 | $ 1,447,179 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 4 | $ 1,439,990 | $ 1,580,146 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 5 | $ 23,294,482 | $ 1,724,997 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 6 | $ 70,647,848 | $ 1,882,731 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 7 | $ 101,257,029 | $ 2,054,420 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 8 | $ 138,426,487 | $ 2,241,208 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 9 | $ 172,599,528 | $ 2,444,317 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 10 | $ 202,529,492 | $ 2,665,050 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 11 | $ 238,919,111 | $ 2,904,789 |
| WaMu Asset-Backed Certificates 2007-HE2 | 41111 | 12 | $ 270,615,040 | $ 3,164,996 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 1 | $ - | $ 1,063,483 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 2 | $ 161,011 | $ 1,161,589 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 3 | $ 500,173 | $ 1,268,540 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 4 | $ 627,410 | $ 1,385,093 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 5 | $ 10,592,646 | $ 1,512,064 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 6 | $ 26,822,887 | $ 1,650,328 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 7 | $ 57,385,779 | $ 1,800,824 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 8 | $ 77,917,284 | $ 1,964,554 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 9 | $ 97,565,071 | $ 2,142,592 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 10 | $ 119,606,028 | $ 2,336,078 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 11 | $ 137,868,150 | $ 2,546,223 |
| WaMu Asset-Backed Certificates 2007-HE3 | 41345 | 12 | $ 157,921,568 | $ 2,774,310 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 1 | $ - | $ 3,015,964 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 2 | $ - | $ 3,294,187 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 3 | $ - | $ 3,597,492 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 4 | $ 7,022,550 | $ 3,928,029 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 5 | $ 6,770,195 | $ 4,288,110 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 6 | $ 13,145,969 | $ 4,680,217 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 7 | $ 20,735,797 | $ 5,107,011 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 8 | $ 34,168,692 | $ 5,571,341 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 9 | $ 50,980,815 | $ 6,076,244 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 10 | $ 60,168,866 | $ 6,624,956 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 11 | $ 64,630,245 | $ 7,220,913 |
| WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | 41674 | 12 | $ 81,367,115 | $ 7,867,753 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 1 | $ - | $ 972,638 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 2 | $ - | $ 1,062,364 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 3 | $ - | $ 1,160,179 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 4 | $ 302,116 | $ 1,266,776 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 5 | $ 520,398 | $ 1,382,901 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 6 | $ 1,576,914 | $ 1,509,354 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 7 | $ 2,024,777 | $ 1,646,994 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 8 | $ 1,638,896 | $ 1,796,738 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 9 | $ 4,271,041 | $ 1,959,568 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 10 | $ 6,137,753 | $ 2,136,526 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 11 | $ 8,731,763 | $ 2,328,720 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | 39875 | 12 | $ 10,266,063 | $ 2,537,324 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 1 | $ - | $ 985,143 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 2 | $ - | $ 1,076,022 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 3 | $ - | $ 1,175,095 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 4 | $ - | $ 1,283,062 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 5 | $ 481,224 | $ 1,400,680 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 6 | $ 2,166,811 | $ 1,528,759 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 7 | $ 3,729,634 | $ 1,668,168 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 8 | $ 8,642,161 | $ 1,819,838 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 9 | $ 11,365,365 | $ 1,984,761 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 10 | $ 12,391,885 | $ 2,163,994 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 11 | $ 15,174,114 | $ 2,358,659 |
| WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | 40643 | 12 | $ 19,247,186 | $ 2,569,945 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 1 | $ - | $ 1,081,131 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 2 | $ - | $ 1,180,866 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 3 | $ - | $ 1,289,592 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 4 | $ 2,711,757 | $ 1,408,079 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 5 | $ 2,719,953 | $ 1,537,157 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 6 | $ 4,594,648 | $ 1,677,715 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 7 | $ 4,856,458 | $ 1,830,708 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 8 | $ 3,707,625 | $ 1,997,156 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 9 | $ 6,994,136 | $ 2,178,149 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 10 | $ 12,163,741 | $ 2,374,845 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 11 | $ 16,488,892 | $ 2,588,478 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | 41835 | 12 | $ 14,704,880 | $ 2,820,350 |



41

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 1 | $ - | $ 1,069,648 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 2 | $ - | $ 1,168,323 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 3 | $ 330,904 | $ 1,275,894 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 4 | $ 1,570,857 | $ 1,393,123 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 5 | $ 1,575,999 | $ 1,520,830 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 6 | $ 4,435,146 | $ 1,659,895 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 7 | $ 7,478,991 | $ 1,811,263 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 8 | $ 9,516,215 | $ 1,975,943 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 9 | $ 15,268,968 | $ 2,155,013 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 10 | $ 15,911,017 | $ 2,349,621 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 11 | $ 13,086,513 | $ 2,560,984 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 40696 | 12 | $ 16,597,831 | $ 2,790,394 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 1 | $ - | $ 2,237,168 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 2 | $ - | $ 2,443,547 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 3 | $ - | $ 2,668,531 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 4 | $ 1,057,723 | $ 2,913,716 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 5 | $ 3,101,962 | $ 3,180,815 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 6 | $ 11,254,800 | $ 3,471,670 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 7 | $ 17,272,778 | $ 3,788,256 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 8 | $ 21,876,722 | $ 4,132,684 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 9 | $ 23,439,771 | $ 4,507,209 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 10 | $ 35,398,882 | $ 4,914,230 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 11 | $ 35,119,094 | $ 5,356,297 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | 42346 | 12 | $ 52,196,413 | $ 5,836,106 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 1 | $ - | $ 2,022,282 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 2 | $ 328,487 | $ 2,208,838 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 3 | $ 3,415,814 | $ 2,412,212 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 4 | $ 8,134,850 | $ 2,633,846 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 5 | $ 7,588,554 | $ 2,875,290 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 6 | $ 16,967,408 | $ 3,138,208 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 7 | $ 27,691,052 | $ 3,424,384 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 8 | $ 29,329,947 | $ 3,735,729 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 9 | $ 41,354,913 | $ 4,074,280 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 10 | $ 43,427,206 | $ 4,442,206 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 11 | $ 57,393,263 | $ 4,841,811 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | 42175 | 12 | $ 68,382,534 | $ 5,275,534 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 1 | $ - | $ 1,991,844 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 2 | $ - | $ 2,175,592 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 3 | $ - | $ 2,375,905 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 4 | $ 1,182,031 | $ 2,594,203 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 5 | $ 8,620,218 | $ 2,832,012 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 6 | $ 20,227,758 | $ 3,090,973 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 7 | $ 21,911,101 | $ 3,372,842 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 8 | $ 28,870,867 | $ 3,679,501 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 9 | $ 30,180,879 | $ 4,012,956 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 10 | $ 61,229,443 | $ 4,375,344 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 11 | $ 70,433,778 | $ 4,768,935 |
| WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | 42121 | 12 | $ 74,029,686 | $ 5,196,129 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 1 | $ - | $ 3,614,900 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 2 | $ - | $ 3,948,375 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 3 | $ - | $ 4,311,913 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 4 | $ - | $ 4,708,091 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 5 | $ 7,309,872 | $ 5,139,680 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 6 | $ 17,139,329 | $ 5,609,655 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 7 | $ 28,051,404 | $ 6,121,206 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 8 | $ 34,674,512 | $ 6,677,746 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 9 | $ 36,728,991 | $ 7,282,917 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 10 | $ 39,938,350 | $ 7,940,597 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 11 | $ 51,423,158 | $ 8,654,905 |
| Washington Mutual Asset-Backed Certificates WMABS 2006-HE5 | 39891 | 12 | $ 56,514,786 | $ 9,430,200 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 1 | $ - | $ 1,067,626 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 2 | $ - | $ 1,166,115 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 3 | $ - | $ 1,273,482 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 4 | $ 655,581 | $ 1,390,490 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 5 | $ 657,504 | $ 1,517,955 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 6 | $ 751,191 | $ 1,656,758 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 7 | $ - | $ 1,807,840 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 8 | $ 1,101,693 | $ 1,972,208 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 9 | $ 1,667,725 | $ 2,150,940 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 10 | $ 2,741,608 | $ 2,345,179 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 11 | $ 3,774,452 | $ 2,556,143 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | 38630 | 12 | $ 4,305,545 | $ 2,785,119 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 1 | $ - | $ 781,104 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 2 | $ - | $ 853,161 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 3 | $ - | $ 931,714 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 4 | $ 209,733 | $ 1,017,320 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 5 | $ 155,500 | $ 1,110,577 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 6 | $ 1,043,672 | $ 1,212,129 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 7 | $ 2,065,530 | $ 1,322,664 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 8 | $ 2,758,635 | $ 1,442,921 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 9 | $ 4,289,880 | $ 1,573,686 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 10 | $ 6,229,946 | $ 1,715,796 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 11 | $ 6,857,414 | $ 1,870,143 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | 39034 | 12 | $ 6,172,111 | $ 2,037,668 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 1 | $ - | $ 2,391,901 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 2 | $ - | $ 2,612,555 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 3 | $ - | $ 2,853,100 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 4 | $ 700,188 | $ 3,115,243 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 5 | $ 1,683,148 | $ 3,400,815 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 6 | $ 2,572,588 | $ 3,711,788 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 7 | $ 2,904,445 | $ 4,050,270 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 8 | $ 2,919,307 | $ 4,418,520 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 9 | $ 3,011,529 | $ 4,818,949 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 10 | $ 4,454,577 | $ 5,254,122 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 11 | $ 6,479,965 | $ 5,726,764 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | 38830 | 12 | $ 9,316,301 | $ 6,239,760 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 1 | $ - | $ 1,417,416 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 2 | $ - | $ 1,548,173 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 3 | $ - | $ 1,690,718 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 4 | $ - | $ 1,846,060 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 5 | $ 4,032,954 | $ 2,015,288 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 6 | $ 4,052,265 | $ 2,199,567 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 7 | $ 1,660,044 | $ 2,400,148 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 8 | $ 2,927,075 | $ 2,618,369 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 9 | $ 4,173,420 | $ 2,855,659 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 10 | $ 6,359,998 | $ 3,113,538 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 11 | $ 10,340,727 | $ 3,393,621 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | 38628 | 12 | $ 12,638,669 | $ 3,697,617 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 1 | $ - | $ 1,173,203 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 2 | $ - | $ 1,281,431 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 3 | $ - | $ 1,399,416 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 4 | $ 1,129,193 | $ 1,527,995 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 5 | $ 2,888,691 | $ 1,668,065 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 6 | $ 1,937,620 | $ 1,820,594 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 7 | $ 2,610,752 | $ 1,986,616 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 8 | $ 4,088,508 | $ 2,167,239 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 9 | $ 3,652,179 | $ 2,363,645 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 10 | $ 8,683,911 | $ 2,577,093 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 11 | $ 10,411,175 | $ 2,808,919 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | 38741 | 12 | $ 10,101,557 | $ 3,060,538 |



46

| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 1 | $ - | $ 1,060,945 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 2 | $ - | $ 1,158,817 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 3 | $ - | $ 1,265,513 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 4 | $ 1,248,923 | $ 1,381,788 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 5 | $ 3,694,878 | $ 1,508,456 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 6 | $ 5,219,765 | $ 1,646,390 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 7 | $ 6,750,441 | $ 1,796,526 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 8 | $ 6,138,087 | $ 1,959,866 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 9 | $ 10,874,486 | $ 2,137,479 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 10 | $ 15,621,363 | $ 2,330,503 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 11 | $ 18,898,467 | $ 2,540,147 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | 41722 | 12 | $ 20,756,344 | $ 2,767,690 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 1 | $ - | $ 1,724,605 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 2 | $ - | $ 1,883,700 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 3 | $ 314,171 | $ 2,057,138 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 4 | $ 648,882 | $ 2,246,147 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 5 | $ 2,768,122 | $ 2,452,051 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 6 | $ 4,101,553 | $ 2,676,267 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 7 | $ 4,594,019 | $ 2,920,319 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 8 | $ 9,879,658 | $ 3,185,835 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 9 | $ 15,320,891 | $ 3,474,551 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 10 | $ 20,012,450 | $ 3,788,319 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 11 | $ 22,855,201 | $ 4,129,102 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 41269 | 12 | $ 29,961,405 | $ 4,498,982 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 1 | $ - | $ 1,497,767 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 2 | $ - | $ 1,635,936 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 3 | $ - | $ 1,786,562 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 4 | $ - | $ 1,950,711 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 5 | $ 4,954,092 | $ 2,129,532 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 6 | $ 8,260,306 | $ 2,324,257 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 7 | $ 13,083,298 | $ 2,536,209 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 8 | $ 15,545,108 | $ 2,766,801 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 9 | $ 13,267,522 | $ 3,017,542 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 10 | $ 16,955,088 | $ 3,290,040 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 11 | $ 22,009,859 | $ 3,586,000 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | 41704 | 12 | $ 28,373,218 | $ 3,907,229 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 1 | $ - | $ 41,946 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 2 | $ - | $ 45,816 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 3 | $ - | $ 50,034 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 4 | $ 2,653,630 | $ 54,631 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 5 | $ 5,658,307 | $ 59,639 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 6 | $ 7,762,953 | $ 65,092 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 7 | $ 9,660,461 | $ 71,028 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 8 | $ 12,199,471 | $ 77,486 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 9 | $ 17,785,899 | $ 84,508 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 10 | $ 23,327,278 | $ 92,140 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 11 | $ 25,983,471 | $ 100,428 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | 41741 | 12 | $ 30,062,739 | $ 109,425 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 1 | $ - | $ 2,978,935 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 2 | $ - | $ 3,253,742 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 3 | $ - | $ 3,553,324 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 4 | $ 2,535,091 | $ 3,879,803 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 5 | $ 3,043,984 | $ 4,235,462 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 6 | $ 3,059,212 | $ 4,622,755 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 7 | $ 5,314,531 | $ 5,044,310 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 8 | $ 9,137,378 | $ 5,502,938 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 9 | $ 16,814,485 | $ 6,001,642 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 10 | $ 23,677,196 | $ 6,543,618 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 11 | $ 31,249,372 | $ 7,132,258 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | 40388 | 12 | $ 44,199,013 | $ 7,771,156 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 1 | $ - | $ 775,097 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 2 | $ 251,386 | $ 846,600 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 3 | $ 1,465,017 | $ 924,548 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 4 | $ 1,471,311 | $ 1,009,496 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 5 | $ 4,908,602 | $ 1,102,036 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 6 | $ 7,621,788 | $ 1,202,807 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 7 | $ 11,624,878 | $ 1,312,492 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 8 | $ 19,681,019 | $ 1,431,824 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 9 | $ 18,112,769 | $ 1,561,583 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 10 | $ 21,186,590 | $ 1,702,601 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 11 | $ 23,846,020 | $ 1,855,761 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | 41752 | 12 | $ 30,008,074 | $ 2,021,997 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 1 | $ 962,887 | $ 883,276 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 2 | $ 966,645 | $ 964,758 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 3 | $ 1,536,942 | $ 1,053,586 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 4 | $ 7,176,440 | $ 1,150,390 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 5 | $ 10,901,274 | $ 1,255,845 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 6 | $ 14,878,204 | $ 1,370,681 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 7 | $ 23,530,592 | $ 1,495,675 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 8 | $ 21,720,201 | $ 1,631,661 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 9 | $ 24,565,167 | $ 1,779,531 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 10 | $ 26,750,381 | $ 1,940,230 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 11 | $ 31,842,143 | $ 2,114,767 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | 42156 | 12 | $ 35,088,946 | $ 2,304,204 |



| Issuing Entity | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 1 | $ - | $ 662,084 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 2 | $ - | $ 723,162 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 3 | $ 4,586,775 | $ 789,745 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 4 | $ 11,535,555 | $ 862,307 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 5 | $ 19,333,406 | $ 941,354 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 6 | $ 28,087,882 | $ 1,027,432 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 7 | $ 35,334,665 | $ 1,121,125 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 8 | $ 43,585,479 | $ 1,223,057 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 9 | $ 45,368,664 | $ 1,333,897 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 10 | $ 49,342,680 | $ 1,454,354 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 11 | $ 53,741,993 | $ 1,585,183 |
| Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | 42112 | 12 | $ 54,195,812 | $ 1,727,181 |



90.     As indicated in Figure 2 (*supra*), actual gross losses spiked almost immediately after issuance of the RMBS.  For example, in the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 offering, actual gross losses at month twelve exceeded $54 million, or more than 31 times the expected gross losses of approximately $1.7 million (*see supra* Figure 2).

91.     This dramatic spike in actual versus expected  gross losses during the first twelve months following issuance is strong evidence that a significant number of the loans in those pools were underwritten in disregard of the underwriting guidelines stated in the Offering Documents.

92.     In addition, credit enhancement is designed to ensure that high investment grade rated RMBS perform to that standard.  The fact that the credit enhancement for the Credit Unions' senior tranches failed also shows that a critical number of mortgages in the pool were improperly underwritten.

**C.     The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines**

93.     All of the RMBS the Credit Unions purchased were rated triple-A at issuance.

94.     Moody's and S&P have since downgraded the RMBS the Credit Unions purchased to well below investment grade (*see supra* Table 4).

95.     Triple-A rated product "should be able to withstand an extreme level of stress and still meet its financial obligations. A historical example of such a scenario is the Great Depression in the U.S."  Understanding Standard & Poor's Rating Definitions, June 3, 2009, at 14.  The certificates purchased in the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 offering (CUSIP 939346AD4, *see supra* Table 1), the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 offering (CUSIP

93936LAE7, *see supra* Table 1), the Luminent Mortgage Trust 2007-1 offering (CUSIP

55028CAE5, *see supra* Table 2), and the Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR9 offering (CUSIP 939346AD4, *see supra* Table 2), have

defaulted, meaning the certificate has failed to pay out to RMBS investors as promised, because

the income stream generated from borrower's mortgage loan payments was insufficient and

credit enhancement failed to make up for the shortfall.

96.     The collapse in the credit ratings of the RMBS indicates that the loans

collateralizing the certificates were the product of systematic disregard of underwriting

guidelines and that these securities were impaired from the outset.

**D.      Revelations Subsequent to the Offerings Show That the Originators
          Systematically Disregarded Underwriting Standards**

97.     Public disclosures subsequent to the issuance of the RMBS reinforce the

allegation that the Originators systematically abandoned their stated underwriting guidelines.

**1.      The Systematic Disregard of Underwriting Standards Was Pervasive
          as Revealed After the Collapse**

98.     Originators experienced unprecedented success during the mortgage boom.  Yet,

their success was illusory.

99.     The OCC, an office within the  Treasury Department, published a report in

November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures

and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008

'Worst Ten in the Worst Ten' Report").  In this report, the OCC emphasized the importance of

adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of
> the borrower and market conditions that a borrower is highly likely to be able to
> repay the loan as promised—is a major determinant of subsequent loan
> performance.  The quality of underwriting varies across lenders, a factor that is

evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

100.    Recently government reports and investigations and newspaper reports have uncovered the extent of the pervasive abandonment of underwriting standards.  The Permanent Subcommittee on Investigations in the United States Senate ("PSI") recently released its report detailing the causes of the financial crisis.  Using WaMu Bank as a case study, the PSI concluded through its investigation:

> Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage backed securities that undermined U.S. financial markets.  The Subcommittee investigation indicates that Washington Mutual was emblematic of a host of financial institutions that knowingly originated, sold, and securitized billions of dollars in high risk, poor quality home loans.  These lenders were not the victims of the financial crisis; the high risk loans they issued became the fuel that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011) ("PSI Wall Street Report").

101.    Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report in January 2011 that detailed, among other things, the collapse of mortgage underwriting standards and subsequent collapse of the mortgage market and wider economy.  *See* Fin. Crisis Inquiry Comm'n, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (2011) ("FCIC Report").

102.    The FCIC Report concluded that there was a "systemic breakdown in accountability and ethics" during the housing and financial crisis. "Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis."  *Id*. at xxii.  The FCIC found that the current economic crisis had its genesis in the housing boom:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown crises in the fall of 2008. Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.

*Id*. at xvi.

103.    During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan. The FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id*. at xxii. Early Payment Default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards. . . ." *Id*.

104.    In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id*.

105.    Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id*. at xxiii.

106.    In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id*. at 12-13 (internal quotation marks omitted).

107.    Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in his speech before the World Affairs Council of Greater Richmond on April 10, 2008:

> First, at the point of origination, underwriting standards became increasingly compromised.   The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories.   To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay.   In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators.   Notably, the incentive structures sometimes often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain.   Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process.   However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

108.    Investment banks securitized loans that were not originated in accordance with underwriting guidelines and failed to disclose this fact in RMBS offering documents.   As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.   Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

109.    The lack of disclosure regarding the true underwriting practices of the Originators

in the Offering Documents at issue in this Complaint put the Credit Unions at a severe

disadvantage.

110.    Because investors had limited or no access to information concerning the actual

quality of loans underlying the RMBS, the OTD model created a situation where the origination

of low quality mortgages through poor underwriting thrived.  The FSOC found:

> In the originate-to-distribute model, originators receive significant compensation
> upfront without retaining a material ongoing economic interest in the performance
> of the loan.  This reduces the economic incentive of originators and securitizers to
> evaluate the credit quality of the underlying loans carefully.   Some research
> indicates that securitization was associated with lower quality loans in the
> financial crisis.   For instance, one study found that subprime borrowers with
> credit scores just above a threshold commonly used by securitizers to determine
> which loans to purchase defaulted at significantly higher rates than those with
> credit scores below the threshold.   By lowering underwriting standards,
> securitization may have increased the amount of credit extended, resulting in
> riskier and unsustainable loans that otherwise may not have been originated.

FSOC Risk Retention Report at 11 (footnote omitted).

111.    The FSOC reported that as the OTD model became more pervasive in the

mortgage industry, underwriting practices weakened across the industry.  The FSOC Risk

Retention Report found "[t]his deterioration was particularly prevalent with respect to the

verification of the borrower's income, assets, and employment for residential real estate loans."

*Id*.

112.    In sum, the disregard of underwriting standards was pervasive across originators.

The failure to adhere to underwriting standards directly contributed to the sharp decline in the

quality of mortgages that became part of mortgage pools collateralizing RMBS.  The lack of

adherence to underwriting standards for the loans underlying RMBS was not disclosed to

investors in the offering materials.  The nature of the securitization process, with the investor

several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

113.    As discussed below, facts have recently come to light that show many of the Originators that contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

### 2.    Alliance Bancorp's Systematic Disregard of Underwriting Standards

114.    Alliance Bancorp originated or contributed a material portion of the loans in the mortgage pool underlying the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 offerings. *See infra* Table 7.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

115.    Alliance Bancorp's abandonment of its guidelines was revealed in a suit by the Federal Home Loan Bank of Boston ("FHLB Boston"), an RMBS investor like the Credit

Unions.  FHLB Boston conducted a review of nine loans from Alliance Bancorp.  Each deviated

from the underwriting guidelines.  *See* Am. Compl., *FHLB Boston v. Ally Fin. Inc.*, No. 11-

10952, ¶¶ 629-636 & App. VIII (D. Mass. filed June 29, 2012).

116.     The types of deviations from the guidelines uncovered included:

- A loan file with no credit documentation whatsoever, making it impossible to evaluate the borrower's ability to repay the loan.  *Id.* ¶ 635.

- A cash-out refinance loan for a property with an unrealistic appraisal value of $2.8 million.  Less than 16 months before the appraisal, the home had sold for just $1.55 million.  *Id.* at ¶ 634.

- A loan made using an improper appraised value.  For refinance loans that had been purchased within the prior year, the underwriting guidelines required that the sale price of the property be used to calculate the LTV ratio.  If the sale price had been used, the loan could not have been made because the CLTV exceeded 100%.  Because an appraised value was used instead of the sale price, the CLTV dropped below 100% and the loan was made.  *Id.* App. VIII at 1-2.

- A loan to a janitor, for whom the 75th percentile income was $3,317 per month.  The borrower's monthly obligations alone – including the subject transaction – were $5,587, far exceeding what could have been a reasonable repayment amount.  *Id.* App. VIII at 6.

**3.     Argent Mortgage Company's Systematic Disregard of Underwriting Standards**

117.     Argent Mortgage Company originated or contributed a material portion of the

loans in the mortgage pool underlying the Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-HY1 offering.  *See infra* Table 7.  Accordingly, a reasonable

investor would have considered information that this originator systematically disregarded

underwriting standards to be material to the decision whether to purchase from these offerings.

In addition, a reasonable investor would also have considered information that this originator

systematically disregarded underwriting standards to be material to the decision whether to

purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

118.    ACC Capital Holdings ("ACC Capital"), based in Orange, California, was the nation's largest privately-owned subprime lender.  Ameriquest Mortgage Company ("Ameriquest") was ACC Capital's retail mortgage lending unit.  Argent Mortgage Company ("Argent") was ACC Capital's wholly-owned wholesale lending unit that made loans through independent brokers.  ACC Capital was one of the first subprime lenders to start showing problems stemming largely from problems with loan quality.  On September 1, 2007, Citigroup purchased Argent from the troubled ACC Capital, and Ameriquest announced that it was shutting down lending operations.

119.    Argent appeared in OCC's 2008 "Worst Ten in the Worst Ten" Report.  Argent was ranked as the "worst" lender in Cleveland, Ohio, and Detroit, Michigan; the second worst in Las Vegas, Nevada, and Miami, Florida; the third worst in Denver, Colorado; the fourth worst in Stockton, California; the fifth worst in Bakersfield, California; the sixth worst in Riverside and Sacramento, California; and the eighth worst in Memphis, Tennessee.

120.    In the 2009 Report, Argent was fourth in Las Vegas, Nevada, sixth in Fort Pierce-Port St. Lucie, Florida and Reno, Nevada, seventh in Bakersfield, California and Stockton-Lodi, California, eighth in Riverside-San Bernardino, California, ninth in Merced, California, Modesto, California and Fort Myers-Cape Coral, Florida and tenth in Vallejo-Fairfield-Napa, California.

121.    According to a May 11, 2008, Cleveland Plain Dealer article titled The Subprime House of Cards, Jacquelyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, reported that "some

Argent employees played fast and loose with the rules" and stated: "I personally saw some stuff I didn't agree with."  Ms. Fishwick "saw [Argent] account managers remove documents from files and create documents by cutting and pasting them."  Mark Gillispie, *The Subprime House of Cards, Cleveland Plain-Dealer*, May 11, 2008, *available at*

http://blog.cleveland.com/metro/2008/05?the_subprime_house_of_cards.html.

122.    According to a January 29, 2009, article in the Miami Herald, Orson Benn, a former vice president of Argent who was convicted and sentenced to prison for racketeering relating to mortgage fraud, spent three years during the height of the housing boom teaching brokers "how to doctor credit reports, coached them to inflate [borrower] income on loan applications, and helped them invent phantom jobs for borrowers" so that loans could be approved.  Jack Dolan et al., *Home Loan Racket Flourished In Florida*, Miami Herald, Jan. 29, 2009, available at http://www.miamiherald.com/2008/12/07/v-fullstory/878194/home-loanracket-flourished-in.html.

123.    According to Mr. Benn himself, "the accuracy of loan applications was not a priority."  *Id.*  The article reports: "The simplest way for a bank to confirm someone's income is to call the employer.  But in at least two dozen cases, the applications show bogus telephone numbers for work references."  *Id.*  The article notes that one Argent broker generated at least 100 loans worth $22 million in Miami and nearly all of them were based on false and misleading financial information.  *See id.*  For instance, "one borrower claimed to work for a company that didn't exist—and got a $170,000 loan.  Another borrower claimed to work a job that didn't exist—and got enough money to buy four houses."  *Id.*  The Miami Herald obtained applications for 129 loans funded by Argent and found that "103 contained red flags: non-existent employers, grossly inflated salaries and sudden, drastic increases in the borrower's net worth."  *Id.*

124.     Richard Bowen, the former Business Chief Underwriter at Citibank, was involved in the due diligence process for Citibank's acquisition of Argent.  In his April 7, 2010 appearance before the FCIC, Mr. Bowen testified that he advised against the acquisition because "we sampled loans that were originated by Argent, and we found large numbers that did not— that were not underwritten according to the representations that were there."  *Subprime Lending and Securitization and Government Sponsored Entities: Hearing Before the Fin. Crisis Inquiry Comm'n*, Hearing Transcript 239 (Apr. 7, 2010) (testimony of Richard M. Bowen III, former Business Chief Underwriter, Citibank).

125.     In a video released by the American News Project on May 11, 2009 titled "*Fraud By Mortgage Companies Key Cause of Foreclosures*," reporters Lagan Sebert and Mike Fritz interviewed several former employees of Argent/Ameriquest regarding their lending practices.

126.     Tamara Loatman-Clark, a former loan closer for Argent, stated "I mean you did what you had to do and again if that meant manipulating documents so that you can get them out so that they could conform, that's what you did. …[T]here were incentives to get as many done as possible.  So on a typical Thursday, I may have 15 or 20 files that I need to get funded somehow and you know you need to work very hard to get 20 files funded.  Whatever hit your desk for the day is what you wanted to get out."

127.     According to the video, "It was the Wall Street business that drove the frantic pace.  Even before proper papers were signed, Ameriquest was bundling the loans and passing them on."  Loatman-Clark said, "And so sometimes when they came back and you're talking about, you know, names not properly on mortgage documents… you're talking about missing documents, like internally the incentive was to do whatever you needed to do to get them out and that sometimes meant that you manipulated documents to get them out."

128.    The video report contained the following exchange:

Reporter: "So you are saying the goal was to make these loans and then get them off your books as quick as possible?"

Loatman-Clark: "Exactly. That was the pressure."

Reporter: "But who were the people who were buying, who were like the most hungry for these loans?"

Loatman-Clark: "Bear Stearns… Citigroup was another one.  Basically the ones that were/are hardest hit were the people who invested.  And these were the people we were shuffling these documents out to by any means necessary."

*Id.*

129.    Omar Kahn, a former Ameriquest Loan Officer, also told the reporters, "Every new closing we had was a bait and switch, because you could never get them to the table if you were honest. … There were instances where the borrower felt uncomfortable about signing the stated income letter, because they didn't want to lie, and the stated income letter would be filled out later on by the processing staff."  *Id*.

130.    Another former Ameriquest Loan Officer named Tyson Russum said, "The entire system is built to do whatever you can to close as many loans at the highest fee amount as possible."  *Id*.

131.    In testimony before the FCIC given Jan. 14, 2010, Illinois Attorney General Lisa Madigan explained that a multistate investigation of Ameriquest "revealed that the company engaged in the kinds of fraudulent practices that other predatory lenders subsequently emulated on a wide scale ... includ[ing]: inflating home appraisals."

132.    On June 23, 2011, the Cleveland Plain Dealer reported that a Cleveland grand jury indicted nine former Argent employees for their suspected roles in approving fraudulent home loans.  *See* Mark Gillespie, "*Former employees of subprime mortgage lender indicted by*

*Cuyahoga County grand jury*," The Plain Dealer, June 23, 2011.  The indictment alleges that Argent employees "helped coach mortgage brokers about how to falsify loan documents so that they misstated the source or existence of down payments as well as borrower's income and assets."  *Id*.  The article noted that "[e]mployees at an Argent loan processing center in Illinois ultimately approved the loans knowing that the company's own lending rules had not been satisfied."  *Id*.  A spokesman for the prosecutor's office said that "Argent employees bent the rules to get loans approved in order to inflate their wages and bonuses."  *Id*.

133.    In a follow-up article published November 15, 2011, Gillespie reported that additional criminal charges had been brought against one of the former Argent employees indicted in June—a woman named Angela Pasternak.  *See* Mark Gillespie, "*Argent Mortgage worker gets indicted again in suspected mortgage fraud case*," The Plain Dealer, Nov. 15, 2011.  According to the article, prosecutors said that Ms. Pasternak, "approved exceptions knowing that loan applications contained false income information and bogus credit scores."  *Id*.  The article also reported, "Plain Dealer investigations found numerous instances in which Argent approved mortgages that contained blatant misrepresentations of borrowers' income, assets and ability to pay."  *Id*.

134.    According to another article, Steve Jernigan, a fraud investigator at Argent, said that when he sent an appraiser to check on a subdivision for which Argent had made loans, the address on the loans was fictitious because the appraiser was standing in the middle of a cornfield.  *See* Michael W. Hudson, "*Silencing the Whistle-blowers*," The Investigative Fund, May 10, 2010.  When Jernigan reviewed the loan files, he determined that the houses did not exist and that each of the loan files contained the picture of the same house.  *See id*.  The article also reported that Argent had been ripped off by a con man named Robert Andrew Penn, who

63

later admitted that he had appropriated victims' names and credit histories to obtain loans and buy properties for inflated prices around Indianapolis. *See id.* Although Argent was warned about the man in 2004, Jernigan said the company did not "conduct a serious investigation" into the fraud until mid-2006 when it learned the scheme was about to be made public by another duped lender. *Id.*

135.   The article stated that the reluctance to investigate fraud was deliberate because management did not want to "crimp loan sales." *Id.* The article quoted Kelly Dragna, a fraud investigator at Ameriquest who said, "You're like a dog on a leash. You're allowed to go as far as a company allows you to go. … At Ameriquest, we were on pretty short leash. We were there for show. We were there to show people that they had a lot of investigators on staff." *Id.*

136.   The article outlined the story of one fraud investigator's career at Ameriquest to demonstrate the extent to which Ameriquest turned a blind eye to fraud:

> Ed Parker signed on as Ameriquest's head of mortgage fraud investigation in early 2003, as the company was on the verge of becoming the nation's largest subprime lender. The first case he took on involved allegations that employees at the company's Grand Rapids, Mich., branch were pushing real-estate appraisers to inflate loan applicants' home values. Workers admitted to the scheme, Parker said, and the company shut down the branch and repurchased hundreds of loans from the investors who'd bought them.

> Parker saw the investigation as a success. He thought he'd helped set a precedent that fraud wouldn't be tolerated. But he discovered that his actions didn't endear him to many of his co-workers. One executive told him the sales force looked on him as "Darth Vader." On another occasion, when a suspicious loan file was brought up during a staff meeting, a senior executive said: "Don't give it to Ed. If you give it to him, that one file will multiply and become hundreds of files."

> Parker said higher-ups began pushing him to limit the scope of his inquiries and focus on smaller cases rather than big-impact ones like Grand Rapids. This message was driven home after Ameriquest learned that a TV reporter was digging into problems at a branch in Mission Valley, Calif. Two loans raised questions about whether branch employees were falsifying not only borrowers' incomes but also their ages, so that the inflated incomes would seem plausible. One borrower was 67, but the loan application prepared in her name said she was

64

41. Another was 74, but the loan application indicated the borrower was 44. The company, Parker said, wanted to limit its exposure and portray the problem as a couple of isolated cases. The company had all of the branch's loan files boxed up and transported to the fraud investigation team in Orange County. Management sent word, however, that Parker's team shouldn't open the boxes. His investigators looked anyway. As they cracked open the files, they saw that falsified incomes and ages were a problem that went beyond two borrowers' loans. When senior managers discovered what the team was doing, Parker said, they weren't happy. "They said: 'Don't look anymore,' " he recalled. "They didn't want to know."

*Id.*

137.    In January 2010, Ameriquest and Argent agreed to pay $22 million to settle 29 class action lawsuits against them that had been consolidated in the Northern District of Illinois, alleging that Argent and Ameriquest inflated appraisal values and borrower income or asset statements and aggressively employed misleading marketing/sales techniques as part of a business strategy to force potential borrowers to close loans.  *See In re Ameriquest Mortgage Co. Mortgage Lending Practices Litig.*, MDL No. 1715 (N.D. Ill).

### 4.    Countrywide's Systematic Disregard of Underwriting Standards

138.    Countrywide Home Loans, Inc. ("Countrywide") was one of the largest originators of residential mortgages in the United States during the time period at issue in this Complaint.  Countrywide originated or contributed a material portion of the loans in the mortgage pool underlying the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7, Washington Mutual Mortgage Pass-Through Certificates, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 offerings.  *See infra* Table 7. Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to

purchase from these offerings.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

139.     In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis." Press Release, Comm. on Oversight & Government Reform, Statement of Chairman Towns on Committee Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks omitted).

140.     On May 9, 2008, the New York Times noted that minimal documentation and stated income loans—Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program—have "bec[o]me known [within the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their income."  Floyd Norris, A Little Pity, Please, for Lenders, N.Y. Times, May 9, 2008 at C1.

141.     In a television special titled, "*If You Had a Pulse, We Gave You a Loan*," Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

He said the loans were "an invitation to lie" because there was so little scrutiny of lenders.  "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."

He said they joked about it:  "If you had a pulse, we gave you a loan.  If you fog the mirror, give you a loan."

But it turned out to be no laughing matter for Partow.  Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes. On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials.  "It's impossible they didn't know."
…

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated.  "I don't buy the rogue.  I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray.  He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path.   It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

Chris Hansen, *'If You Had a Pulse, We Gave You a Loan,'* NBC Dateline (Mar. 22, 2009)

http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-the_hansen_files_with_chris_hansen.

142.     On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives,

alleging securities fraud.  Specifically, the SEC alleged that Mozilo and the others misled

investors about the credit risks that Countrywide created with its mortgage origination business,

telling investors that Countrywide was primarily involved in prime mortgage lending, when it

was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See* Compl. for Violations of the Federal Securities Laws, *SEC v. Mozilo*, No. CV 09-3994-JFW (C.D. Cal. filed June 4, 2009). Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

143. Internal Countrywide e-mails the SEC released in connection with its lawsuit show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." E-mail from Angelo Mozilo to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT). Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." *Id.* (internal quotation marks omitted).

144. Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals." E-mail from Angelo Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept. 1, 2004 8:17 PM PDT).

145.    To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

146.    In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract.  In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate."  E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing Director and Chief of Mortgage Banking and Capital Markets at Countrywide Financial (Apr. 17, 2006 5:55 PM PST).  Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic]  It's not only subordinated to the first, but the first is subprime.  In addition, the [FICOs] are below 600, below 500 and some below 400 . . . .  With real estate values coming down . . . the product will become increasingly worse.  There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

*Id.*

147.    Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."  E-mail from Angelo Mozilo to Carlos Garcia, former CFO of Countrywide Financial and Jim Furash, former President of Countrywide Bank (June 1, 2006 10:38 PM PST).

69

148.    An internal quality control report e-mailed on June 2, 2006, showed that for stated income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.  *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PDT).

149.    Countrywide, apparently, was "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."  E-mail from Angelo Mozilo to Dave Sambol, Managing Director Countrywide (Sept. 26, 2006 10:15 AM PDT).  Yet such loans were securitized and passed on to unsuspecting investors such as the Credit Unions.

150.    With growing concern over the performance of Pay Option ARM loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated for the Bank."  E-mail from Angelo Mozilo Countrywide to Carlos Garcia, former Managing Director, Countrywide (Nov. 3, 2007 5:33 PM PST).  In other words, if Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto the loans.  Mozilo's concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys."  *Id.*

151.    In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product.  This is the most dangerous product in existence and there can be

nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."  E-mail from Angelo Mozilo to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM PST).

152.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors.  In an April 14, 2005 e-mail, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed.  He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." E-mail from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing Director, Countrywide (Apr. 14, 2005 12:14 PM PDT).  Aguilera continued: "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general disregard for corporate program policies and guidelines."  *Id.*  Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice:

> It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions.  I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . .  [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry. . . .

*Id*.

153.    Internal reports months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive. E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PDT).

154.    In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide

executives found that exceptions continued to be used at an unacceptably high rate.  Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."  E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST).

155.    John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 e-mail that "the exception process has never worked properly."  E-mail from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

156.    Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed that its high combined loan-to-value ratio ("CLTV") stated income loans were performing worse than those of its competitors.  After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."  E-mail from Russ Smith, Countrywide to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

157.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

158.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

159.     According to Zachary, Countrywide pressured employees to approve unqualified borrowers.  Countrywide's mentality, he said, was "what do we do to get one more deal done.  It doesn't matter how you get there [i.e., how the employee closes the deal] . . . ."  NBC Nightly News, Countrywide Whistleblower Reports "Liar Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly News").  Zachary also stated that the practices were not the work of a few bad apples, but rather:  "It comes down, I think from the very top that you get a loan done at any cost."  *Id.*

160.     Zachary also told of a pattern of:  1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income in order to qualify for loans.

161.     NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices.  Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans.  NBC News quoted a former loan officer:  "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'"  July 1, 2008 NBC Nightly News.

162.     Not surprisingly, Countrywide's default rates reflected its approach to underwriting.  *See* 2008 "Worst Ten in the Worst Ten" Report.  Countrywide appeared on the top ten list in six of the ten markets: 4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in Stockton, California and Riverside, California; and 10th in Bakersfield, California and Miami, Florida.  When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, Countrywide appeared on the top ten list in every market, holding 1st place in Las Vegas,

Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida,

Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California

and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in

Bakersfield, California.  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 5.    First Magnus Financial Corporation's Systematic Disregard of Underwriting Standards

163.    First Magnus Financial Corporation ("First Magnus") originated or contributed a

material portion of the loans in the mortgage pool underlying the Washington Mutual Mortgage

Pass-Through Certificates, WMALT 2006-AR3, Washington Mutual Mortgage Pass-Through

Certificates, WMALT 2006-AR4, Washington Mutual Mortgage Pass-Through Certificates,

WMALT 2006-AR5, Washington Mutual Mortgage Pass-Through Certificates, WMALT 2006-

AR7, Washington Mutual Mortgage Pass-Through Certificates, WMALT 2006-AR9,

Washington Mutual Mortgage Pass-Through Certificates, WMALT 2007-OA1 and Washington

Mutual Mortgage Pass-Through Certificates, WMALT 2007-OA4 offerings.  *See infra* Table 7.

Accordingly, a reasonable investor would have considered information that this originator

systematically disregarded underwriting standards to be material to the decision whether to

purchase from these offerings.  In addition, a reasonable investor would also have considered

information that this originator systematically disregarded underwriting standards to be material

to the decision whether to purchase from these offerings because that information would have

cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in

connection with these offerings.

164.    In 2007, Lehman Brothers and other banks requested that First Magnus

repurchase $100 million of non-performing loans which First Magnus had sold to the banks.

This drove First Magnus into Chapter 11 bankruptcy.  *See* Josh Brodesky, *Suit Says First*

*Magnus Officers Fueled Crisis; Their Reply: "Absurd,"* Arizona Daily Star A1 (Feb. 28, 2009),

*available at* http://azstarnet.com/article_169e26ed-3c23-5ff7-8e2c-b765b02f8da6.html.

165.    The bankruptcy trustee subsequently filed suit against former First Magnus

directors and officers.  The trustee alleged that First Magnus employees "would overstate

incomes or assets to qualify potential borrowers."  *Id.*

166.    The trustee's complaint also detailed First Magnus's compensation structure.

Starting in January 2005, approximately 60-65% of the loans that First Magnus originated were

referred by mortgage brokers.  First Magnus paid these brokers a fee for approved loans, creating

an incentive for brokers to falsify information in the loan applications and for underwriters to

ignore underwriting guidelines.  *See* Compl. in Adversary No. 09-211, *In re First Magnus Fin.

Corp.*, ¶ 88, No. 07-1578 (D. Ariz. Bankr. filed Feb. 26, 2009).

167.    After a lengthy battle, the trustee settled its claims against First Magnus's

directors and officers on confidential terms.  *See* Josh Brodesky, *First Magnus Saga's End

Shouldn't Surprise You*, Arizona Daily Star (Apr. 10, 2011), *available at*

http://azstarnet.com/news/local/josh-brodesky-first-magnus-saga-s-end-shouldn-t-

surprise/article_b3e3d446-e111-51d7-8303-c4316de15dfa.html.

#### 6.    GMAC's Systematic Disregard of Underwriting Standards

168.    GMAC Bank n/k/a Ally Bank and GMAC Mortgage originated or contributed a

material portion of the loans in the mortgage pool underlying the Washington Mutual Mortgage

Pass-Through Certificates, WMALT Series 2006-AR3 and Washington Mutual Mortgage Pass-

Through Certificates, WMALT Series 2006-AR4 offerings.  *See infra* Table 7.  Accordingly, a

reasonable investor would have considered information that this originator systematically

disregarded underwriting standards to be material to the decision whether to purchase from this

offering.  In addition, a reasonable investor would also have considered information that this

originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with this offering.

169.     GMAC's abandonment of its underwriting guidelines is at issue in suits filed by MBIA, Inc.  MBIA was a monoline insurer for RMBS.  *See* Compl., *MBIA Ins. Corp. v. Ally Fin., Inc.*, No. 12-18889 (MN Ct., Hennepin Cnty. filed Sept. 17, 2012) ("*MBIA v. Ally* Compl."); Compl., *MBIA Ins. Corp. v. GMAC Mortg., LLC*, No. 600837/2010 (N.Y. Sup. Ct. filed Apr. 1, 2010) ("*MBIA v. GMAC* Compl.").

170.     MBIA's suits concern loans underlying certain offerings for which GMAC Bank and GMAC Mortgage were the principal originators.  *MBIA v. Ally* Compl. ¶¶ 7, 45; *MBIA v. GMAC* Compl. ¶¶ 2, 44.

171.     After sustaining large losses, MBIA conducted forensic analyses of loans underlying these offerings.  MBIA found material breaches of representations and warranties in more than 89% of the loans from GMAC Mortgage.  These breaches included:

- GMAC Mortgage egregiously and routinely breached its representation and warranty that the mortgage loans were underwritten generally in compliance with GMAC Mortgage's underwriting standards.

- A significant number of mortgage loans were made on the basis of "stated incomes" that were grossly unreasonable or were approved despite DTI or CLTV ratios in excess of the cut-offs stated in GMAC Mortgage's Underwriting Guidelines or the Purchase Agreements or Prospectus Supplements.

- Moreover, contrary to its Underwriting Guidelines, GMAC Mortgage failed in many cases to verify the borrower's employment when required to do so or to verify prior rental or mortgage payment history, approved mortgage loans with ineligible collateral, approved mortgage loans to borrowers with

ineligible credit scores, and approved loans without verifying that the borrower had sufficient funds or reserves.

- GMAC Mortgage used its proprietary automated electronic loan underwriting program, known as "Assetwise," to approve loans that did not comply with its Underwriting Guidelines. Assetwise assisted in the underwriting of mortgage loans by automating the process of determining whether a loan met prespecified underwriting criteria set up in the program. GMAC Mortgage used the program itself and also made the program available to its affiliates. Assetwise, however, failed to analyze proposed mortgage loans using the criteria set forth in GMAC Mortgage's Underwriting Guidelines. As a result, GMAC Mortgage routinely contributed loans to the Transactions that failed to comply with its own underwriting standards.

*MBIA v. GMAC* Compl. ¶ 76; *see MBIA v. Ally* Compl. ¶¶ 76-83; *MBIA v. GMAC* Compl. ¶¶ 70-79.

172.     Representative examples of the breaches encountered by the MBIA include:

- On January 25, 2006, a loan in the amount of $210,000 was made to a borrower in Vacaville, California on a property with an original appraisal value of $460,000 and a senior loan balance of $368,150. The borrower was employed as a correctional officer by the State of California. The loan was approved based on a DTI that was calculated using the borrower's highest reported monthly income, rather than his average income over a 33-month period, as is required by the Underwriting Guidelines. As a result, the true DTI on the loan was 65.56%, which exceeded the maximum ratio of 50% permitted under the applicable loan program. The CLTV ratio of 125.68% also exceeded the maximum CLTV ratio of 100% permitted under the Guidelines. The loan has been charged-off (Loan # 8601487693 — 2004 Transaction.)

- On April 20, 2007, a loan in the amount of $40,000 was made to co-borrowers in Vernon, New Jersey on a property with an original appraisal value of $305,000 and a senior loan balance of $244,000. The loan file is incomplete and lacks, among other documents, verbal verification of either borrower's employment, evidence of sufficient closing funds and reserves, an appraisal, a copy of the note from the senior lien, and the borrowers' credit reports. Further, the loan was approved even though the income stated by each borrower was unreasonable. One claimed to earn $4,583 per month as a counter manager at a discount tire store though, for example, salary.com, a website which maintains a national salary

database based on job title and zip code, reports that the income at the 90th percentile for such a position is only $2,801 per month. The second borrower claimed to earn $59,592 annually as a sales associate at a home improvement store, but an income verification database showed that the borrower earned only $28,092 in 2006 and $32,977 in 2007.  The loan has been charged-off (Loan # 1000117685 — 2006 Transaction.)

- On December 15, 2006, a loan in the amount of $22,000 was made to a borrower in Medford, Oregon on a property with an original appraisal value of $220,000 and a senior loan balance of $176,000. The loan file is missing many documents that bear upon the borrower's ability to repay and are required to be included in the file, including: verification of down payment funds, a CPA letter, an appraisal, a twelve-month housing history, a copy of the first mortgage, a preliminary title commitment, a credit report, and the final loan application. Moreover, although the borrower, an operator at a drywall company, had declared bankruptcy prior to applying for the loan, the loan file lacks documentation that the bankruptcy had been discharged for at least three years, as required by the Guidelines. The loan has been charged off.  (Loan # 8254682837 – 2007 Transaction.)

- On January 23, 2007, a loan with a principal balance of $100,000 was made to a borrower in Yuma, Arizona on a property with an original appraisal value of $298,000 and a senior loan balance of $129,035.  The borrowers claimed on their loan application that their combined income was $113,520 per year.  However, on May 12, 2009, the borrowers jointly filed for bankruptcy under Chapter 7, and their court filings indicated that they earned only $13,085 in 2007 and $17,650 in 2008.  Moreover, no record of the borrower's claimed employer can be located on websites commonly used to verify the existence of a business: manta.com or yellowpages.com. The loan has been charged-off. (Loan # 8254730412 – 2007 Transaction.)

*MBIA v. GMAC* Compl. ¶ 78.

173.    Both suits are still pending.  The Court in *MBIA v. GMAC* denied a motion to dismiss; there have been no rulings in *MBIA v. Ally*.  *See MBIA v. GMAC*, 914 N.Y.S.2d 604 (N.Y. Sup. Ct. 2010); *MBIA v. RFC*, Order, No. 603552/08 (N.Y. Sup. Ct. Dec. 22, 2009).

174.    GMAC's disregard of its underwriting guidelines has led to the repurchase of loans it had sold to Fannie Mae.  As of September 10, 2010, Fannie Mae had required GMAC to

repurchase 2,887 loans because of violations of representations and warranties regarding those loans. They had a total unpaid principal balance of $544 million. *See* Letter to Gary Cohen, FCIC (Sept. 21, 2010), Attach. "Total Aggregate Recovery, Data as of 8/31/2010," at 1, *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-docs/2010-09-21%20Fannie%20Mae%20Counsel%20letter%20to%20the%20FCIC.pdf.

### 7.   GreenPoint Mortgage Funding, Inc.'s Systematic Disregard of Underwriting Standards

175.   GreenPoint Mortgage Funding Inc. ("GreenPoint") contributed a material portion of the loans underlying the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 offering. *See infra* Table 7.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from this offering.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with this offering.

176.   GreenPoint, based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One").  Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006.  Capital One shut down GreenPoint's operations less than one year later on August 21, 2007.

177.   According to a press release issued by Capital One on August 20, 2007, GreenPoint had an "originate and sell" (*i.e.*, OTD) business model with a focus on "prime non-conforming and near-prime markets, especially the Alt-A mortgage sector."  Capital One

eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

178.    When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5%.  A September 12, 2008, article on Bloomberg reports on GreenPoint's underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay stubs or tax returns to document their earnings, were offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found it difficult to verify their salaries.
> . . .
>
> "To grow, the market had to embrace more borrowers, and the obvious way to do that was to move down the credit scale," said Guy Cecala, publisher of Inside Mortgage Finance.  "Once the door was opened, it was abused."
> . . .
>
> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent, according to a study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*, BLOOMBERG, Sept. 12, 2008, *available at* http://www.bloomberg.com/apps/news? pid=newsarchive&sid=arb3xM3SHBVk.

179.    U.S. Bank, the indenture trustee of GreenPoint Mortgage Funding Trust 2006-HE1, sued GreenPoint in order to force GreenPoint to repurchase the loans that GreenPoint had contributed to the RMBS.  U.S. Bank alleged that GreenPoint "pervasive[ly] fail[ed] to follow its underwriting guidelines during the origination of the Loans."  *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, No. 600352/09, 2010 WL 841367, at *7 (N.Y. Sup. Ct. Mar. 3, 2010); *see also* Compl., *U.S. Bank Nat'l Assoc. v. GreenPoint Mortg. Funding, Inc.*, 2009 WL

6084150, ¶ 35 (N.Y. Sup. Ct. Feb. 5, 2009) (alleging pervasive misrepresentations of borrowers'
income, assets, employment, intent to occupy the property, inflated appraisal values, and
violations of GreenPoint's underwriting guidelines regarding credit scores, debt-to-income
ratios, and loan-to-value ratios).

180.    U.S. Bank based its allegations on its forensic analysis of GreenPoint-originated
loans.  Of 1,030 randomly sampled loans, U.S. Bank found that 93% were in violation of
GreenPoint's underwriting guidelines.  *See id.* at *7 n.4.  Its complaint survived a motion to
dismiss.  *See id.* at *8.

181.    Syncora Guarantee, a monoline insurer, sued J.P. Morgan Securities, LLC, as
successor to Bear Stearns & Co., Inc., in connection with an RMBS underwritten by Bear
Stearns and exclusively collateralized by GreenPoint-originated loans.  After sustaining large
losses due to the poor performance of GreenPoint loans, Syncora hired an independent consultant
to "reunderwrite" 1,431 GreenPoint loans, 400 of which were randomly selected without regard
to payment status.  Over 92% of the 1,431 loans contained misrepresentations, and over 85% of
the randomly selected 400 loans contained misrepresentations.  The misrepresentations
uncovered include:

- Rampant fraud, primarily involving misrepresentation of the borrower's income, assets, employment, or intent to occupy the property as the borrower's residence (rather than as an investment), and subsequent failure to so occupy the property;

- Failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property;

- Inflated and fraudulent appraisals; and,

- Pervasive violations of GreenPoint's own underwriting guidelines without adequate, or any, compensating factors, and in disregard of prudent mortgage lending practices, including loans made to

81

> borrowers (i) who made unreasonable claims as to their income,
> (ii) with multiple, unverified social-security numbers, (iii) with
> credit scores below the required minimum; (iv) with debt-to-
> income and loan-to-value ratios above the allowed maximums, or
> (v) with relationships to the applicable originator or other non-
> arm's-length relationships.

*See* Compl., *Syncora Guar. Inc. v. J.P. Morgan Secs. LLC*, ¶¶ 7, 181-82, No. 651566/2011 (N.Y.

Sup. Ct. filed June 6, 2011).  Syncora's lawsuit survived a combined motion to dismiss and

motion for summary judgment.  *See* Decision and Order, *Syncora Guar. Inc. v. J.P. Morgan*

*Secs. LLC*, Doc. 50, No. 651566/2011 (N.Y. Sup. Ct. May 2, 2012).

182.    GreenPoint's own employees have corroborated the findings of U.S. Bank and

Syncora.  A confidential witness in the *Federal Home Loan Bank of Indianapolis v. Banc of*

*America Mortgage Securities, Inc.*, confirmed that (1) GreenPoint employees faced intense

pressure to close loans at any cost; (2) GreenPoint managers overrode employees' decisions to

reject loans and approved loans based upon inflated incomes; (3) GreenPoint approved loans that

contained exceptions for which there were no reasonable compensating factors; and (4)

GreenPoint failed to adhere to sound underwriting guidelines.  This confidential witness was a

senior loan underwriter at GreenPoint from October 1997 through August 2007.  *See* Compl.,

*Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Secs., Inc.*, ¶ 265, No.

49D051010PL045071 (Ind. Sup. Ct., Marion Cnty. filed Oct. 15, 2010) ("FHLB Indianapolis").

183.    According to that confidential witness, sales staff and managers at GreenPoint

Mortgage received bonuses based on the number of loans closed.  As she said, "sales had

tremendous authority" at GreenPoint Mortgage, and "[t]hey were in business to make more

money.  They would try to find any way to close a loan."  *Id.* ¶ 266.

184.    Between 2005 and 2007, the confidential witness said that stated income loans

became increasingly popular and GreenPoint managers approved loans based upon inflated

incomes that she believed should not have been approved.  She saw a lot of loans with stated

"income that was more than could be justified by the borrower's employment."  When she

denied loans because she believed the income was inflated, sometimes the underwriting

managers, operations managers, and the regional operations manager overrode her decisions.  *Id.*

¶ 267.

185.    More often than not, the confidential witness believed that her managers overrode

her denials due to the incentives that they received based upon loan volume.  As she said, "They

were making the decision because they had to hit certain sales numbers."  She was aware of such

targets because of comments made in operations meetings about the company needing to meet

certain goals.  *Id.* ¶ 268.

186.    The FHLB Indianapolis suit survived a motion to dismiss, with the Court holding,

"the plaintiff has, indeed, stated a claim upon which relief can be granted on the issue of

underwriting guidelines."  *Fed. Home Loan Bank of Indianapolis v. Bank of Am. Mortg. Secs.,*

*Inc.*, No. 49D051010PL045071, 2012 WL 2844690 (Ind. Sup. Ct., Marion Cnty. July 3, 2012).

187.    Various affiliates of insurance giant Allstate, an RMBS investor, sued various

JPMorgan affiliates for misrepresentations in RMBS offering documents.  Allstate's complaint

relied on several confidential witnesses.  One confidential witness, who was an underwriting

analyst at GreenPoint from 2003 to 2007, stated that GreenPoint reviewed only 10% of the loans

it originated for fraud.  He thought this was a "mistake" because the fraud and misrepresentation

uncovered in the 10% sample indicated that many more loans likely contained fraud.  But the

remaining 90% of the loans were not reviewed.  Am. Compl., *Allstate Bank v. JPMorgan Chase,*

*N.A.*, ¶ 485, No. 11-1869 (S.D.N.Y. filed May 10, 2012).

188.     That confidential witness also stated that sales personnel ran GreenPoint, and

senior management was comprised of people from sales who were incentivized to push the

volume of mortgage loans, not adherence to the underwriting guidelines or due diligence.

Managers' bonuses were tied to production volume, and they were not penalized if loans were

later found to be fraudulent or if the borrower defaulted on the first payment.  He stated that

GreenPoint's management deliberately overlooked misrepresentations from mortgage loan

brokers, particularly if the broker brought in a high volume of loans.  Problem brokers were

rarely suspended, and even when they were, there was never a review of the loans they

originated that were already in the pipeline.  *Id.* ¶ 486.

189.     Another confidential witness was a Wholesale Account Manager at GreenPoint

from 2004 to 2006.  That confidential witness stated that GreenPoint employees understood that

if a mortgage loan could eventually be sold to Wall Street, GreenPoint was to approve and fund

the mortgage loan.  The majority of the loan products originated in the confidential witness's

office were stated income-stated asset loans and pay-option ARMs.  Despite the risk inherent in

these products, the sales force "never learned of negative loan performance" and their

compensation was in no way tied to loan performance.  *Id.* ¶ 487.

190.     Another confidential witness was an Underwriting Supervisor at GreenPoint from

2005 to 2006 and supervised five Underwriters and three Conditions Specialists.  That

confidential witness stated that GreenPoint management authorized exceptions to loan

underwriting guidelines in order to approve applications, even when there were no compensating

factors justifying the exceptions.  The confidential witness was aware that management overrode

decisions to refuse funding in locations known for fraud and property flipping, even when

evidence of fraud was found.  According to the confidential witness, "if the borrower is breathing and could sign loan documents, they could get a loan" from GreenPoint.  *Id.* at ¶ 488.

191.    Allstate's complaint also alleged that many of GreenPoint's loans were granted by the over 18,000 brokers that were approved to transact with GreenPoint – a large enough number that GreenPoint could not exercise any realistic degree of control.  Typically, new brokers were actively monitored for only the first five to seven loans submitted, usually during only the first 90 days of being approved.  *Id.* ¶ 490.

192.    This was problematic because mortgage brokers were known to commit fraud in order to get loan applications approved by originators.  As one former mortgage wholesaler put it, "I'd walk into mortgage shops and see brokers openly cutting and pasting income documents and pay stubs, getting out the Wite-Out and changing Social Security numbers."  Mara Der Hovanesian, *Sex, Lies, and Subprime Mortgages*, Bloomberg Businessweek (Nov. 12, 2008), available at http://www.businessweek.com/stories/2008-11-12/sex-lies-and-subprime-mortgages.

193.    GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada.  *See* 2008 "Worst Ten in the Worst Ten" Report.  In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California; 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada.  *See* 2009 "Worst Ten in the Worst Ten" Report.

**8.    IndyMac Bank, FSB's Systematic Disregard of Underwriting Standards**

194.    IndyMac Bank, FSB ("IndyMac") contributed a material portion of the loans underlying the IndyMac INDX Mortgage Loan Trust 2006-AR12 and Luminent Mortgage Trust

2007-1 offerings.  *See infra* Table 7.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

195.    On July 11, 2008, just four months after IndyMac filed its 2007 Annual Report, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history.  IndyMac filed for bankruptcy on July 31, 2008.

196.    On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness:  Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac.  The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

197.    According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale."  IndyMac OIG Report at 2.  The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories.  Appraisals obtained by IndyMac on underlying collateral were often questionable as well."  *Id.*

198.    IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id*. at 11, 21.  The IndyMac OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id*. at 11.

199.    IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable. *Id*. at 2-3.

200.    IndyMac's "risk from its loan products. . .was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id*. at 31.

201.    Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market." *Id*. at 3.  This proved to be a weight it could not bear, and IndyMac ultimately failed.  *See id*.

202.    In June 2008, the Center for Responsible Lending ("CRL") published a report entitled IndyMac: *What Went Wrong?  How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending* (June 30, 2008) ("CRL Report"), available at http://www.responsiblelending.org/mortgage-lending/research-analysis/indymac_what_went_wrong.pdf.  The CRL Report detailed the results of the CRL's investigation into IndyMac's lending practices.  CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac.  The CRL Report summarized the results of its investigation as follows:

> IndyMac's story offers a body of evidence that discredits the notion that the
> mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll

the purchase of bigger homes or investment properties. CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

203. CRL reported that its investigation "uncovered substantial evidence that [IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id*. at 2.

204. The CRL Report stated that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id*.

205. The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id*. at 3.

206. Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id*. at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans' – in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id*. at 3.

207. The CRL also found evidence that: (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed.  "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL.  "And then they pressure you to approve it."

> The refrain from managers, Miller recalls, was simple:  "Find a way to make this work."

*Id*. at 9 (footnote omitted).

208.    Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated:  "I would reject a loan and the insanity would begin.  It would go to upper management and the next thing you know it's going to closing."  *Id*. at 1, 3.  Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing – a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors."  *Id*. at 8.

209.    Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time.  *See id*. at 9.  According to Montilla:

> "I would tell them:  'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says.  "There were some loans that were just blatantly overstated. . . .  Some of these loans are very questionable.  They're not going to perform."

*Id*. at 10.

210.    Montilla and another IndyMac mortgage underwriter told the CRL that borrowers did not know their stated incomes were being inflated as part of the application process.  *See id*. at 14.

211.    On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division ("HBD"), alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects

with insufficient collateral.  *See* Compl. ¶ 6, *FDIC v. Van Dellen*, No. 2:10-cv-04915-DSF (C.D. Cal. filed July 2, 2010).  As of the first week of December 2012, the case was in the midst of a jury trial.

212.    IndyMac currently faces a class action lawsuit alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS.  *See* Class Action Compl., *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y. filed May 14, 2009).  On June 21, 2010, the class action suit survived a motion to dismiss.

213.    As a result of IndyMac's systematic disregard of its underwriting standards, the OCC included IndyMac in the OCC's 2008 "Worst Ten in the Worst Ten" Report.  IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California in 2009.  *See* 2008 "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

### 9.    MortgageIT's Systematic Disregard of Underwriting Standards

214.    MortgageIT, Inc. ("MortgageIT") originated or contributed a material portion of the loans in the mortgage pool backing the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 offerings.  *See infra* Table 7.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings. In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from this offering because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with this offering.

215.    MortgageIT is a residential mortgage banking company headquartered in New

York, New York.  On January 3, 2007, MortgageIT was acquired by Deutsche Bank Structured

Products.  Less than a year after the acquisition, MortgageIT began its precipitous decline from

one of the largest mortgage originators in the country, laying off hundreds of employees and

closing multiple branches.

216.    MortgageIT faces a civil mortgage fraud lawsuit brought in May 2011 by the

United States Department of Justice ("DOJ") that alleges MortgageIT made repeated false

certifications to the U.S. Department of Housing and Urban Development ("HUD") in

connection with its residential mortgage origination and sponsorship practices.  *See United States*

*v. Deutsche Bank AG and MortgageIT, Inc*., No. 11-cv-02976 (S.D.N.Y.).  An amended

complaint was filed on August 22, 2011 ("DOJ Complaint").

217.    The United States alleges that "MortgageIT repeatedly lied to be included in a

Government program to select mortgages for insurance by the Government.  Once in that

program, they recklessly selected mortgages that violated program rules in blatant disregard of

whether borrowers could make mortgage payments."  DOJ Complaint ¶ 1.

218.    According to the DOJ Complaint, "As of June 2011, HUD has paid more than

$368 million in FHA insurance claims and related costs arising out of MortgageIT's approval of

mortgages for FHA insurance.  Many of those claims arose out of FHA mortgage insurance

provided by HUD based on MortgageIT's false certifications of due diligence."  *Id*. ¶ 233.

219.    The complaint also alleges that MortgageIT chronically understaffed quality

control: "Between 2006 and 2009, the sole employee at Deutsche Bank or MortgageIT

conducting quality control reviews of closed FHA-insured mortgages was the Government Loan

Auditor.  His review of closed FHA-insured mortgages continually declined during that period,

and declined most significantly after Deutsche Bank acquired MortgageIT.  By the end of 2007,

the Government Loan Auditor was no longer spending any time conducting quality control reviews of closed mortgage files.  To increase sales, Deutsche Bank and MortgageIT shifted his work from quality control reviews of closed mortgages (i.e., quality control audits) to assistance with production.  By the end of 2007, not a single person at Deutsche Bank or MortgageIT was conducting quality control reviews of closed FHA-insured mortgages, as required by HUD rules."  *Id*. ¶ 143-144.

220.    MortgageIT allegedly also ignored quality control measures.  For example, MortgageIT contracted with an outside vendor to conduct quality control reviews of FHA-insured loans.  The vendor provided the reviews in letters detailing underwriting violations found in FHA-insured mortgages to MortgageIT.  The findings included identification of serious underwriting violations.  Instead of reading the letters, MortgageIT employees "stuffed the letters, unopened and unread, in a closet at MortgageIT's Manhattan headquarters."  It was not until MortgageIT hired its first quality control manager that these letters were taken out of the closet and read.  Accordingly, "MortgageIT's failure to read the audit reports from its outside vendor prevented MortgageIT from taking appropriate actions to address patterns of ongoing underwriting violations."  *Id*. ¶ 111-124.

221.    The Amended DOJ Complaint further alleges that "Deutsche Bank's and MortgageIT's failure to implement the required quality control systems rendered them unable to prevent patterns of mortgage underwriting violations and mortgage fraud."  *Id*. ¶ 145.

222.    Additionally, the complaint alleges that "contrary to the certifications appearing on each and every mortgage endorsed by MortgageIT, MortgageIT engaged in a nationwide pattern of failing to conduct due diligence in accordance with HUD rules and with sound and prudent underwriting principles."  *Id*. ¶ 162.

223.     The complaint cites many examples of MortgageIT's failure to perform due diligence.  These examples, all violations of HUD rules, include the following:

- failure to develop a credit score for borrowers who had no credit score;

- failure to verify a borrower's cash investment in a property;

- failure to verify employment by telephone, and to record the name and telephone number of the person who verified employment on behalf of the employer;

- failure to verify the source of earnest money deposits that appear excessive in relation to the borrower's savings by completing a verification of deposit, or by collecting bank statements, to document that the borrower had sufficient funds to cover the deposit;

- failure to ensure that gift funds are not provided by a party to the sales transaction;

- failure to examine irregularities in mortgage applications such as conflicting records of employment in the same file;

- failure to obtain the required documentation to verify the borrower's mortgage payment history and income;

- failure to obtain the required documentation to verify the borrower's employment, income, and depositary assets;

- failure to verify a borrower's current employment and obtain the borrower's most recent pay stub, along with failure to obtain income tax returns for a self-employed borrower or borrower paid on commission; and

- and failure to obtain a credit report on all borrowers who will be obligated on the mortgage note.

*See id.* ¶¶ 162-230.

224.     On May 9, 2012, the parties settled the case for $202.3 million.

### 10.     People's Choice Home Loans' Systematic Disregard of Underwriting Standards

225.     People's Choice Home Loans ("People's Choice") originated or contributed a

material portion of the loans in the mortgage pool backing the Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5 offering.  *See infra* Table 7.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings. In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from this offering because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with this offering.

226.    People's Choice was prominently featured in a March 22, 2009 program on Dateline NBC which highlighted the underhanded lending practices committed by various mortgage companies:

> James LaLiberte joined People's Choice in 2004 as the chief credit officer, overseeing the underwriting. Later, he was promoted to one of the top positions, chief operating officer, and was in charge of all operations and setting credit guidelines.
>
> He presented Dateline with a list of nearly 13,000 loans People's Choice funded in one year from April 2004 through March 2005, totaling more than $2 billion. Many of the loans, he said, were questionable; some possibly fraudulent.
>
> In an interview, he said that when he came on board, the company's reputation was "spotty at best," though he acknowledged the company was more conservative than many other subprime lenders.
> …
>
> Income discrepancies Dateline independently researched dozens of the stated income loans on the list LaLiberte presented and found many instances where incomes apparently were inflated.
>
> Examples on the People's Choice list included a registered massage therapist who claimed an income of $15,000 a month ($180,000 a year) and whom People's Choice loaned $640,000. According to the Web site Salary.com, which is often used by lenders, the median income in the zip code where the borrower lived is $3,799 a month, about one quarter of the amount the borrower claimed.

A manicurist who borrowed $445,500 in 2004 claimed monthly income of $16,800, more than $200,000 a year. Later, she filed for bankruptcy and submitted papers to the court reporting her 2005 annual income as $27,092, meaning $2,258 a month (plus approximately $4,500 a year in child support).

Another borrower in 2005 listed herself as director of development for a charity earning $15,500 a month ($186,000 a year) and obtained $655,000. But a review of the charity's publicly-filed tax returns shows that the director of development that year was paid $69,808, or $5,817 a month. Surprisingly, that person has a different name from the borrower. A call to the charity elicited the information that the borrower indeed had worked there at the time the loan was issued, but held a position below director of development.

Former People's Choice COO LaLiberte said that he used the list of loans as a training tool. He put the spreadsheet up on a screen to highlight the types of loans the company should stop issuing.

"The initial reaction was laughter," LaLiberte said. "And then I said, 'Well, wait a minute here. Y'all think it's funny. I think it's funny, too, sort of. But these are loans that we funded. These are loans that we wired the money on.'"

He said that when he tried to implement more controls, he ran into resistance. "The chief appraiser once said, 'Fraud is what we do.' That's how we got where we are today.'" Another former executive told Dateline he was present when the comment was made and confirmed the accuracy of LaLiberte's account.
…

Eileen Loiacono was an underwriter at People's Choice from 2003 until September 2005. She said LaLiberte tried to do the right thing, but lost out to more powerful forces.

She and several other underwriters told Dateline that they felt pressured by sales staff to approve questionable applications. While their work as underwriters was supervised by a chief credit officer, they said that for administrative and basic personnel matters, they reported to sales managers.

One former People's Choice manager who spoke on condition of anonymity said, "That place was run by the sales people," some making $200,000 to $300,000 a month. That did create pressure on underwriters, the former manager said. "There was a lot of 'keep your mouth shut' going on, meaning you just didn't ask questions about things you knew were wrong."

Loiacono said that the problems and pressure were not restricted to stated income loans, but also involved full documentation applications for which borrowers submitted records to prove how much they made.

95

Falsified documents

She said she saw numerous instances of falsified W-2s, tax returns, and bank statements, including crude cut-and-paste jobs. "They would use someone else's tax returns, and then they'd put someone else's name in them," she said.

She said that she challenged about a third of all loan applications but was overruled by company executives the vast majority of the time.

According to Loiacono and several other underwriters, in a few instances, sales people offered incentives to sign off on loans. Loaicono claimed the offers included breast implants, cars, and cash. She said she declined all such offers and reported them to the human resources department. She said nothing was done, as far as she knows.

Loiacono said that some sales people engaged in intimidation, threatening, for instance, to slash the tires of an uncooperative underwriter. Another underwriter, who requested anonymity, told Dateline her car was scratched up with a key by a sales person she crossed.

The environment became too uncomfortable, Loiacono said, so she quit in September 2005. "I wanted to be able to sleep at night without feeling like I was coming into a fight every day about something that I knew needed to be done right, and was not being done right."

Hansen, *'If You Had a Pulse, We Gave You a Loan,'* NBC Dateline.

### 11.   VirtualBank's Systematic Disregard of Underwriting Standards

227.   VirtualBank, a division of the former Lydian Private Bank ("Lydian") originated or contributed a material portion of the loans in the mortgage pool underlying the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 offerings.  *See infra* Table 7.  Accordingly, a reasonable investor would have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor would also have considered information that this originator systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings because that information

would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

228. Lydian was a federal savings bank based in Florida that originated and purchased residential mortgage loans through its VirtualBank and VirtualBank Mortgage divisions. On August 19, 2011, the OCC closed Lydian and appointed the FDIC as receiver in one of the largest bank failures in Florida history. Miami-based Sabadell United Bank bought Lydian's assets from the FDIC that same day.

229. According to Audit Report No. OIG-12-045, "*Safety and Soundness: Material Loss Review of Lydian Private Bank*" issued March 21, 2012 (the "Lydian OIG Report"), the OIG attributed Lydian's failure primarily to "(1) a high-risk concentration in nontraditional mortgages, including option adjustable rate mortgages (ARM) and (2) a dominant chief executive officer (CEO) and deficient board of directors' oversight and governance." *Id*. at 2.

230. With respect to the first issue, the Lydian OIG Report states:

> Prior to 2007, Lydian focused its growth strategy on originating and purchasing high-risk nontraditional mortgages but did not appropriately manage the associated risks. As of December 31, 2005, and March 31, 2007, Lydian's nontraditional mortgages represented 918 and 874 percent, respectively, of core capital plus ALLL. Of those loans, option ARMs represented 255 and 450 percent, respectively, of core capital plus ALLL.

> The option ARM loan portfolio predominately consisted of mortgage loans originated by Lydian in 2005 during the peak of the real estate market as well as loans purchased by Lydian in January 2007 that had been originated by Countrywide Home Loans, Inc. The portfolio consisted mainly of loans secured by properties in California and Florida, and contained many stated income and negative amortizing loans.

*Id.* at 3.

231. An article written after the Lydian's failure reported:

> Miami-based bank analyst and economist Kenneth H. Thomas said it's extremely rare for a private bank to fail, but Lydian was living a "shadow life" as VirtualBank, which created trouble with problem loans.
>
> About two-thirds of the bank's loans came from VirtualBank, where the underwriting was called into question by Provident Funding Associates in a lawsuit seeking to force the bank to repurchase troubled home loans.

Brian Bandell, "*Lydian Private Bank fails, Sabadell steps in*," South Florida Business Journal, (Aug. 22, 2011).

232.   In its breach of contract complaint referenced in the above article, Provident Funding alleged that it entered into an agreement with VirtualBank under which VirtualBank agreed to originate loans and sell them to Provident.  *See* Compl., *Provident Funding Assocs., LP v. Lydian Private Bank, et al.*, Case No. 3:11-cv-01538-JCS (N.D. Cal.) (removed from Cal. Super. Ct. San Matteo Cnty. on Mar. 30, 2011).  Provident further alleged that the terms of the agreement required all loans being sold to comply with underwriting guidelines and that Lydian/VirtualBank breached the agreement in selling loans with material defects.  *Id*.  The complaint provided examples of 24 specific loans that contained material defects, including missing documentation, misrepresentations as to income, employment and other financial obligations and misrepresentations regarding the borrower's intent to occupy the property.  *Id*.  In 2012, the plaintiff voluntarily dismissed the action after the FDIC approved its administrative claim.

### 12.   WaMu Bank's and Long Beach Mortgage's Systematic Disregard of Underwriting Standards

233.   WaMu Bank and/or its affiliate Long Beach Mortgage ("Long Beach") originated a material portion of the loans underlying the Long Beach Mortgage Loan Trust 2006-11, Long Beach Mortgage Loan Trust 2006-10,  Long Beach Mortgage Loan Trust 2006-9, Luminent Mortgage Trust 2007-1, WaMu Asset-Backed Certificates, WaMu Series 2007-HE2, WaMu

Asset-Backed Certificates, WaMu Series 2007-HE3, WaMu Asset-Backed Certificates, WaMu Series 2007-HE4, WaMu Mortgage Pass-Through Certificates, Series 2006-AR17, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, WaMu Mortgage Pass-Through Certificates, Series 2007-OA4, WaMu Mortgage Pass-Through Certificates, Series 2007-OA5, WaMu Mortgage Pass-Through Certificates, Series 2007-OA6, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5, and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 offerings. *See infra* Table 7.  Accordingly, a reasonable investor would have considered information that these originators systematically disregarded underwriting standards to be material to the decision whether to purchase from these offerings.  In addition, a reasonable investor would also have considered information that these originators systematically disregarded underwriting standards

to be material to the decision whether to purchase from these offerings because that information would have cast doubt on the quality of the loan pool as a whole and the reliability of the procedures used in connection with these offerings.

234.    WaMu Bank was a Seattle-based bank that rapidly grew from a regional to a national mortgage lender during the period from 1991 to 2006.  With more than $300 billion in total assets, WaMu Bank was at one time the largest institution regulated by the Office of Thrift Supervision ("OTS").  On September 25, 2008, however, federal regulators closed WaMu Bank when loan losses, borrowing capacity limitations, a plummeting stock price, and rumors of WaMu Bank's problems led to a run on the thrift by depositors.  Federal regulators facilitated the sale of WaMu Bank to JPMorgan Chase Bank in September 2008.

235.    In April 2010, the Treasury OIG, issued a report titled "Evaluation of Federal Regulatory Oversight of Washington Mutual Bank," Report No. EVAL-10-002 (the "WaMu OIG Report"), discussing the reasons for WaMu Bank's meteoric rise and consequent collapse. The WaMu OIG Report found, "WaMu failed primarily because of management's pursuit of a high-risk lending strategy that included liberal underwriting standards and inadequate risk controls."  WaMu OIG Report at 2.  The report elaborated on how WaMu Bank adopted this new strategy to compete with Countrywide and maximize profits:

> In 2005, WaMu management made a decision to shift its business strategy away from originating traditional fixed-rate and conforming single family residential loans, towards riskier nontraditional loan products and subprime loans.  WaMu pursued the new strategy in anticipation of increased earnings and to compete with Countrywide.
> . . . .
>
> WaMu estimated in 2006 that its internal profit margin from subprime loans could be more than 10 times the amount for a government-backed loan product and more than 7 times the amount for a fixed-rate loan product.

*Id*. at 8 (footnote omitted).

236. As previously noted in this Complaint, the PSI issued its report on the causes of the economic crisis. The PSI Wall Street Report used WaMu Bank as its case study into lending practices of the mortgage industry during the housing bubble. Citing internal e-mails and correspondence the PSI obtained as part of its investigation, the PSI made the following factual findings:

(1) High Risk Lending Strategy. [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) Shoddy Lending Practices. WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) Steering Borrowers to High Risk Loans. WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

(4) Polluting the Financial System. WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

(5) Securitizing Delinquency-Prone and Fraudulent Loans. At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6) Destructive Compensation. WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when their High Risk Lending Strategy placed the bank in financial jeopardy.

PSI Wall Street Report at 50-51.

237.    In particular, the PSI Wall Street Report noted that WaMu Bank had engaged in internal reviews of its lending practices and the lending practices of its affiliate, Long Beach. WaMu Bank's Chief Risk Officer, Ron Cathcart commissioned a study to look into the quality of loans originated by Long Beach.  The review found that the "top five priority issues" were as follows:

> "Appraisal deficiencies that could impact value and were not addressed[;]
> Material misrepresentations relating to credit evaluation were confirmed[;]
> Legal documents were missing or contained errors or discrepancies[;]
> Credit evaluation or loan decision errors[; and]
> Required credit documentation was insufficient or missing from the file."

*Id*. at 82 (quoting e-mail from Ron Cathcart, Chief Risk Officer, WaMu, to Cory Gunderson (Dec. 11, 2006 9:21 AM PST)).

238.    Pushing "Option ARMs" was a major part of WaMu Bank's new "high risk" lending strategy.  In a bipartisan memorandum from Senators Carl Levin and Tom Coburn to the Members of the PSI, dated April 13, 2010, Option ARMs are labeled WaMu Bank's "flagship" product.  Senate Exhibit 1.a, at 3.  The WaMu OIG Report describes the inherently dangerous nature of WaMu Bank's Option ARMs:

> WaMu's Option ARMs provided borrowers with the choice to pay their monthly mortgages in amounts equal to monthly principal and interest, interest-only, or a minimum monthly payment.  Borrowers selected the minimum monthly payment option for 56 percent of the Option ARM portfolio in 2005.
>
> The minimum monthly payment was based on an introductory rate, also known as a teaser rate, which was significantly below the market interest rate and was usually in place for only 1 month.  After the introductory rate expired, the minimum monthly payment feature introduced two significant risks to WaMu's portfolio:  payment shock and negative amortization.  WaMu projected that, on average, payment shock increased monthly mortgage amounts by 60 percent.  At the end of 2007, 84 percent of the total value of Option ARMs on WaMu's financial statements was negatively amortizing.

WaMu OIG Report at 9.

239.   The WaMu OIG Report notes that "Option ARMs represented as much as half of all loan originations from 2003 to 2007 and approximately $59 billion, or 47 percent, of the home loans on WaMu's balance sheet at the end of 2007." *Id.*

240.   The OIG also notes that WaMu Bank's "new strategy included underwriting subprime loans, home equity loans, and home equity lines of credit to high-risk borrowers.  In line with that strategy, WaMu purchased and originated subprime loans, which represented approximately $16 billion, or 13 percent, of WaMu's 2007 home loan portfolio." *Id.* at 10.

241.   WaMu Bank's careless underwriting practices rendered these already high risk loan products even more risky.  *See id.*  The WaMu OIG Report stated that the OTS and the FDIC repeatedly "identified concerns with WaMu's high-risk lending strategy" and loan underwriting, weaknesses in management and "inadequate internal controls." *Id.* at 3-4.  Those concerns included "questions about the reasonableness of stated incomes contained in loan documents, numerous underwriting exceptions, miscalculations of loan-to-value ratios, and missing or inadequate documentation."  Hearing on Wall Street & the Fin. Crisis: The Role of Bank Regulators Before the United States S. Homeland Sec. and Governmental Affairs Comm., Permanent Subcomm. on Investigations, 111th Cong. 9 (Apr. 16, 2010) (statement of the Hon. Eric M. Thorson, Inspector General, Dep't of the Treasury) ("Thorson Statement").

242.   WaMu Bank's management began to notice the pattern of "first payment default" ("FPD") for loans Long Beach originated.  In June 2007, WaMu Bank closed Long Beach as a separate entity and placed its subprime lending operations in a new division called "Wholesale Specialty Lending."

243.   In late 2007, WaMu Bank performed an internal review to determine whether its plans to address its poor underwriting practices were effective.  The review focused on 187 loans

that experienced FPD, originated from November 2006 to March 2007.  As an initial matter, the

review found:

> The overall system of credit risk management activities and process has major
> weaknesses resulting in unacceptable level of credit risk.   Exposure is
> considerable and immediate corrective action is essential in order to limit or avoid
> considerable losses, reputation damage, or financial statement errors.

PSI  High  Risk  Home  Loans  Hearing,  Senate  Ex.  21,  "WaMu  Corporate  Credit  Review:

Wholesale Specialty Lending-FPD" at 2 (Sept. 28, 2007).

244.    Specifically, the WaMu Bank internal review reported the following findings

regarding the 187 FPD loans:

- (High) Ineffectiveness of fraud detection tools – 132 of the 187 (71%) files
  were reviewed by Risk Mitigation for fraud.  Risk Mitigation confirmed fraud
  on 115 files and could not confirm on 17 of the files, but listed them as
  "highly suspect."  This issue is a repeat finding with CCR.
- (High)  Weak  credit  risk  infrastructure  impacting  credit  quality.    Credit
  weakness and underwriting deficiencies is a repeat finding with CCR.  It was
  also identified as a repeat finding and Criticism in the OTS Asset Quality
  memo 3 issued May 17, 2007.  Internal Audit in their August 20, 2007 Loan
  Origination  &  Underwriting  report  identified  it  as  a  repeat  issue.    Findings
  from the CCR FPD review in relation to credit quality:

  - 132 of the 187 loans sampled were identified with red flags that were
    not addressed by the business unit
  - 80 of the 112 (71%) stated income loans were identified for lack of
    reasonableness of income
  - 87 files (47%) exceeded program parameters in place at the time of
    approval
  - 133 (71%) had credit evaluation or loan decision errors present
  - 25 (13%) had the title report issues that were not addressed
  - 28 (14%) had income calculation errors and 35 (19%) had income
    documentation errors
  - 58 (31%) had appraisal discrepancies that raised concerns that the
    value was not supported

Id. at 3.

245.    An OTS memorandum on Loan Fraud Investigation, dated June 19, 2008,

observes the systematic nature of the problem:  "[T]he review defines an origination culture

focused more heavily on production volume rather than quality. An example of this was a finding that production personnel were allowed to participate in aspects of the income, employment, or asset verification process, a clear conflict of interest. . . . Prior OTS examinations have raised similar issues including the need to implement incentive compensation programs to place greater emphasis on loan quality." PSI High Risk Home Loans Hearing, Senate Ex. 25, Memorandum from D. Schneider, President Home Loans, to A. Hedger, OTS Examiner and B. Franklin, OTS EIC at 1 (June 19, 2008).

246. A WaMu Significant Incident Notification, Date Incident Reported – 04/01/2008, Loss Type - Mortgage Loan, stated:

> One Sales Associate admitted that during that crunch time some of the Associates would 'manufacture' assets statements from previous loan docs and submit them to the [Loan Fulfillment Center ('LFC')]. She said the pressure was tremendous from the LFC to get them the docs since the loan had already funded and pressure from the Loan Consultants to get the loans funded.

PSI High Risk Home Loans Hearing, Senate Ex. 30, "Significant Incident Notification (SIN)" at 1 (Apr. 1, 2008).

247. A New York Times article described WaMu Bank's underwriting practices as follows: "On a financial landscape littered with wreckage, WaMu, a Seattle-based bank that opened branches at a clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending." Peter S. Goodman & Gretchen Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans,* N.Y. Times, Dec. 27, 2008 at A1.

248. Sherri Zaback, a former underwriter at a WaMu Bank branch in San Diego, California, stated that "[m]ost of the loans she . . . handled merely required borrowers to provide an address and Social Security number, and to state their income and assets." *Id.* On one occasion, Zaback asked a loan officer for verification of a potential borrower's assets. The officer sent her a letter from a bank showing a balance of about $150,000 in the borrower's

account. Zaback called the bank to confirm and was told the balance was only $5,000. The loan officer yelled at her, Ms. Zaback recalled. "She said, 'We don't call the bank to verify.'" *Id.*

249.    Zaback also recalled that the sheer volume of loans precluded WaMu Bank employees from adhering to underwriting standards. According to Zaback, she would typically spend a maximum of 35 minutes per file: "'Just spit it out and get it done. That's what they wanted us to do. Garbage in, and garbage out.'" *Id.* Another WaMu Bank agent in Irvine, California told the New York Times that she "coached brokers to leave parts of applications blank to avoid prompting verification if the borrower's job or income was sketchy." *Id.*

250.    WaMu Bank's underwriting also critically failed with respect to appraisals as well. An accurate appraisal of a property's market value is crucial to the underwriting process as the property provides collateral for the loan in case of default.

> WaMu's review of appraisals establishing the value of single family homes did not always follow standard residential appraisal methods because WaMu allowed a homeowner's estimate of the value of the home to be included on the form sent from WaMu to third-party appraisers, thereby biasing the appraiser's evaluation.

WaMu OIG Report at 11.

251.    The New York Times reported, "WaMu pressured appraisers to provide inflated property values that made loans appear less risky, enabling Wall Street to bundle them more easily for sale to investors." Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1. The article quoted the founder of one appraisal company that did business with WaMu Bank until 2007 as saying, "'It was the Wild West,' . . . . 'If you were alive, they would give you a loan. Actually, I think if you were dead, they would still give you a loan.'" *Id.* (quoting Steven Knoble, founder Mitchell, Maxwell & Jackson).

252.    Nor did WaMu Bank adequately monitor third-party brokers (non-employees) who originated most of WaMu Bank's loans. As Eric Thorson explained before the PSI:

In addition to originating retail loans with its own employees, WaMu began originating and purchasing wholesale loans through a network of brokers and correspondents.  From 2003 to 2007, wholesale loan channels represented 48 to 70 percent of WaMu's total single family residential loan production.  WaMu saw the financial incentive to use wholesale loan channels for production as significant.  According to an April 2006 internal presentation to the WaMu Board, it cost WaMu about 66 percent less to close a wholesale loan ($1,809 per loan) than it did to close a retail loan ($5,273).  So while WaMu profitability increased through the use of third-party originators, it had far less oversight and control over the quality of the originations.

Thorson Statement at 5.  According to the WaMu OIG Report, WaMu Bank had only 14 employees monitoring the actions of 34,000 third-party brokers.  *See* WaMu OIG Report at 11. This lack of oversight led to WaMu Bank "identif[ying] fraud losses attributable to third-party brokers of $51 million for subprime loans and $27 million for prime loans" in 2007.  *Id.*

253.    Federal regulators also noted that "WaMu acquired 11 institutions and merged with 2 affiliates" from 1991 to 2006, yet failed to "fully integrate . . . information technology systems, risk controls, and policies and procedures" from its acquisitions and institute "a single enterprise-wide risk management system."  Thorson Statement at 5.  An integrated risk management system was critically important in light of WaMu Bank's high-risk lending strategy. *See id.*

254.    Based on interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers, Goodman and Morgenson of the New York Times noted the "relentless pressure to churn out loans" "while disregarding borrowers' incomes and assets" that came from WaMu Bank's top executives.  Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.  According to Dana Zweibel, a former financial representative at a WaMu Bank branch in Tampa, Florida, even if she doubted whether a borrower could repay the loan, she was told by WaMu Bank management that it was not her concern:  her concern was "'just to write the loan.'"  *Id.*  Said Zweibel, "'[i]t was a disgrace'. . . .  'We were giving loans to

people that never should have had loans.'" *Id*.

255.   In November 2008, the New York Times, quoting Keysha Cooper, a Senior Mortgage Underwriter at WaMu Bank from 2003 to 2007, recounted "'[a]t WaMu it wasn't about the quality of the loans; it was about the numbers'. . . .  'They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?'"  Gretchen Morgenson, *Was There a Loan It Didn't Like*?, N.Y. Times, Nov. 1, 2008. According to the article, "[i]n February 2007 . . . the pressure became intense.  WaMu executives told employees they were not making enough loans and had to get their numbers up. . . ." Cooper concluded, "'I swear 60 percent of the loans I approved I was made to.' . . . 'If I could get everyone's name, I would write them apology letters.'"  *Id*.

256.   WaMu Bank inflated salaries of baby sitters and mariachi singers to the six-figure range.  Indeed, the only verification of the mariachi singer's income was a photograph of the mariachi singer in his outfit included in the loan application file.  The New York Times reported:

> As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'.  He rarely questioned them.  A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.
>
> Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows.  The borrower was claiming a six-figure income and an unusual profession:  mariachi singer.
>
> Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit.  The photo went into a WaMu file.  Approved.
>
> "I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons.
> . . .
>
> At WaMu, getting the job done meant lending money to nearly anyone who asked for it — the force behind the bank's meteoric rise and its precipitous collapse this

year in the biggest bank failure in American history.

. . .

Interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers reveal the relentless pressure to churn out loans that produced such results.

Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.

257.    Long Beach specialized in the riskiest of loans—subprime mortgages.  Internal WaMu Bank documents reveal a well-documented pattern of underwriting deficiencies at Long Beach.  A memorandum to the Audit Committees of the Board of Directors of WaMu Bank and Washington Mutual, Inc. ("WMI"), WaMu Bank's holding company, dated April 17, 2006, re: Long Beach Mortgage Company -Repurchase Reserve Root Cause Analysis states:  "[Long Beach] experienced a dramatic increase in EPDs[] during the third quarter of 2005. . . . [R]elaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel . . . coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan quality."  Senate Exhibit 10 at 1-2.

258.    A WaMu Audit Report titled Long Beach Mortgage Loan Origination & Underwriting, dated August 20, 2007, states:  "[T]he overall system of risk management and internal controls has deficiencies related to multiple, critical origination and underwriting processes. . . .  These deficiencies require immediate effective corrective action to limit continued exposure to losses."  Senate Exhibit 19 at 2.  In its "Executive Summary" section, this Audit Report states:

In response to challenges resulting from the softening housing market, rising interest rates, tightening capital markets, poor portfolio performance and underwriting deficiencies, [Long Beach] continually refines their processes and guidelines.  While management has been responsive to these challenges by identifying and implementing corrective actions, actual underwriting practices

> have not been consistent to achieve the desired levels of improvement. Continued
> patterns of loans being underwritten outside of established underwriting and
> documentation guidelines have been previously identified.

*Id*. at 2. It also identifies the following as the number one high rated "repeat issue" to correct:

"Underwriting guidelines established to mitigate the risk of unsound underwriting decisions are

not always followed and the decisioning methodology is not always fully documented." *Id*. at 8.

The number two "repeat issue" was identified as "[p]olicies and procedures defined to allow and

monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently

followed." *Id.* at 10. An e-mail from a WaMu Bank executive describes the Long Beach audit

report as "the ultimate in bayonetting the wounded, if not the dead." Senate Exhibit 20 at 1.

259.    In a WaMu Bank internal report titled "[Long Beach] Post Mortem – Early

Findings Read Out," dated November 1, 2005, the authors note the following "common theme"

surfacing: "Underwriting guidelines are not consistently followed and conditions are not

consistently or effectively met." Senate Exhibit 9 at 1. The report goes on to note that 60% of

First Payment Default cases could have been prevented "had current policy, procedures and

guidelines been better executed." *Id*. at 2.

260.    In Gretchen Morgenson's July 9, 2010, article titled Mortgage Investors Turn to

State Courts for Relief, Morgenson of The New York Times reported on a lawsuit filed by

Cambridge Place Investment Management, an investment management firm that lost over a

billion dollars in RMBS it bought for clients, against 15 banks, for abetting fraud. The complaint

alleges that management at Long Beach directed underwriters to "'approve, approve, approve'"

and highlights the "anything-goes" lending practices at Long Beach:

> One Long Beach program made loans to self-employed borrowers based on three
> letters of reference from past employers. A former worker said some letters
> amounted to "So-and-so cuts my lawn and does a good job," adding that the
> company made no attempt to verify the information, the complaint stated.

261.    The OTS also reported concerns with subprime underwriting practices by Long Beach from 2006 to 2007.  *See* Thorson Statement at 9-10.

262.    As a result of its systematic disregard of underwriting standards, Long Beach also appeared in the 2008 "Worst Ten in the Worst Ten" Report.  In fact, Long Beach was in the top five in every city other than Las Vegas, Nevada (1st in Stockton, California, Sacramento, California, Denver, Colorado, and Memphis, Tennessee; 2nd in Bakersfield, California and Detroit, Michigan; 3rd in Cleveland, Ohio and Miami, Florida; and 4th in Riverside, California).  *See* 2008 "Worst Ten in the Worst Ten" Report.  Long Beach again ranked near the top in nearly every city in the 2009 "Worst Ten in the Worst Ten" Report (1st in Stockton-Lodi, California, Merced, California, and Vallejo-Fairfield-Napa, California; 5th in Fort Pierce-Port St. Lucie, Florida; and 6th in Riverside-San Bernardino, California).  *See* 2009 "Worst Ten in the Worst Ten" Report.

## VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT

263.    The Offering Documents included material untrue statements or omitted facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

264.    For purposes of Section 11 liability, the prospectus supplements are part of and included in the registration statements of the offerings pursuant to 17 C.F.R. §§ 230.158, 230.430B (2008); *see also* Securities Offering Reform, 70 Fed. Reg. 44,722-01, 44,768-69 (Aug. 3, 2005).

265.    Statements in the Offering Documents concerning the following subjects were material and untrue at the time they were made: (1) the Originators' evaluation of the borrower's

capacity and likelihood to repay the loan through application of the stated underwriting standards, including the calculation and use of an accurate "debt-to-income" ratio and the frequency and use of exceptions to those standards; (2) adherence to stated underwriting standards for reduced documentation programs; (3) the accurate calculation of "loan-to-value" ratio for each mortgaged property and the accuracy of appraisals; and (4) the existence of credit enhancement to minimize the risk of loss.

266.    The following chart lists which originators contributed loans to each RMBS. Under SEC's Regulation AB, the Offering Documents must disclose the originators that contributed more than 10% of the loans underlying the RMBS, and the Offering Documents must include underwriting guidelines for the originators that contributed more than 20% of the loans underlying the RMBS.  *See* 17 C.F.R. § 229.1110 (2005).  For the RMBS listed below, the Offering Documents generally included only those underwriting guidelines for the Originators that contributed more than 20% of the loans to the RMBS.

*Table 7*
*Originators Supplying Loans for Each RMBS at Issue*

| CUSIP(S) | ISSUING ENTITY | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 45661VAC0 | IndyMac INDX Mortgage Loan Trust 2006-AR12 | A-3 | IndyMac (100%) |
| 54251WAD4 54251WAE2 | Long Beach Mortgage Loan Trust 2006-9 | II-A3 II-A4 | Long Beach (100%) |
| 54251YAD0 54251YAE8 | Long Beach Mortgage Loan Trust 2006-10 | II-A3 II-A4 | Long Beach (100%) |
| 542512AE8 | Long Beach Mortgage Loan Trust 2006-11 | II-A4 | Long Beach (100%) |
| 55028CAA3 55028CAB1 55028CAE5 | Luminent Mortgage Trust 2007-1 | I-A-1 I-A-2 II-A-3 | WaMu (88.16% Group 1) Metrocities Mortgage LLC (11.84% Group 1) IndyMac (100% Group 2) |

| CUSIP(S) | ISSUING ENTITY | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 92926SAD8 | WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust | II-A3 | WaMu (100%) |
| 93364EAD6 | WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust | II-A3 | WaMu (100%) |
| 93363XAD5 93363XAE3 | WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 | II-A3 II-A4 | WaMu (100%) |
| 92925DAF7 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | CA-1C | WaMu (100%) |
| 933638AF5 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | CA-1C | WaMu (100%) |
| 92926WAB3 92926WAC1 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | A-1B A-1C | WaMu (100%) |
| 933635AA2 933635AD6 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 | 1A CA-1C | WaMu (100%) |
| 93364CAE8 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | CA-1C | WaMu (100%) |
| 93364BAD2 93364BAE0 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | CA-1B CA-1C | WaMu (100%) |
| 92927BAD4 92927BAE2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | CA-1B CA-1C | WaMu (100%) |
| 93934XAC7 | Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5 | II-A2 | People's Choice (55.9%) First NLC Financial Services, LLC (15.1%) |
| 93934FMQ2 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 | A-1C | Alliance Bancorp (17.3%) MortgageIT, Inc. (15.0%) Plaza Home Mortgage, Inc. (12.4%) SPM Co., Inc. (11.4%) Secured Bankers Mortgage (11.3%) WaMu (% not disclosed) |

| CUSIP(S) | ISSUING ENTITY | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 93934FQR6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 | A-1C | GMAC Mortgage Corporation (16.3%) Virtual Bank (15.1%) First Magnus Financial Corporation (13.1%) WaMu (% not disclosed) |
| 939345AE4 939345AF1 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 | CA1B DA1B | Countrywide Home Loans (23.5%) GMAC Mortgage Corporation (16.4%) First Magnus Financial Corporation (13.0%) WaMu (% not disclosed) |
| 93935AAH5 93935AAE2 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 | CA-1B 4A-1B | First Magnus Financial Corp. (24.6%) Residential Funding Corp. (15.5%) Alliance Bancorp (14.1%) First Horizon Home Loans (11.1%) WaMu (% not disclosed) |
| 93935FAE1 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 | CA-1C | Alliance Bancorp (23.6%) First Horizon Home Loans (13.2%) Plaza Home Mortgage, Inc. (11.0%) Residential Funding Corp. (11.0%) WaMu (% not disclosed) |
| 93935DAC0 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 | A-1C | Countrywide Home Loans (23.3%) Alliance Bancorp (21.4%) First Magnus Financial Corporation (15.4%) First Horizon Home Loan Corporation (10.1%) WaMu (% not disclosed) |
| 93935LAB4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 | 2-A | Alliance Bancorp (37.6% Groups 1 and 2) WaMu (% not disclosed) |
| 939346AD4 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 | CA-1C | SunTrust Mortgage Inc. (19.3%) Alliance Bancorp (19.2%) Countrywide Home Loans (13.2%) First Magnus Financial Corporation (10.8%) WaMu (% not disclosed) |
| 93936AAB7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 | A-2A | WaMu (71.10%) Argent Mortgage Company (13.3%) |

| CUSIP(S) | ISSUING ENTITY | TRANCHE | ORIGINATOR(S) |
|---|---|---|---|
| 93935NAC8 93935NAD6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 | CA-1B CA-1C | Alliance Bancorp (40.0%) Countrywide Home Loans (16.2%) First Magnus Financial Corporation (18.0%) WaMu (% not disclosed) |
| 93936MAC9 93936MAD7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | A-1C A-1D | Plaza Home Mortgage, Inc. (13.7%) First Magnus Financial Corp. (12.2%) WaMu (% not disclosed) |
| 93936RAD6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | A-1D | MortgageIT, Inc., (27.7%) Virtual Bank (16.3%) SunTrust Mortgage, Inc. (11.4%) WaMu (% not disclosed) |
| 93936LAE7 93936LAB3 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | A-5 A-2 | WaMu (59.5%) GreenPoint (24.3%) |

267.    Examples of material untrue statements and/or omissions of fact in the Offering

Documents of the RMBS listed above follow.

**A.    Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood to Repay the Mortgage Loan**

268.    The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement

represented:

> All of the mortgage loans owned by the trust have been, or will be, originated by the sponsor through wholesale brokers or re-underwritten upon acquisition from correspondents by the sponsor generally in accordance with the Long Beach underwriting guidelines described in this section. The Long Beach underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and repayment ability as well as the value and adequacy of the mortgaged property as collateral.    The term "sponsor" as used in this "Underwriting of the Mortgage Loans" section of this prospectus supplement refers to Long Beach Mortgage Company for mortgage loans owned by the trust that were originated or acquired prior to July 1, 2006.

Prospective borrowers are required to complete a standard loan application in which they provide financial information regarding the amount of income and related sources, liabilities and related monthly payments, credit history and employment history, as well as certain other personal information. During the underwriting or re-underwriting process, the sponsor reviews and verifies the prospective borrower's sources of income (only under the full documentation residential loan program), calculates the amount of income from all such sources indicated on the loan application, reviews the credit history and credit score(s) of the prospective borrower and calculates the debt-to-income ratio to determine the prospective borrower's ability to repay the loan, and determines whether the mortgaged property complies with the Long Beach underwriting guidelines.

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-36; *see* Long Beach Mortgage Loan Trust 2006-10 Prospectus Supplement at S-36; Long Beach Mortgage Loan Trust 2006-9 Prospectus Supplement at S-35; *see also* WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 Prospectus Supplement at S-29; WaMu Asset-Backed Certificates, WaMu Series 2007-HE2 Prospectus Supplement at S-29-30; WaMu Asset-Backed Certificates, WaMu Series 2007-HE3 Prospectus Supplement at S-27-28.

269. The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement represented:

On a case-by-case basis and only with the approval of an employee with appropriate risk level authority, the sponsor may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the Long Beach underwriting risk category guidelines warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit history, stable employment and time in residence at the prospective borrower's current address. It is expected that some of the mortgage loans owned by the trust will be underwriting exceptions.

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-37-38; Long Beach Mortgage Loan Trust 2006-10 Prospectus Supplement at S-37-38; Long Beach Mortgage Loan Trust 2006-9 Prospectus Supplement at S-36-37; *see also* WaMu Asset-Backed Certificates, WaMu Series 2007-HE4 Prospectus Supplement at S-30; WaMu Asset-Backed Certificates,

WaMu Series 2007-HE2 Prospectus Supplement at S-31; WaMu Asset-Backed Certificates,

WaMu Series 2007-HE3 Prospectus Supplement at S-29.

270.    The WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus

Supplement stated:

> All of the mortgage loans owned by the Trust have been originated in accordance with the underwriting guidelines of the sponsor as described in this section. Mortgage loans may have been underwritten directly by the sponsor or by correspondent lenders with delegated underwriting approval.
>
> The sponsor's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some mortgage loans are manually underwritten, in which case an underwriter reviews a loan application and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms stated in the loan application. Some mortgage loans are underwritten through the sponsor's automated underwriting system, described below.

WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus Supplement at S-39;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 Prospectus Supplement at S-39;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 Prospectus Supplement at S-38;

WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 Prospectus Supplement at S-37;

WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 Prospectus Supplement at S-39;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 Prospectus Supplement at S-31;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 Prospectus Supplement at S-38;

*see* Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2

Prospectus Supplement at S-26; Washington Mutual Mortgage Pass-Through Certificates,

WMALT Series 2006-AR5 Prospectus Supplement at S-47; Washington Mutual Mortgage Pass-

Through Certificates, WMALT Series 2006-AR6 Prospectus Supplement at S-37; Washington

Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 Prospectus Supplement

at S-34; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 Prospectus Supplement at S-50; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 Prospectus Supplement at S-38; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 Prospectus Supplement at S-33; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 Prospectus Supplement at S-33, Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5 Prospectus Supplement at S-39; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 Prospectus Supplement at S-25; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 Prospectus Supplement at S-28; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 Prospectus Supplement at S-33; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 Prospectus Supplement at S-43; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 Prospectus Supplement at S-38; and Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-32.

271.     The WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus Supplement represented:

> In evaluating a prospective borrower's ability to repay a mortgage loan, the loan underwriter considers the ratio of the borrower's mortgage payments, real property taxes and other monthly housing expenses to the borrower's gross income (referred to as the "housing-to-income ratio" or "front end ratio"), and the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back end ratio"). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus Supplement at S-40;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 Prospectus Supplement at S-40;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 Prospectus Supplement at S-39;

WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 Prospectus Supplement at S-38;

WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 Prospectus Supplement at S-40;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 Prospectus Supplement at S-32;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 Prospectus Supplement at S-39;

*see* Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2

Prospectus Supplement at S-27; Washington Mutual Mortgage Pass-Through Certificates,

WMALT Series 2006-AR5 Prospectus Supplement at S-47; Washington Mutual Mortgage Pass-

Through Certificates, WMALT Series 2006-AR6 Prospectus Supplement at S-37; Washington

Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 Prospectus Supplement

at S-34; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8

Prospectus Supplement at S-50; Washington Mutual Mortgage Pass-Through Certificates,

WMALT Series 2006-AR9 Prospectus Supplement at S-38; Washington Mutual Mortgage Pass-

Through Certificates, WMALT Series 2007-OA4 Prospectus Supplement at S-34; Washington

Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 Prospectus Supplement

at S-34; Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5 Prospectus

Supplement at S-39; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2007-HY1 Prospectus Supplement at S-26; Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR2 Prospectus Supplement at S-29; Washington Mutual

Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 Prospectus Supplement at S-34;

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 Prospectus

Supplement at S-44; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2007-OA1 Prospectus Supplement at S-39; and Luminent Mortgage Trust 2007-1 Prospectus

Supplement at S-33.

 272. The WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus

Supplement stated:

> Exceptions to the sponsor's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus Supplement at S-41;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 Prospectus Supplement at S-41;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 Prospectus Supplement at S-40;

WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 Prospectus Supplement at S-39;

WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 Prospectus Supplement at S-41;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 Prospectus Supplement at S-33;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 Prospectus Supplement at S-40;

*see* Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2

Prospectus Supplement at S-29; Washington Mutual Mortgage Pass-Through Certificates,

WMALT Series 2006-AR5 Prospectus Supplement at S-49-50; Washington Mutual Mortgage

Pass-Through Certificates, WMALT Series 2006-AR6 Prospectus Supplement at S-39-40;

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 Prospectus

Supplement at S-36; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2006-AR8 Prospectus Supplement at S-52; Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR9 Prospectus Supplement at S-40; Washington Mutual

Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 Prospectus Supplement at S-36; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 Prospectus Supplement at S-36; Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5 Prospectus Supplement at S-43; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 Prospectus Supplement at S-27; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 Prospectus Supplement at S-30; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 Prospectus Supplement at S-45-46; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 Prospectus Supplement at S-40; and Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-34.

273.    The Luminent Mortgage Trust 2007-1 Prospectus Supplement represented:

> IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines.

Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-36; IndyMac INDX Mortgage Loan Trust 2006-AR12 Prospectus Supplement at S-42-S-43.

274.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed.  The preceding statements were untrue at the time they were made because, as alleged herein, the Originators did not adhere to the stated underwriting guidelines, did not effectively evaluate the borrowers' ability or likelihood to repay the loans, did not properly evaluate whether the borrower's debt-to-income ratio supported a

conclusion that the borrower had the means to meet his/her monthly obligations, and did not

ensure that adequate compensating factors justified the granting of exceptions to guidelines.

Rather, as alleged herein, the Originators systematically disregarded the stated underwriting

guidelines in order to increase the volume of mortgages originated (*see supra* Section VII.D).

Further evidence of this fact is found in, among other things, the surge in delinquencies and

defaults shortly after the offerings (*see supra* Table 5), the rate at which actual gross losses

outpaced expected gross losses within the first year after the offerings (*see supra* Figure 2), the

collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged

in high OTD lending (*see supra* Table 6).

### B.   Untrue Statements Concerning Reduced Documentation Programs

275.   The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement stated:

> The Long Beach underwriting guidelines are less stringent than the guidelines
> Washington Mutual Bank applies to borrowers who qualify for its prime or Alt-A
> mortgage loans and less stringent than the guidelines generally acceptable to
> Fannie Mae and Freddie Mac with regard to the borrower's credit history, credit
> score(s), loan-to-value ratio and debt-to-income ratio. Borrowers who qualify
> under the Long Beach underwriting guidelines generally have payment histories,
> documentation or debt-to-income ratios that would not satisfy Fannie Mae and
> Freddie Mac underwriting guidelines and such borrowers may have a record of
> major derogatory credit items, such as outstanding judgments or prior
> bankruptcies.

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-36; Long Beach

Mortgage Loan Trust 2006-10 Prospectus Supplement at S-36; Long Beach Mortgage Loan

Trust 2006-9 Prospectus Supplement at S-35; *see also* WaMu Asset-Backed Certificates, WaMu

Series 2007-HE2 Prospectus Supplement at S-29; WaMu Asset-Backed Certificates, WaMu

Series 2007-HE3 Prospectus Supplement at S-28.

276.   The WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus

Supplement stated:

> The sponsor's low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. It is available to borrowers with certain loan-to-value ratios, loan amounts and credit scores. Under this program, the income as stated in the borrower's loan application is not verified, although the borrower's employment may be verified by telephone. The borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion). Assets may be verified for higher risk transactions and when exceptions are approved, such as when specific loan-to-value ratios or loan amount limits are exceeded.

WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus Supplement at S-41;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 Prospectus Supplement at S-41;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 Prospectus Supplement at S-40;

*see* Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 Prospectus Supplement at S-28; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5 Prospectus Supplement at S-49; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6 Prospectus Supplement at S-39; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 Prospectus Supplement at S-36; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 Prospectus Supplement at S-52; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 Prospectus Supplement at S-40; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 Prospectus Supplement at S-35; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 Prospectus Supplement at S-35; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 Prospectus Supplement at S-27; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 Prospectus Supplement at S-30; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 Prospectus Supplement at S-35; and Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-34.

123

277.    The Luminent Mortgage Trust 2007-1 Prospectus Supplement stated:

Under the Stated Income Documentation Program and the No Ratio Program, more emphasis is placed on the prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income underwriting. The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income. Information regarding assets is verified through written communications.  Information regarding income is not verified. The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications. The No Ratio Program does not require prospective borrowers to provide information regarding their income.  Employment is orally verified under both programs.

Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-37; *see also* IndyMac INDX

Mortgage Loan Trust 2006-AR12 Prospectus Supplement at S-43.

278.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding

statements were material at the time they were made, because the quality of the loans in the

mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans

is dependent upon the underwriting process employed.  The preceding statements were untrue at

the time they were made, because regardless of the documentation program purportedly

employed, the Originators systematically disregarded their underwriting guidelines in order to

increase the volume of mortgages originated, emphasizing quantity of loans rather than the

quality of those loans (*see supra* Section VII.D).  Further evidence of this fact is found in, among

other things, the surge in delinquencies and defaults shortly after the offerings (*see supra* Table

5), the huge discrepancy between expected and actual gross losses (*see supra* Figure 2), the

collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged

in high OTD lending (*see supra* Table 6).

**C.    Untrue Statements Concerning Loan-to-Value Ratios**

279.    The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement stated:

> The Long Beach underwriting guidelines permit first lien mortgage loans with loan-to-value ratios at origination of up to 100%, or 80% if at the time of origination of the first lien mortgage loan, the sponsor also originated a second lien mortgage loan. The Long Beach second lien mortgage loan underwriting guidelines permit second lien mortgage loans with a combined loan-to-value ratios at origination of up to 100%. The maximum allowable loan-to-value ratio varies based upon the residential loan program, income documentation, property type, creditworthiness and debt service-to-income ratio of the prospective borrower and the overall risks associated with the loan decision.

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-37; Long Beach Mortgage Loan Trust 2006-10 Prospectus Supplement at S-37; Long Beach Mortgage Loan Trust 2006-9 Prospectus Supplement at S-36; *see also* WaMu Asset-Backed Certificates, WaMu Series 2007-HE2 Prospectus Supplement at S-30; WaMu Asset-Backed Certificates, WaMu Series 2007-HE3 Prospectus Supplement at S-28.

280. The Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5 Prospectus Supplement stated:

> The sponsor's underwriting guidelines permit first lien mortgage loans with loan-to-value ratios at origination of up to 100%, or 80% if at the time of origination of the first lien mortgage loan, the originator also originated a second lien mortgage loan. The sponsor's second lien mortgage underwriting guidelines permit second lien mortgage loans with a combined loan-to-value ratios at origination of up to 100%. The maximum allowable loan-to-value ratio varies based upon the residential loan program, income documentation, property type, creditworthiness and debt service-to-income ratio of the prospective borrower and the overall risks associated with the loan decision. The maximum combined loan-to-value ratio, including any second lien mortgage subordinate to the sponsor's first lien mortgage, is generally 100% under the "Premium A/A+" "A," "A-," "B+" and "B" risk categories, and 95% under the "C" and "D" risk categories.

Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5 Prospectus Supplement at S-40.

281. The Luminent Mortgage Trust 2007-1 Prospectus Supplement stated:

> Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO credit score, number of previous late mortgage payments, and the age of any

bankruptcy or foreclosure actions. Additionally, maximum total monthly debt payments-to-income ratios and cash-out limits may be applied.

Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-37; IndyMac INDX Mortgage Loan Trust 2006-AR12 Prospectus Supplement at S-43.

282.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made because the riskiness of the RMBS investment is directly dependent on the quality of the underwriting process and adequate assessment and limits on loan-to-value ratios (in addition to accurate appraisals) is key to that process.  The preceding statements were untrue at the time they were made because the Originators did not adhere to the maximum loan-to-value ratios as represented in the Offering Documents, encouraged inflated appraisals and frequently granted loans with high loan-to-value ratios with no meaningful assessment of the borrower's ability to repay the loan based on the borrower's credit profile (*see supra* Section VII.D).  Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the huge discrepancy between expected and actual gross losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

### D.   Untrue Statements Concerning Credit Enhancement

283.   The Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement stated:

The rights of the Subordinate Certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the Class A Certificates. This subordination is intended to enhance the likelihood of regular receipt by the holders of the Class A Certificates of the full amount of their scheduled monthly payments of interest and principal, and to afford such holders protection against realized losses.

Long Beach Mortgage Loan Trust 2006-11 Prospectus Supplement at S-79-80; Long Beach

Mortgage Loan Trust 2006-10 Prospectus Supplement at S-79-80; Long Beach Mortgage Loan

Trust 2006-9 Prospectus Supplement at S-79; WaMu Asset-Backed Certificates, WaMu Series

2007-HE2 Prospectus Supplement at S-67; WaMu Asset-Backed Certificates, WaMu Series

2007-HE3 Prospectus Supplement at S-64.

284.    The WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus

Supplement stated:

> The Class B Certificates will be subordinate in right of payment and provide credit support to the Senior Certificates to the extent described in this prospectus supplement. The support provided by the Class B Certificates is intended to enhance the likelihood of regular receipt by the Senior Certificates of the full amount of the monthly distributions of interest and principal to which they are entitled and to afford the Senior Certificates protection against some losses. The protection afforded to the Senior Certificates by the Class B Certificates will be accomplished by the preferential right on each Distribution Date of the Senior Certificates to receive distributions of interest and principal to which they are entitled before distributions of interest and principal to the Class B Certificates and by the allocation of losses to the Class B Certificates before any allocation of losses to the Senior Certificates.

WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 Prospectus Supplement at S-87;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 Prospectus Supplement at S-87;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 Prospectus Supplement at S-85;

WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 Prospectus Supplement at S-83;

WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 Prospectus Supplement at S-86;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 Prospectus Supplement at S-67;

WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 Prospectus Supplement at S-84;

*see* Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2

Prospectus Supplement at S-80; Washington Mutual Mortgage Pass-Through Certificates,

WMALT Series 2006-AR5 Prospectus Supplement at S-24; Washington Mutual Mortgage Pass-

Through Certificates, WMALT Series 2006-AR6 Prospectus Supplement at S-87; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7 Prospectus Supplement at S-84; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 Prospectus Supplement at S-123; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9 Prospectus Supplement at S-97-98; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 Prospectus Supplement at S-76-77; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 Prospectus Supplement at S-74; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 Prospectus Supplement at S-64; and Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5 Prospectus Supplement at S-79-80; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2 Prospectus Supplement at S-63; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3 Prospectus Supplement at S-73; Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4 Prospectus Supplement at S-108; and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1 Prospectus Supplement at S-98.

285.    The Luminent Mortgage Trust 2007-1 Prospectus Supplement stated:

Credit enhancement is intended to reduce the loss caused to holders of the certificates as a result of shortfalls in payments received and losses realized on the mortgage loans. The credit enhancement for each of the Class I and Class II offered certificates includes subordination, excess interest, overcollateralization and realized loss allocation with respect to the related group of mortgage loans.

Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-6.

286.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the Credit Unions nearly always purchased the highest rated tranches of the RMBS, and those highly rated tranches relied on the

credit enhancement, which purportedly afforded protection against financial loss. The preceding statements were untrue at the time they were made, because, due to the Originators' systematic disregard of underwriting standards, the mortgages in the pools were fatally impaired at the outset and destined to fail (*see supra* Section VII.D).  This rendered the protection allegedly afforded by the credit enhancement in the highest tranches illusory.  Further evidence of the Originators' pervasive disregard of underwriting standards is found in the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5); the huge discrepancy between expected and actual gross losses (*see supra* Figure 2); the collapse of the credit ratings (*see supra* Table 4); and the Originators' high OTD lending (*see supra* Table 6).

## IX.    LIABILITY OF NON-PARTY WAMU BANK

287.    Non-party WaMu Bank was the sponsor of 13 of the 29 offerings at issue in this complaint.  Its wholly-owned subsidiary WMMSC was the sponsor of all but two of the rest.  As such, WaMu Bank determined the structure of the offerings, initiated the offerings, originated or purchased the mortgage loans to be securitized (*see* Table 7, *supra*), determined the distribution of principal and interest, and provided data to the credit rating agencies to secure investment grade ratings for the certificates.  WaMu Bank also selected and indeed formed the depositor (WaMu Asset Acceptance) that would be used to transfer the mortgage loans from WaMu Bank to the trusts and selected the underwriter(s) who would sell the certificates to investors.

288.    WaMu Bank employed its wholly-owned subsidiaries, WMMSC, Defendant WaMu Capital and the Issuer Defendants, to fill all key roles in the securitization process. Unlike typical arms' length securitizations, all but two of the offerings at issue in this Complaint involved WaMu subsidiaries and affiliates at every step in the securitization process.  In other words, WaMu Bank or one of its wholly owned subsidiaries, including WMMSC as well as

Defendant WaMu Capital and the Issuer Defendants, sponsored, issued (acted as depositor) and underwrote 27 of the 29 offerings at issue herein.  Further, WaMu Bank contributed loans to 27 of the 29 offerings.  *See* Table 7, *supra*.

289.    Specifically regarding WaMu Capital and WaMu Asset Acceptance, the PSI Wall Street Report notes:

> When [WaMu Bank] began securitizing its loans, it was dependent upon investment banks to help underwrite and sell its securitizations. In order to have greater control of the securitization process and to keep securitization underwriting fees in house, rather than paying them to investment banks, [WaMu Bank] acquired a company able to handle securitizations and renamed it Washington Mutual Capital Corporation (WCC), which became a wholly-owned subsidiary of the bank. WCC was a registered broker-dealer and began to act as an underwriter of WaMu and Long Beach securitizations. WCC worked with two other bank subsidiaries, [WMMSC] and [WaMu Asset Acceptance], that provided warehousing for WaMu loans before they were securitized. WCC helped to assemble RMBS pools and sell the resulting RMBS securities to investors. At first it worked with other investment banks; later it became the sole underwriter of some WaMu securitizations.

PSI Wall Street Report at 56.

290.    The extent of interrelation between the WaMu/Long Beach entities is also shown by their common officers and directors.  For instance, Richard Careaga was First Vice President of WaMu Asset Acceptance and First Vice President and Assistant Secretary of WMMSC; David Beck was a Director of WaMu Capital, Executive Vice President of WMMSC, and Senior Vice President of Long Beach Mortgage (once a subsidiary then a division of WaMu Bank); Donald Wilhelm was CFO/Treasurer of WaMu Capital, and First Vice President of WMMSC; Timothy J. Maimone was Senior Vice President of WMMSC and President of WaMu Capital; and David H. Zielke was First Vice President of WaMu Asset Acceptance and First Vice President of WMMSC.

291.    Defendant WaMu Asset Acceptance has been engaged in the securitization of mortgage loans as a depositor since its incorporation.  It is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing entities, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

292.    Defendant WaMu Asset Acceptance was the depositor for 24 of the 29 offerings at issue herein.  In its capacity as depositor, WaMu Asset Acceptance purchased the mortgage loans from the sponsor pursuant to a Mortgage Loan Purchase Agreement or Mortgage Loan Sale Agreement, as applicable. WaMu Asset Acceptance then sold, transferred, or otherwise conveyed the mortgage loans to be securitized to the issuing entities.  WaMu Asset Acceptance was also responsible for preparing and filing the Offering Documents.  The issuing entities in turn held the mortgage loans for the benefit of the certificateholders, and issued the certificates to be sold to investors such as the Credit Unions.

293.    Defendant Long Beach Securities has been engaged in the securitization of mortgage loans as a depositor since its incorporation.  It is a special purpose entity formed solely for the purpose of purchasing mortgage loans, filing registration statements with the SEC, forming issuing entities, assigning mortgage loans and all of its rights and interests in such mortgage loans to the trustee for the benefit of the certificateholders, and depositing the underlying mortgage loans into the issuing trusts.

294.    Defendant Long Beach Securities was the depositor for 3 of the 29 offerings.  In its capacity as depositor, Long Beach Securities purchased the mortgage loans from the sponsor pursuant to a Mortgage Loan Purchase Agreement, as applicable.  Long Beach Securities then

sold, transferred, or otherwise conveyed the loans to be securitized to the issuing entities. Long

Beach Securities was also responsible for preparing and filing the Offering Documents. The

issuing entities in turn held the mortgage loans for the benefit of the certificateholders, and

issued the certificates to be sold to investors such as the Credit Unions.

295. Defendant WaMu Capital acted as underwriter or co-underwriter for all but one of

the offerings. In that role, it was responsible for underwriting and managing the offer and sale of

Certificates to the Credit Unions and other investors.

296. WaMu Capital and the Issuer Defendants were wholly-owned subsidiaries of

WaMu Bank. As the sole corporate parent of WaMu Capital and the Issuer Defendants, WaMu

Bank had the practical ability to direct and control the actions of WaMu Capital and the Issuer

Defendants in issuing and selling the certificates, and in fact, exercised such direction and

control over the activities of WaMu Capital and the Issuer Defendants in connection with the

issuance and sale of the certificates.

297. In the Financial Industry Regulatory Authority ("FINRA") BrokerCheck Report

on WaMu Capital, WaMu Bank is affirmatively stated as "direct[ing] the management and

policies" of WaMu Capital, and WaMu Capital is listed as being "directly or indirectly,

controlled by" WaMu Bank.

298. Non-party WaMu Bank also controlled all aspects of the businesses of Issuer

Defendants, as they were merely special purpose entities—shell corporations created for the

purpose of acting as pass-throughs for the issuance of certain of the certificates.

## X. LIABILITY OF JPM CHASE BANK

299. On September 25, 2008, the OTS closed WaMu Bank and named the FDIC as

receiver. Thereafter, the FDIC, as receiver for WaMu Bank, entered into the PAA with JPM

Chase Bank under which JPM Chase Bank agreed to "purchase substantially all of the assets and

assume all deposit and substantially all other liabilities of" WaMu Bank.  *See* PAA.

> 300.    According to the PAA, JPM Chase Bank purchased the following assets:

> 3.1  Assets Purchased by Assuming Bank.  Subject to Sections 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) *including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank* whether or not reflected on the books of the Failed Bank as of Bank Closing.  Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1.  The subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a. Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

PAA § 3.1 (emphasis added).

> 301.    Thus, JPM Chase Bank purchased "all subsidiaries" of WaMu Bank under the

PAA, which subsidiaries included WaMu Capital and the Issuer Defendants.  As such, WaMu

Capital and the Issuer Defendants became wholly-owned subsidiaries of JPM Chase Bank.

> 302.    JPM Chase Bank also assumed certain liabilities under the PAA:

> 2.1  Liabilities Assumed by Assuming Bank.  Subject to Sections 2.5 [Borrower Claims] and 4.8 [Agreement with Respect to Certain Existing Agreements], the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed").  Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

PAA § 2.1.

303.    Under the terms of the PAA, the only liability JPM Chase Bank expressly

disclaimed was "any liability associated with borrower claims for payment of or liability to any

borrower for monetary relief, or that provide for any other form of relief to any borrower . . .

related in any way to any loan or commitment to lend made by the Failed Bank prior to failure,

or to any loan made by a third party in connection with a loan which is or was held by the Failed

Bank, or otherwise arising in connection with the Failed Bank's lending or loan purchase

activities."  PAA § 2.5.

304.    The Final Report of the Examiner ("Examiner's Report"), submitted by the court

appointed Examiner on November 1, 2010 during WMI's bankruptcy supports that JPM Chase

Bank assumed all liabilities associated with claims such as those asserted herein under the PAA.

*In re Washington Mutual, Inc.*, No. 08-12229 MFW (Bankr. D. Del. Nov. 1, 2010) (filed publicly

with exhibits on Nov. 22, 2010).

305.    For instance, the FDIC posted a "FAQ" for potential acquirers with respect to the

WaMu Bank transaction.  The FDIC's explicit position was that the mortgage securitization

obligations passed to the acquirer:

> 9. Are the off-balance sheet credit card portfolio and mortgage securitizations
> included in the transaction?  Do you expect the acquirer to assume the servicing
> obligations?  If there are pricing issues associated with the contracts (e.g., the
> pricing is disadvantageous to the assuming institution), can we take advantage of
> the FDIC's repudiation powers to effect a repricing?
>
> Answer: The bank's interests and obligations associated with the off-balance
> sheet credit card portfolio and mortgage securitizations pass to the acquirer. Only
> contracts and obligations remaining in the receivership are subject to repudiation
> powers.

Examiner's Report Ex. JPMCD 000001550.00212 – JPMCD 000001550.00213.

306.    In fact, WMI had warned investors in its quarterly 10-Q report for the quarter ending June 30, 2008 that "errors may have been made in the process of originating the loans" in its securitizations, and further cautioned that "representations and warranties made by the Company in connection with" the sales of its RMBS products could be "breached."  WMI further explained, if "it is determined that such errors constitute a breach of a representation or warranty made to the investor in connection with the Company's sale of the loan, then if the breach had a material adverse effect on the value of the loan, the Company will be required to either repurchase the loan or indemnify the investor for losses sustained. Reserves established to repurchase loans or indemnify investors are recorded as a reduction to revenue from sales and servicing of home loans on the Consolidated Statements of Income."  Prior to the sale of its assets and liabilities to JPM Chase Bank, WaMu Bank had already "recorded reserves of $375 million and $268 million as of June 30, 2008 and December 31, 2007, to cover its estimated exposure" related to these "aforementioned loss contingencies." WMI Form 10-Q for the Period Ended June 30, 2008, at 10-11.

307.    Thus, JPM Chase Bank was fully aware of the pending claims and potential claims against WaMu Bank when it purchased and assumed WaMu Bank's assets and liabilities.

308.    Further, JPMorgan Chase & Co.'s SEC filings specifically recognize the additional liability associated with claims as those asserted herein.  For instance, in a 424(b)(5) prospectus supplement filed Dec. 12, 2009, for an offering of warrants for the rights to purchase shares of its common stock, JPMorgan Chase & Co. warns potential investors (at S-7) that "repurchase and/or indemnity obligations arising in connection with the sale and securitization of loans . . . by us and certain of our subsidiaries, as well as entities acquired by us as part of the Bear Stearns, Washington Mutual and other transactions, could materially increase our costs and

lower our profitability, and could materially and adversely impact our results of operations and financial condition."

309.    JPM Chase Bank is therefore liable as successor-in-interest to WaMu Capital and the Issuer Defendants and/or non-party WaMu Bank.

310.    In the alternative, the transaction between JPM Chase Bank and the FDIC resulted in a *de facto* merger of JPM Chase Bank and WaMu Bank, because WaMu Bank was put into receivership and sold to JPM Chase Bank in one day with no interruption of and in fact a continuity of business, JPM Chase Bank discontinued the WaMu brand and converted it to the JPM Chase brand as soon as was possible, and JPM Chase Bank assumed the liabilities of WaMu Bank that were necessary to continue WaMu Bank's ordinary business.  As a result of the *de facto* merger, JPM Chase Bank is liable for WaMu Bank's liability as control person of WaMu Capital and the Issuer Defendants.

## XI.    THE CLAIMS ARE TIMELY

311.    For actions brought by the NCUA Board as Liquidating Agent, the FCU Act extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent.  *See* 12 U.S.C. § 1787(b)(14)(B)(i).

312.    The NCUA Board placed U.S. Central and WesCorp under conservatorship and appointed itself as conservator on March 20, 2009.  On September 24, 2010, the NCUA Board placed Southwest into conservatorship.  On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into liquidation and appointed itself as Liquidating Agent.  On October 31, 2010, the NCUA Board placed Southwest into involuntary liquidation, appointing itself Liquidating Agent.

313.    Actions brought under Sections 11 and 12(a)(2) of the Securities Act must be:

brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . .  In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

15 U.S.C. § 77m.

314.    Actions brought under section 17-12a509 of the Kansas Blue Sky Law must be brought within "within the earlier of two years after discovery of the facts constituting the violation or five years after the violation."  Kan. Stat. Ann. § 17-12a509(j).

315.    Actions brought under section 25501 of the California Corporate Securities Law must be brought within "five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire."  Cal. Corp. Code § 25506(b).

316.    Actions brought under section 581-33 of the Texas Securities Act must be brought no "(a) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence; or (b) more than five years after the sale."  Tex. Rev. Civ. Stat. Ann. art 581, § 33(H)(2).

317.    As the Federal Reserve Board noted in November 2008, the "[d]eteriorating lending standards" and "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher J. Mayer, *The Rise in Mortgage Defaults* 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59); *see also* FSOC Risk Retention Report at 9.

318.    The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical

information concerning the quality and performance of RMBS.  The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

> One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

319.    Accordingly, U.S. Central and WesCorp did not discover and could not have discovered the untrue statements and/or misleading omissions in the Offering Documents more than one year prior to March 20, 2009, the date on which the NCUA Board placed U.S. Central and WesCorp into conservatorship.  A reasonably diligent investor would not have known even to begin investigating misrepresentations in the Offering Documents until at least the date the Certificates were downgraded to a credit rating below investment grade.  *See supra* Table 4.

320.    In addition, the Credit Unions and/or the NCUA Board as their Liquidating Agent are or were members of putative classes in the cases listed in Table 8, below.  Therefore, the NCUA Board's claims are subject to legal tolling of the statute of limitations and statute of repose under the doctrine announced in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) ("American Pipe") and its progeny.

**Table 8**
*Purchases Subject to Tolling Under American Pipe*

| CUSIP | ISSUING ENTITY | PURCHASER | TRADE DATE | AMERICAN PIPE TOLLING COMMENCEMENT DATE |
|---|---|---|---|---|
| 92925DAF7 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | WesCorp | 11/20/2006 | *New Orleans Employees' v. Washington Mutual Bank,* No. 08-2-26210-3 SEA (Wash. Super. Ct., King County) Complaint **Filed: August 4, 2008** (Removed to No. 09-0134 (W.D.W.A.)) (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Complaint **Filed: January 12, 2009** |
| 92925DAF7 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR17 | WesCorp | 11/20/2006 | *New Orleans Employees' v. Washington Mutual Bank,* No. 08-2-26210-3 SEA (Wash. Super. Ct., King County) Complaint **Filed: August 4, 2008** (Removed to No. 09-0134 (W.D.W.A.)) (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Complaint **Filed: January 12, 2009** |
| 933638AF5 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | U.S. Central | 12/1/2006 | *New Orleans Employees' v. Washington Mutual Bank,* No. 08-2-26210-3 SEA (Wash. Super. Ct., King County) Complaint **Filed: August 4, 2008** (Removed to No. 09-0134 (W.D.W.A.)) (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Complaint **Filed: January 12, 2009** |
| 933638AF5 | WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 | WesCorp | 12/20/2006 | *New Orleans Employees' v. Washington Mutual Bank,* No. 08-2-26210-3 SEA (Wash. Super. Ct., King County) Complaint **Filed: August 4, 2008** (Removed to No. 09-0134 (W.D.W.A.)) (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Complaint **Filed: January 12, 2009** |
| 92926WAB3 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | U.S. Central | 1/9/2007 | *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint **Filed: November 23, 2009** |
| 92926WAC1 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | U.S. Central | 1/9/2007 | *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint **Filed: November 23, 2009** |
| 92926WAC1 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA1 | WesCorp | 1/24/2007 | *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint **Filed: November 23, 2009** |

| CUSIP | ISSUING ENTITY | PURCHASER | TRADE DATE | AMERICAN PIPE TOLLING COMMENCEMENT DATE |
|-------|----------------|-----------|------------|------------------------------------------|
| 93364CAE8 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA4 | WesCorp | 4/25/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint **Filed: November 23, 2009** |
| 93364BAD2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | WesCorp | 5/23/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint **Filed: November 23, 2009** |
| 93364BAE0 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA5 | WesCorp | 5/23/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint **Filed: November 23, 2009** |
| 92927BAD4 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | WesCorp | 6/25/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint **Filed: November 23, 2009** |
| 92927BAE2 | WaMu Mortgage Pass-Through Certificates, Series 2007-OA6 | WesCorp | 6/25/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint **Filed: November 23, 2009** |
| 93936MAC9 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | WesCorp | 5/24/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.))<br><br>*Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint **Filed: November 23, 2009** |

| CUSIP | ISSUING ENTITY | PURCHASER | TRADE DATE | AMERICAN PIPE TOLLING COMMENCEMENT DATE |
|---|---|---|---|---|
| 93936MAD7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4 | WesCorp | 5/24/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.)) <br><br> *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint  **Filed: November 23, 2009** |
| 93936RAD6 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5 | WesCorp | 6/27/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.)) <br><br> *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint  **Filed: November 23, 2009** |
| 93936LAE7 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | WesCorp | 6/26/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.)) <br><br> *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint  **Filed: November 23, 2009** |
| 93936LAB3 | Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 | Southwest | 6/19/2007 | *Doral Bank v. Washington Mutual,* No. 09-1557 (W.D.W.A.) Complaint **Filed: October 30, 2009** (Consolidated with *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.)) <br><br> *Boilermakers v. WaMu,* No. 09-0037 (W.D.W.A.) Consolidated Complaint  **Filed: November 23, 2009** |

321.    With respect to those RMBS purchases for which the NCUA Board asserts claims for WesCorp and U.S. Central under Section 11 of the Securities Act (Counts One - Five), the earliest date they were bona fide offered to the public was March 24, 2006, or not more than three years prior to March 20, 2009.  Accordingly, the NCUA Board's Section 11 claims on behalf of WesCorp and U.S. Central are not time-barred.

322.    With respect to those RMBS purchases for which the NCUA Board asserts claims for Southwest under Section 11 of the Securities Act (Count Six), the earliest date they were bona fide offered to the public – after accounting for *American Pipe* tolling – was not more than

three years prior to September 24, 2010.  Accordingly, the NCUA Board's Section 11 claims on behalf of Southwest are not time-barred.

323.    With respect to those RMBS purchases for which the NCUA Board asserts claims on behalf of U.S. Central and WesCorp under Section 12(a)(2) (Counts Seven and Eight), the earliest sale date was March 27, 2006, or not more than three years prior to March 20, 2009. Accordingly, the NCUA Board's Section 12(a)(2) claims on behalf of U.S. Central and WesCorp are not time-barred.

324.    With respect to those RMBS purchases for which the NCUA Board asserts claims for Southwest under Section 12(a)(2) of the Securities Act (Count Nine), the earliest sale date – after accounting for *American Pipe* tolling – was not more than three years prior to September 24, 2010.  Accordingly, the NCUA Board's Section 12(a)(2) claims on behalf of Southwest are not time barred.

325.    With respect to those RMBS purchases for which the NCUA Board asserts claims on behalf of U.S. Central under Kansas law (Count Thirteen), the earliest purchase date/offering date with respect to those claims was October 5, 2006, or not more than five years prior to March 20, 2009.  Accordingly, the NCUA Board's state law claims are not time-barred.

326.    With respect to those RMBS purchases for which the NCUA Board asserts claims on behalf of WesCorp under California law (Count Eleven), the earliest purchase date/offering date with respect to those claims was March 27, 2006, or not more than five years prior to March 20, 2009.  Accordingly, the NCUA Board's state law claims are not time-barred.

327.    With respect to those RMBS purchases for which the NCUA Board asserts claims on behalf of Southwest under Texas law (Count Fifteen), the earliest purchase date/offering date

with respect to those claims was January 22, 2007, or not more than five years prior to

September 24, 2010.  Accordingly, the NCUA Board's state law claims are not time-barred.

## XII.   CLAIMS FOR RELIEF

**COUNT ONE**
**Section 11 of the Securities Act of 1933**
**(WaMu Mortgage Pass-Through Certificates, Series 2007-OA4,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA5,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA6,**
**WaMu Mortgage Pass-Through Certificates, Series 2006-AR17,**
**WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2)**

328.    The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as

though fully set forth here, except those paragraphs specific to the Issuer Defendants other than

WaMu Asset Acceptance, or specific to offerings other than the WaMu Mortgage Pass-Through

Certificates, Series 2007-OA4, WaMu Mortgage Pass-Through Certificates, Series 2007-OA5,

WaMu Mortgage Pass-Through Certificates, Series 2007-OA6, WaMu Mortgage Pass-Through

Certificates, Series 2006-AR17, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,

WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,  WaMu Mortgage Pass-Through

Certificates, Series 2007-OA2,  Washington Mutual Mortgage Pass-Through Certificates,

WMALT Series 2006-AR2, Washington Mutual Mortgage Pass-Through Certificates, WMALT

Series 2006-AR3, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

143

2006-AR4, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5, and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 offerings.

329.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchases of the WaMu Mortgage Pass-Through Certificates, Series 2007-OA4, WaMu Mortgage Pass-Through Certificates, Series 2007-OA5, WaMu Mortgage Pass-Through Certificates, Series 2007-OA6; WaMu Mortgage Pass-Through Certificates, Series 2006-AR17, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,  WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5, and

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 certificates

against WaMu Capital, as the underwriter, against WaMu Asset Acceptance Corp., as the issuer,

and against JPM Chase Bank as their successor-in-interest.

330.   At the time the registration statement became effective, it (including the

prospectus and any prospectus supplements) contained untrue statements and omitted facts that

were necessary to make the statements made not misleading, as alleged above.

331.   The untrue statements and omitted facts were material because a reasonably

prudent investor deciding whether to purchase the certificates would have viewed them as

important and as substantially altering the total mix of information available, as alleged above.

332.   WesCorp purchased the certificates pursuant to and traceable to a defective

registration statement, as alleged above.

333.   At the time WesCorp purchased the certificates, it did not know of the untrue

statements and omissions contained in the registration statement.

334.   WaMu Capital's and WaMu Asset Acceptance's conduct as alleged above

violated Section 11.

335.   WesCorp and Plaintiff sustained damages as a result of WaMu Capital's and

WaMu Asset Acceptance's violations of Section 11.

336.   JPM Chase Bank is the successor-in-interest to WaMu Capital and WaMu Asset

Acceptance.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against

WaMu Capital and WaMu Asset Acceptance, jointly and severally, and against JPM Chase

Bank, as their successor-in-interest, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT TWO
### Section 11 of the Securities Act of 1933
### (Luminent Mortgage Trust 2007-1)

337. The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Luminent Mortgage Trust 2007-1 offering.

338. The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchase of the Luminent Mortgage Trust 2007-1 certificates against WaMu Capital, as the underwriter, and against JPM Chase Bank, as its successor-in-interest.

339. At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

340. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

341. WesCorp purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

342. At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

343. WaMu Capital's conduct as alleged above violated Section 11.

344. WesCorp and Plaintiff sustained damages as a result of WaMu Capital's violations of Section 11.

345.     JPM Chase Bank is the successor-in-interest to WaMu Capital.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and against JPM Chase Bank as its successor-in-interest, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**COUNT THREE**
**Section 11 of the Securities Act of 1933**
**(Luminent Mortgage Trust 2007-1)**

346.     The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Luminent Mortgage Trust 2007-1 offering.

347.     The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchase of the Luminent Mortgage Trust 2007-1 certificate against WaMu Capital, as the underwriter, and against JPM Chase Bank as its successor-in-interest.

348.     At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

349.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

350.     U.S. Central purchased the certificate pursuant to and traceable to a defective registration statement, as alleged above.

351.     At the time U.S. Central purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

147

352. WaMu Capital's conduct as alleged above violated Section 11.

353. U.S. Central and Plaintiff sustained damages as a result of WaMu Capital's violations of Section 11.

354. JPM Chase Bank is the successor-in-interest to WaMu Capital.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant WaMu Capital and against JPM Chase Bank as its successor-in-interest, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### COUNT FOUR
**Section 11 of the Securities Act of 1933**
**(Long Beach Mortgage Loan Trust 2006-11,**
**Long Beach Mortgage Loan Trust 2006-10,**
**Long Beach Mortgage Loan Trust 2006-9)**

355. The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Long Beach Securities, or specific to offerings other than the Long Beach Mortgage Loan Trust 2006-11, Long Beach Mortgage Loan Trust 2006-10 and Long Beach Mortgage Loan Trust 2006-9 offerings.

356. The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the Long Beach Mortgage Loan Trust 2006-11, Long Beach Mortgage Loan Trust 2006-10, and Long Beach Mortgage Loan Trust 2006-9 certificates against WaMu Capital, as the underwriter, against Long Beach Securities, as the issuer, and against JPM Chase Bank as their successor-in-interest.

357.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

358.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

359.    U.S. Central purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

360.    At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

361.    WaMu Capital's and Long Beach Securities's conduct as alleged above violated Section 11.

362.    U.S. Central and Plaintiff sustained damages as a result of Defendant WaMu Capital's and Defendant Long Beach Securities's violations of Section 11.

363.    JPM Chase Bank is the successor-in-interest to WaMu Capital and Long Beach Securities.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and Long Beach Securities, jointly and severally, and against JPM Chase Bank as their successor-in-interest, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**COUNT FIVE**
**Section 11 of the Securities Act of 1933**
**(WaMu Asset-Backed Certificates, WaMu Series 2007-HE4,**
**WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,**
**Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8)**

364. The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than WaMu Asset Acceptance, or specific to offerings other than the WaMu Asset-Backed Certificates, WaMu Series 2007-HE4, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5 and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 offerings.

365. The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to U.S. Central's purchases of the WaMu Asset-Backed Certificates, WaMu Series 2007-HE4, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, Washington Mutual Asset-Backed Certificates, WMABS Series 2006-HE5, and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 certificates against WaMu Capital, as the underwriter, against WaMu Asset Acceptance, as the issuer, and against JPM Chase Bank as their successor-in-interest.

366. At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

150

367. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

368. U.S. Central purchased the certificates pursuant to and traceable to a defective registration statement, as alleged above.

369. At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

370. Defendant WaMu Capital's and Defendant WaMu Acceptance's conduct as alleged above violated Section 11.

371. U.S. Central and Plaintiff sustained damages as a result of WaMu Capital's and WaMu Asset Acceptance's violations of Section 11.

372. JPM Chase Bank is the successor-in-interest to WaMu Capital and WaMu Asset Acceptance.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and WaMu Asset Acceptance, jointly and severally, and against JPM Chase Bank as their successor-in-interest, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT SIX
### Section 11 of the Securities Act of 1933
### (Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2)

373. The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than WaMu Asset Acceptance, or specific to offerings other than the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 offering.

151

374.     The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to Southwest's purchase of the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 certificate against WaMu Capital, as the underwriter, against Defendant WaMu Asset Acceptance, as the issuer, and against JPM Chase Bank as their successor-in-interest.

375.     At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

376.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

377.     Southwest purchased the certificate pursuant to and traceable to a defective registration statement, as alleged above.

378.     At the time Southwest purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

379.     WaMu Capital's and WaMu Acceptance's conduct as alleged above violated Section 11.

380.     Southwest and Plaintiff sustained damages as a result of WaMu Capital's and WaMu Asset Acceptance's violations of Section 11.

381.     JPM Chase Bank is the successor-in-interest to WaMu Capital and WaMu Asset Acceptance.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and WaMu Asset Acceptance, jointly and severally, and against JPM Chase Bank

as their successor-in-interest, awarding all damages, in an amount to be proven at trial, costs, and

such other relief as the Court deems appropriate and just.

**COUNT SEVEN**
**Section 12(a)(2) of the Securities Act of 1933**
**(WaMu Mortgage Pass-Through Certificates, Series 2007-OA4,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA5,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA6,**
**WaMu Mortgage Pass-Through Certificates, Series 2006-AR17,**
**WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2)**

382.    The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as

though fully set forth here, except those paragraphs specific to offerings other than the WaMu

Mortgage Pass-Through Certificates, Series 2007-OA4, WaMu Mortgage Pass-Through

Certificates, Series 2007-OA5, WaMu Mortgage Pass-Through Certificates, Series 2007-OA6,

WaMu Mortgage Pass-Through Certificates, Series 2006-AR17, WaMu Mortgage Pass-Through

Certificates, Series 2006-AR19; WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,

WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, Washington Mutual Mortgage

Pass-Through Certificates, WMALT Series 2006-AR2, Washington Mutual Mortgage Pass-

Through Certificates, WMALT Series 2006-AR3, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR4, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR5, Washington Mutual Mortgage Pass-Through

153

Certificates, WMALT Series 2006-AR6,Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR7, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR9, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-OA1, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-OA4, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-OA5 and Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-OC2 offerings.

383.    The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the

Securities Act, with respect to WesCorp's purchases of the WaMu Mortgage Pass-Through

Certificates, Series 2007-OA4, WaMu Mortgage Pass-Through Certificates, Series 2007-OA5,

WaMu Mortgage Pass-Through Certificates, Series 2007-OA6, WaMu Mortgage Pass-Through

Certificates, Series 2006-AR17, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,

WaMu Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through

Certificates, Series 2007-OA2, Washington Mutual Mortgage Pass-Through Certificates,

WMALT Series 2006-AR2, Washington Mutual Mortgage Pass-Through Certificates, WMALT

Series 2006-AR3, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series

2006-AR4, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-

AR5, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4,

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5, and

Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 certificates against WaMu Capital, as the underwriter and seller of those certificates, and against JPM Chase Bank as its successor-in-interest.

384.    Defendant WaMu Capital offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

385.    Defendant WaMu Capital offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectuses and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

386.    The prospectuses and/or prospectus supplements contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

387.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

388.    WesCorp purchased the certificates on the initial offering pursuant to the prospectuses and/or prospectus supplements.

389.    At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

390.    Defendant WaMu Capital's conduct as alleged above violated Section 12(a)(2).

391.    WesCorp and Plaintiff sustained damages as a result of WaMu Capital's violations of Section 12(a)(2).

392.     Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration WesCorp paid for the certificates, minus principal and interest received.

393.     JPM Chase Bank is the successor-in-interest to WaMu Capital.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and against JPM Chase Bank as its successor-in-interest, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

**COUNT EIGHT**
**Section 12(a)(2) of the Securities Act of 1933**
**(Long Beach Mortgage Loan Trust 2006-11,**
**Long Beach Mortgage Loan Trust 2006-9,**
**WaMu Asset-Backed Certificates, WaMu Series 2007-HE4,**
**WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,**
**Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5)**

394.     The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Long Beach Mortgage Loan Trust 2006-11, Long Beach Mortgage Loan Trust 2006-9, WaMu Asset-Backed Certificates, WaMu Series 2007-HE4, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through Certificates, Series 2007-OA2 and Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5 offerings.

395.     The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act, with respect to U.S. Central's purchases of the Long Beach Mortgage Loan Trust 2006-11, Long Beach Mortgage Loan Trust 2006-9, WaMu Asset-Backed Certificates, WaMu Series 2007-HE4, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu

Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through

Certificates, Series 2007-OA2, and Washington Mutual Asset-Backed Certificates WMABS

Series 2006-HE5 certificates against WaMu Capital, as the underwriter and seller of those

certificates, and against JPM Chase Bank as its successor-in-interest.

396.    WaMu Capital offered to sell and sold the securities to U.S. Central through one

or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other

means of electronic communication).

397.    WaMu Capital offered to sell and sold the securities, for its own financial gain, to

U.S. Central by means of the prospectuses and/or prospectus supplements, as alleged above,

and/or oral communications related to the prospectuses and/or prospectus supplements.

398.    The prospectuses and/or prospectus supplements contained untrue statements and

omitted facts that were necessary to make the statements made not misleading, as alleged above.

399.    The untrue statements and omitted facts were material because a reasonably

prudent investor deciding whether to purchase the certificates would have viewed them as

important and as substantially altering the total mix of information available, as alleged above.

400.    U.S. Central purchased the certificates on the initial offering pursuant to the

prospectuses and/or prospectus supplements.

401.    At the time U.S. Central purchased the certificates, it did not know of the untrue

statements and omissions contained in the prospectuses and/or prospectus supplements.

402.    WaMu Capital's conduct as alleged above violated Section 12(a)(2).

403.    U.S. Central and Plaintiff sustained damages as a result of WaMu Capital's

violations of Section 12(a)(2).

404.     Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration U.S. Central paid for the certificates, minus principal and interest received.

405.     JPM Chase Bank is the successor-in-interest to WaMu Capital.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and against JPM Chase Bank as its successor-in-interest, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

**COUNT NINE**
**Section 12(a)(2) of the Securities Act of 1933**
**(Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2)**

406.     The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 offering.

407.     The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act, with respect to Southwest's purchase of the Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 certificate against WaMu Capital, as the underwriter and seller of that certificate, and against JPM Chase Bank as its successor-in-interest.

408.     WaMu Capital offered to sell and sold the securities to Southwest through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes, mails, e-mail, or other means of electronic communication).

409.     WaMu Capital offered to sell and sold the securities, for its own financial gain, to Southwest by means of the prospectuses and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

410.    The prospectuses and/or prospectus supplements contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

411.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

412.    Southwest purchased the certificate on the initial offering pursuant to the prospectuses and/or prospectus supplements.

413.    At the time Southwest purchased the certificate, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

414.    WaMu Capital's conduct as alleged above violated Section 12(a)(2).

415.    Southwest and Plaintiff sustained damages as a result of WaMu Capital's violations of Section 12(a)(2).

416.    Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration Southwest paid for the certificate, minus principal and interest received.

417.    JPM Chase Bank is the successor-in-interest to WaMu Capital.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and against JPM Chase Bank as its successor-in-interest, awarding a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

## COUNT TEN
### Violation Of Section 15 Of The Securities Act Of 1933
### Against JPM Chase Bank As Successor-in-Interest To "Control Person" WaMu Bank

418.    The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here.

419.   This claim is brought pursuant to Section 15 against JPM Chase Bank, as successor-in-interest to WaMu Bank, for control-person liability with regard to the primary violations of Section 11 and Section 12(a)(2) set forth above.

420.   Non-party WaMu Bank, by virtue of its control, ownership, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of WaMu Capital and the Issuer Defendants within the meaning of Section 15.  Non-party WaMu Bank conducted and participated, directly and indirectly in the conduct of WaMu Capital and the Issuer Defendants' business affairs, and had the power and influence and exercised the same to cause WaMu Capital and the Issuer Defendants to engage in the acts described herein.

421.   JPM Chase Bank is the successor-in-interest to WaMu Bank who controlled the primary violators – WaMu Capital and the Issuer Defendants.  JPM Chase Bank is therefore jointly and severally liable under Section 15 for the primary violations asserted herein.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant JPM Chase Bank, as successor-in-interest to WaMu Bank, who was a control person of the primary violators, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

<u>COUNT ELEVEN</u>
**Violation of the California Corporate Securities Law of 1968**
**Cal. Corp. Code §§ 25401 and 25501**
**(IndyMac INDX Mortgage Loan Trust 2006-AR12,**
**Luminent Mortgage Trust 2007-1,**
**WaMu Mortgage Pass-Through Certificates, Series 2006-AR17,**
**WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA4,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA5,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA6,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR5,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR6,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR7,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR9,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA1,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2)**

422.    The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the IndyMac INDX Mortgage Loan Trust 2006-AR12, Luminent Mortgage Trust 2007-1, WaMu Mortgage Pass-Through Certificates, Series 2006-AR17, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, WaMu Mortgage Pass-Through Certificates, Series 2007-OA4, WaMu Mortgage Pass-Through Certificates, Series 2007-OA5, WaMu Mortgage Pass-Through Certificates, Series 2007-OA6, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR2, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR3, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR4, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR5, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR6, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR7, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR9, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-OA1, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-OA4, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-OA5 and Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-OC2 offerings.

423. The NCUA Board brings this cause of action pursuant to Sections 25401 and

25501 of the California Corporate Securities Law, with respect to WesCorp's purchases of the

IndyMac INDX Mortgage Loan Trust 2006-AR12, Luminent Mortgage Trust 2007-1, WaMu

Mortgage Pass-Through Certificates, Series 2006-AR17, WaMu Mortgage Pass-Through

Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,

WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, WaMu Mortgage Pass-Through

Certificates, Series 2007-OA4, WaMu Mortgage Pass-Through Certificates, Series 2007-OA5,

WaMu Mortgage Pass-Through Certificates, Series 2007-OA6, Washington Mutual Mortgage

Pass-Through Certificates, WMALT Series 2006-AR2, Washington Mutual Mortgage Pass-

Through Certificates, WMALT Series 2006-AR3, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR4, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR5, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR6, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR7, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2006-AR9, Washington Mutual Mortgage Pass-Through

Certificates, WMALT Series 2007-OA1, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA4, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OA5, and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 certificates against WaMu Capital, as the seller of those certificates, and against JPM Chase Bank as its successor-in-interest.

424.    WaMu Capital offered to sell and sold the securities to WesCorp by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

425.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

426.    At the time WesCorp purchased the certificates, it did not know of these untruths or omissions.

427.    WaMu Capital sold the certificates to WesCorp in California.

428.    WaMu Capital's sales of the certificates violated Cal. Corp. Code § 25401.

429.    WesCorp and Plaintiff sustained damages as a result of Defendant WaMu Capital's violations of Cal. Corp. Code § 25401, and WesCorp and the NCUA Board are entitled to the remedies provided by Cal. Corp. Code § 25501.

430.    JPM Chase Bank is the successor-in-interest to WaMu Capital.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and JPM Chase Bank as its successor-in-interest, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## <u>COUNT TWELVE</u>
**Violation of the California Corporate Securities Law of 1968**
**Cal. Corp. Code § 25504**
**Against JPM Chase Bank as Successor-In-Interest to "Control Person" WaMu Bank**

431.    The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here.

432.    This claim is brought pursuant to § 25504 of the California Corporate Securities Law against JPM Chase Bank, as successor-in-interest to WaMu Bank, for control-person liability with regard to the primary violations of the California Corporate Securities Laws set forth above.

433.    Non-party WaMu Bank, by virtue of its control, ownership, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of WaMu Capital and the Issuer Defendants within the meaning of § 25504.  Non-party WaMu Bank conducted and participated, directly and indirectly in the conduct of WaMu Capital and the Issuer Defendants' business affairs, and had the power and influence and exercised the same to cause WaMu Capital and the Issuer Defendants to engage in the acts described herein.

434.    JPM Chase Bank is the successor-in-interest to WaMu Bank who controlled the primary violators – WaMu Capital and the Issuer Defendants.  JPM Chase Bank is therefore jointly and severally liable under § 25504 for the primary violations asserted herein.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant JPM Chase Bank, as successor-in-interest to WaMu Bank, who was a control person of the primary violators, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**COUNT THIRTEEN**
**Violation of the Kansas Blue Sky Law**
**Kan. Stat. Ann. § 17-12a509**
**(Long Beach Mortgage Loan Trust 2006-11,**
**Long Beach Mortgage Loan Trust 2006-9,**
**WaMu Asset-Backed Certificates, WaMu Series 2007-HE4,**
**WaMu Mortgage Pass-Through Certificates, Series 2006-AR19,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA1,**
**WaMu Mortgage Pass-Through Certificates, Series 2007-OA2,**
**Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8)**

435.    The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Long Beach Mortgage Loan Trust 2006-11, Long Beach Mortgage Loan Trust 2006-9, WaMu Asset-Backed Certificates, WaMu Series 2007-HE4, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5 and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 offerings.

436.    The NCUA Board brings this cause of action pursuant to Section 17-12a509 of the Kansas Uniform Securities Act, with respect to U.S. Central's purchases of the Long Beach Mortgage Loan Trust 2006-11, Long Beach Mortgage Loan Trust 2006-9, WaMu Asset-Backed Certificates, WaMu Series 2007-HE4, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, WaMu Mortgage Pass-Through Certificates, Series 2007-OA1, WaMu Mortgage Pass-Through Certificates, Series 2007-OA2, Washington Mutual Asset-Backed Certificates WMABS Series 2006-HE5, and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR8 certificates against WaMu Capital, as the seller of those certificates, and against JPM Chase Bank as its successor-in-interest.

437.     WaMu Capital offered to sell and sold the securities to U.S. Central by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

438.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

439.     WaMu Capital sold the certificates to U.S. Central in Kansas.

440.     U.S. Central did not know of these untruths and omissions.

441.     If U.S. Central had known about these untruths and omissions, it would not have purchased the securities from WaMu Capital.

442.     WaMu Capital's sales of the certificates violated Kan. Stat. Ann. § 17-12a509(b).

443.     U.S. Central and Plaintiff sustained damages as a result of WaMu Capital's violations of Kan. Stat. Ann. § 17-12a509(b).

444.     JPM Chase Bank is the successor-in-interest to WaMu Capital.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and JPM Chase Bank as its successor-in-interest, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT FOURTEEN
### Violation of the Kansas Blue Sky Law
### Kan. Stat. Ann. § 17-12a509(g)(1)
### Against JPM Chase Bank as Successor-in-Interest to "Control Person" WaMu Bank

445.     The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here.

446.     This claim is brought pursuant to § 17-12a509(g)(1) of the Kansas Blue Sky Law against JPM Chase Bank, as successor-in-interest to WaMu Bank, for control-person liability with regard to the primary violations of the Kansas Blue Sky Law set forth above.

447.     Non-party WaMu Bank, by virtue of its control, ownership, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of WaMu Capital and the Issuer Defendants within the meaning of § 17-12a509(g)(1). Non-party WaMu Bank conducted and participated, directly and indirectly in the conduct of WaMu Capital and the Issuer Defendants' business affairs, and had the power and influence and exercised the same to cause WaMu Capital and the Issuer Defendants to engage in the acts described herein.

448.     JPM Chase Bank is the successor-in-interest to WaMu Bank who controlled the primary violators – WaMu Capital and the Issuer Defendants.  JPM Chase Bank is therefore jointly and severally liable under § 17-12a509(g)(1) for the primary violations asserted herein.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant JPM Chase Bank, as successor-in-interest to WaMu Bank, who was a control person of the primary violators, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**COUNT FIFTEEN**
**Violation of the Texas Blue Sky Law**
**Tex. Rev. Civ. Stat. Ann. art. 581, § 33**
**(WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust,**
**WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust,**
**WaMu Asset-Backed Certificates WaMu Series 2007-HE4 Trust,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1,**
**Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2)**

449.     The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than WaMu Asset-

Backed Certificates WaMu Series 2007-HE2 Trust, WaMu Asset-Backed Certificates WaMu Series 2007-HE4 Trust, WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1 and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 offerings.

450.    The NCUA Board brings this cause of action pursuant to Section 33 of the Texas Securities Act, with respect to Southwest's purchases of the WaMu Asset-Backed Certificates WaMu Series 2007-HE2 Trust, WaMu Asset-Backed Certificates WaMu Series 2007-HE4 Trust, WaMu Asset-Backed Certificates WaMu Series 2007-HE3 Trust, Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-HY1, and Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2007-OC2 certificates against WaMu Capital, as the seller of those certificates, and against JPM Chase Bank as its successor-in-interest.

451.    WaMu Capital offered to sell and sold the securities to Southwest by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

452.    The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

453.    WaMu Capital sold the certificates to Southwest in Texas.

454.    At the time Southwest purchased the certificates, it did not know of these untruths and omissions.

455.    If Southwest had known about these untruths and omissions, it would not have purchased the securities from WaMu Capital.

456.    WaMu Capital's sales of the certificates violated Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2).

457.    Southwest and Plaintiff sustained damages as a result of WaMu Capital's violations of Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2).

458.    JPM Chase Bank is the successor-in-interest to WaMu Capital.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against WaMu Capital and JPM Chase Bank as its successor-in-interest, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT SIXTEEN
### Violation of the Texas Blue Sky Law
### Tex. Rev. Civ. Stat. Ann. art. 581, § 33F
### Against JPM Chase Bank as Successor-in-Interest to "Control Person" WaMu Bank

459.    The NCUA Board realleges paragraphs 1 through 327 of this Complaint, as though fully set forth here.

460.    This claim is brought pursuant to Art. 581-33F of the Texas Blue Sky Law against JPM Chase Bank, as successor-in-interest to WaMu Bank, for control-person liability with regard to the primary violations of the Texas Blue Sky Law set forth above.

461.    Non-party WaMu Bank, by virtue of its control, ownership, directorship, and specific acts was, at the time of the wrongs alleged herein and as set forth herein, a controlling person of WaMu Capital and the Issuer Defendants within the meaning of Art. 581-33F.  Non-party WaMu Bank conducted and participated, directly and indirectly in the conduct of WaMu Capital and the Issuer Defendants' business affairs, and had the power and influence and

exercised the same to cause WaMu Capital and the Issuer Defendants to engage in the acts described herein.

462.    JPM Chase Bank is the successor-in-interest to WaMu Bank who controlled the primary violators – WaMu Capital and the Issuer Defendants.  JPM Chase Bank is therefore jointly and severally liable under Art. 581-33F for the primary violations asserted herein.

WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant JPM Chase Bank, as successor-in-interest to WaMu Bank, who was a control person of the primary violators, awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### Jury Demand and Designation of Place of Trial

Plaintiff hereby demands a trial by jury of all issues properly triable. Pursuant to Local Rule 40.2(a), Plaintiff hereby designates Kansas City, Kansas as the place of trial of this action.

Dated: January 4, 2013

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of U.S. Central Federal
Credit Union Union and of Western Corporate
Federal Credit Union


By: /s/ Norman E. Siegel
Norman E. Siegel (D. Kan. #70354)
Rachel E. Schwartz (Kan. #21782)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Tel: (816) 714-7100
Fax: (816) 714-7101
siegel@stuevesiegel.com
schwartz@stuevesiegel.com

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751


Stephen M. Tillery
Douglas R. Sprong
Peter H. Rachman
Robert L. King
Diane E. Moore
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525

Mark C. Hansen
David C. Frederick
Wan J. Kim
Gregory G. Rapawy
KELLOGG, HUBER, HANSEN, TODD,
EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999

*Attorneys for the National Credit Union
Administration Board*


Of Counsel:
Michael J. McKenna, General Counsel
John K. Ianno, Associate General Counsel
NATIONAL CREDIT UNION
ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314